UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO, EASTERN DIVISION

HERMAN PRICE, *et al.*,                )
                                        )
                    Plaintiffs,         )        Case No. 1:09-cv-0118
                                        )
            v.                          )        Judge Christopher Boyko
                                        )        Magistrate Judge McHargh
LEE LUCAS, *et al.*                     )
                                        )
                    Defendants.         )        JURY TRIAL DEMANDED

**PLAINTIFFS' RESPONSE TO DEFENDANT LEE LUCAS'
12(b)(6) MOTION TO DISMISS COMPLAINT**

Jon Loevy
Mark Loevy-Reyes
Debra Loevy-Reyes
LOEVY & LOEVY
312 North May, Suite 100
Chicago, IL 60607
(312) 243-5900

Attorneys for Plaintiffs

## Table of Contents

Statement of the Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Summary of the Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

I.    Lucas is Not Entitled to Relief Under Rule 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . 16

    A.    The Standard for 12(b)(6) Motions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    B.    Accepting the Allegations in the Complaint as True and
       Construing Them in Plaintiffs' Favor, the Allegations Properly
       State a Claim for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

II.   The Applicable Legal Standards, Should this Motion Be Considered One for
    Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    A.    The Standard for Adjudicating Summary Judgment . . . . . . . . . . . . . . . . 18

    B.    The Standard for Assessing Qualified Immunity . . . . . . . . . . . . . . . . . . . 19

    C.    Assessing Claims of Qualified Immunity in the Context
       of Probable Cause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    D.    Assessing Qualified Immunity in Terms of Burying
       Exculpatory Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

III.  Lucas is Not Entitled to Summary Judgment Because the Available
    Evidence Creates a Dispute of Fact About Whether Lucas Can Invoke
    Qualified Immunity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    A.    Summary Judgement Fails With Regards to Unlawful Arrest and/or
       Malicious Prosecution Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

        1.    There is a Dispute of Fact About Whether Lucas Intentionally Lied to
          the Grand Jury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

        2.    The "Evidence" Lucas Relies on in Support of Probable Cause
          for the Warrant is All Unsubstantiated and/or Belied by
          Plaintiffs' Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

B.     Lucas is not Entitled to Summary Judgment on the
Remaining Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Ahlers v. Schebil*, 188 F.3d 365 (6th Cir.1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242(1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Benzon v. Morgan Stanley Distrib., Inc.*, 420 F.3d 598 (6th Cir. 2005) . . . . . . . . . . . . . . . . . 16

*California v. Trombetta*, 467 U.S. 479 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Crawford-El v. Britton*, 523 U.S. 574 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Ex Parte United States*, 287 U.S. 241 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Franks v. Delaware*, 438 U.S. 154 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Gregory v. City of Louisville*, 444 F.3d 725 (6th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Hardesty v. Hamburg Twp.*, 461 F.3d 646 (6th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . 19, 21, 29

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

*Higgason v. Stephens*, 288 F.3d 868 (6th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Hill v. McIntyre*, 884 F.2d 271 (6th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*InterRoyal Corp. v. Sponseller*, 889 F.2d 108 (6th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . 26-27

*Johnson v. Hayden*, 67 Fed. Appx. 319(6th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Kain v. Nesbitt*, 156 F.3d 669 (6th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Kinkus v. Village of Yorkville, Ohio*, 289 Fed. Appx. 86 (6th Cir. 2008) . . . . . . . . . . . . . . . . 18

*Lanman v. Hinson*, 529 F.3d 673 (6th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Malley v. Briggs*, 475 U.S. 335 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) . . . . . . . . . . . . . . . . 19

*Mitchell v. Forsyth*, 472 U.S. 511 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Moldowan v. City of Warren*, 578 F.3d 351 (6th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539(6th Cir. 2008) . . . . . . . . . . . . . . . . . . 18, 19

*Napue v. Illinois*, 360 U.S. 264 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Radvansky v. City of Olmsted Falls*, 395 F.3d 291 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . 20

*Spurlock v. Satterfield*, 167 F.3d 995 (6th Cir.1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Bagely*, 473 U.S. 667 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Yancey v. Carroll County*, 876 F.2d 1238(6th Cir.1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Fed. R. Civ. P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## Statement of the Issues

This case comes before the Court on defendant Lucas' pre-discovery Rule 12(b)(6) motion to dismiss.  In the motion, Lucas does not dispute that crediting the allegations in the complaint, plaintiffs state claims upon which relief can be granted.  Instead, Lucas argues that certain facts he delineates in his motion establish that he had sufficient probable cause at the relevant time period, so he is entitled to qualified immunity for any allegations relating to a wrongful arrest or search.  Lucas does not address the remaining allegations in the complaint directly, except to suggest that those claims are no longer viable after his criminal trial.

## Summary of the Argument

Lucas does not contest as a legal matter, that if the allegations in plaintiffs' complaint are credited, the complaint states claims upon which relief can be granted, so Lucas is not entitled to dismissal under Rule 12(b)(6).  Despite filing this motion under Rule 12(b)(6), defendant's motion is in substance a pre-mature summary judgment motion, without the evidence.  It fails as either type of motion.  Lucas argues that the "facts" require dismissal, but then he fails to support the bulk of his so-called facts with any actual evidence.  As set forth below, there are abundant facts establishing that Lucas is not entitled to qualified immunity for his egregious violations of Herman Price's clearly established constitutional rights, and that dispute of facts precludes summary judgment.

The evidence from defendant Lucas' criminal trial creates an unmistakable dispute of fact about whether Lucas was aware that his purported confidential informant, Jerrell Bray, was intentionally framing innocent people and whether Lucas played a pivotal role in the frame-up conspiracy by overlooking blatantly obvious frame-ups, altering DEA reports and transcripts to

1

enable the frame-ups to succeed, testifying falsely, failing to include exonerating information in his reports, failing to pass on exonerating information to the prosecutors, and sitting silently at the prosecution's table during the frame-up victims' criminal trials, with the knowledge that other witnesses were testifying falsely. There is powerful evidence showing that Lucas worked very hard to keep prosecutors and counsel for the accused unaware of the proof of the frame-ups and unaware that Bray was stealing from the DEA, cheating, and dealing his own drugs while framing innocents. The evidence also establishes that the probable cause Lucas purports to rely on is premised on his own false testimony and manufactured evidence.

Lucas is not entitled to qualified immunity for violating Price's clearly established constitutional rights in that manner nor for the countless *Brady* violations he perpetrated, and summary dismissal and/or judgment must therefore be denied.

## Factual Background

Plaintiff Herman Price (formerly known as Ronald Davis) was wrongfully arrested, indicted, and incarcerated on charges that have since proven to be pure fabrication. Confidential informant Jerrell Bray framed Price (then known as Davis) by selling his own drugs and falsely claiming that Davis was the seller. (App.[1] ¶ 71-74).

This frame-up occurred in the midst of a larger conspiracy in which dozens of Mansfield citizens were falsely implicated based on Bray's false testimony and defendants' doctored and fictitious evidence in support of that testimony. At prosecutors' requests, federal judges have now freed most of those who were wrongfully convicted and incarcerated in this mass frame-up,

---

[1] The evidentiary support for plaintiffs' factual allegations is set forth in the appendix to this response, hereinafter cited as "App."

2

and Bray is in custody for his role in the frame-up.

Defendant Lucas is the DEA agent who worked directly with Bray in a surveillance or undercover capacity during most of the frame-ups and who assisted in the prosecution of the conspiracy victims. (App. ¶ 2-4). Lucas' role in this conspiracy permeated every stage and provided the key support so that Bray's lies would go undetected. First of all, Lucas drafted reports about each of the deals Bray was involved with, and those reports (called DEA-6 reports) included false support for the charges and omitted exonerating evidence. (App. ¶ 11, 12, 18-20, 26, 28, 30-31, 33, 38, 41, 56, 80, 89). For instance, Bray routinely dialed the identical telephone numbers for unrelated suspects, called one suspect while claiming he had called another, and/or had a different phone encounter from the one described by Bray or detailed in Lucas' report, but Lucas never documented these subterfuges. (App. ¶ 18). Instead, Lucas actually altered the text of at least two telephone transcripts to mask inconsistencies between the calls and Bray's claims. (App. ¶ 45-47, 60-61).

Lucas worked hard to protect Bray's credibility, despite Bray's blatant cheating, stealing and lying. In furtherance of that goal, Lucas' reports neglected to note obvious discrepancies between the drug weights allegedly transferred by Bray during the deals and the actual weights, which allowed Bray to deal his own drugs or steal money from the DEA without being caught. (App. ¶ 18, 20, 72). When a defendant's proffer revealed that Bray was selling his own drugs on the side, in addition to the buying he was doing for the government, Lucas buried that impeaching fact as well. (App. ¶ 20). Lucas also buried the fact that Bray was caught stealing money from the DEA during a deal. (App. ¶ 12-13). Indeed, Lucas lied to the prosecutor on more than one occasion to cover for Bray. (App. ¶ 36, 39).

3

Additionally, during the conspiracy to frame innocent Mansfield citizens, Lucas testified falsely against conspiracy victims, suborned perjury, and failed to correct patently false testimony. For example, Lucas testified falsely and/or watched several individuals get prosecuted when it was readily apparent to him that they were wrongly accused. (App. ¶ 21, 23-25, 34-35, 42-44, 51, 56, 62, 63-66, 67-68, 75-76, 83, 87, 91-92). Lucas also sat silently at the prosecutors' table while defendant Metcalf perjured himself during Nabors' trial (a fact Metcalf now openly admits), and Lucas was aware that Metcalf's testimony was false, but he did nothing to address the perjury. (App. ¶ 32-33, 37). Likewise, although Lucas knew the testimony to be false, he repeatedly sat silently while Bray perjured himself and even backed up Bray's false testimony with false testimony of his own. (App. ¶ 39, 48-50, 81-82, 86). Lucas also knowingly drafted a false search warrant affidavit for Metcalf to sign. (App. ¶ 40).

On May 12, 2009, Lucas was indicted in an eighteen count federal indictment for violating 18 U.S.C. §§ 1503(a) (obstruction of justice), 1001(a)(3) (knowing creation of a false government document), 1623(a) (false testimony and/or creation of a material false declaration), and 242 (deprivation of rights under color of law). (App. ¶ 6). The indictment's allegations all related to Lucas' actions in conjunction with using Jerrell Bray as a duplicitous informant. (App. ¶ 6). After Lucas was indicted, he drafted a memo that he distributed to others, including some of the defendants here. (App. ¶ 10). The memo had false information about Lucas' investigations regarding who saw what and how certain deals were verified, and Lucas now admits that the memo was inaccurate. (App. ¶ 10). Lucas admits that his intention in drafting the memo was to coordinate what the witnesses would say at his trial about the investigations. (App. ¶ 10). The government failed to prove Lucas guilty beyond a reasonable doubt.

4

## Lucas' Behavior During Specific Drug Buys Establishes
## His Efforts to Help Bray Frame Innocent People

*Roosevelt Williams*

Lucas' misconduct during conspiracy victim Roosevelt Williams' frame-up is evidence of his role supporting and enabling Bray's false allegations. Williams has proven with evidence that he was in Chicago when the deal he was accused of participating in happened in Ohio. (App. ¶ 21). Detective Wheeler was very familiar with Williams from well before this deal, having encountered Williams countless times, having followed his doings for five to six months, and having spent hours watching him during surveillance. (App. ¶ 22). According to Wheeler, who was conducting surveillance with Lucas during the deal, even though Roosevelt Williams is tall, thin, and light-skinned with freckles, the person Lucas identified as Williams was short, dark-skinned, and stocky. (App. ¶ 23).

Immediately after the drug deal, detective Wheeler informed Lucas that the suspect Lucas identified as Williams was misidentified. (App. ¶ 24). Ignoring this informed opinion, Lucas insisted that the identification was correct, and Lucas' report of the buy omitted Wheeler's credible claim that the suspect was not Williams. (App. ¶ 25-26). In order to support Bray's frame-up of Williams, Wheeler's findings were not documented by Lucas, and Wheeler's claim of misidentification was, therefore, never revealed to the defense. (App. 26-27).

In actuality, Robert Harris acted as a "stand-in," impersonating Roosevelt Williams. (App. ¶ 28). Harris also acted as a stand-in during Johnny Robertson's fake drug deal, wearing the same shirt during both deals. (App. ¶ 28). The exonerating fact that the same man wearing the same shirt was identified as both Williams and Robertson was never noted or documented by

Lucas in his reports nor disclosed during either's prosecution. (App. ¶ 28).

As if Harris' unlawful impersonation was not obvious enough, during the supposed Williams deal, Lucas saw the drug dealer alleged to be Williams actually arrive in Bray's car – the same car that Lucas previously saw Bray use during the alleged Nabors drug deal. (App. ¶ 29). In fact, during the so-called Williams deal, defendant Ansari ran the license plate of the car driven by the dealer and confirmed that the car was Bray's. (App. ¶ 30). To hide this startling fact, a second DEA-6 report was generated, falsely identifying the make of car driven by the fake drug-dealer. (App. ¶ 30). On information and belief, only the second DEA-6 report was tendered to Williams' attorneys.

Additionally, Lucas saw and commented on the fact that the seller not only drove Bray's car, but he drove it back to Bray's house after the purported drug deal. (App. ¶ 31). That important observation was also omitted from Lucas' DEA-6 report. (App. ¶ 31).

*Dwayne Nabors*

Lucas' false testimony in support of the frame-up conspiracy was unmistakable in the fabricated case against Dwayne Nabors. Defendant Chuck Metcalf now admits that he blatantly lied during Dwayne Nabors' criminal trial. (App. ¶ 32). Metcalf's fictitious testimony included his false identification of Dwayne Nabors as a participant during the drug deal at issue. (App. ¶ 32). Metcalf now admits that in actuality, during the fake Nabors deal, Metcalf saw Nabors go into Platinum Status (where Nabors worked), and Nabors was not outside in the car dealing drugs, as Metcalf and Lucas falsely testified. (App. ¶ 32). When questioned about why he testified falsely against Nabors, Metcalf answered, "Because I really thought this is what everybody else was going to testify to. This is what was on paper. . . . Because it had to make

6

sense." (App. ¶ 33). Metcalf explained that he perjured himself "because I regurgitated what [came] off the DEA-6 report." (App. ¶ 33). The DEA-6 report, of course, was full of the false statements that typified Lucas' reports in the Mansfield cases.

Although there is "a vast difference" in the physical appearances of Nabors and the person who admitted to driving the car, Lucas falsely identified Nabors as the driver of the car. (App. ¶ 34-35). In support of their false identification, defendants Lucas and Metcalf lied to the prosecutor Blas Serrano, telling him that there was no video capturing this deal when there was in fact a video taken. (App. ¶ 36). Metcalf then falsely testified that there was no video tape taken of the supposed Nabors deal, and although Lucas sat at the prosecutors' table during this false testimony, he did not alert the prosecutor to Metcalf's lie. (App. ¶ 37).

Lucas' express efforts to falsely bolster Bray's credibility were also readily apparent in the alleged Nabors deal. During that deal, Bray flagrantly stole thousands of dollars from the DEA, an exculpatory fact that goes directly to Bray's credibility, but that Lucas never documented or revealed to any of the conspiracy victims during their prosecutions. (App. ¶ 38). During Nabors' trial, Bray tried to cover up the fact that he was paid for the drugs in part with a Cutlass that he kept for himself (leading to the DEA's shortfall) by falsely testifying that the recorded discussion about a "Cutty" was actually a discussion about Nabors' "Caddy" (Cadillac). (App. ¶ 39). When a prosecutor angrily confronted Bray about his obviously false explanation, Lucas stepped up to cover up Bray's false explanation by telling the prosecutor that "Cutty" was another word for "dope." (*Id.*). Lucas never told anyone that he was lying about that.

*Lowesco Ballard*

Lucas' role in the frame-up conspiracy is also demonstrated by the evidence arising from

7

the Ballard case.  Lucas saw the same stand-in, Darren Transou, impersonate both Noel Mott and Lowesco Ballard in two separate drug deals.  (App. ¶ 42).  The obviousness of this ruse was augmented by the fact that Transou looked nothing at all like Ballard, who Lucas saw during the prosecution.  (App. ¶ 4, 43).  Lucas testified that he looked at a picture of Darren Transou to rule him out before (falsely) identifying Ballard.  (App. ¶ 44).  But, defendant Cross did not actually order the identification picture of Transou for the DEA file until more than a year after Lucas' false identification, so Lucas' testimony was pure fiction.  (App. ¶ 44).   Lucas' testimony is laughable regardless because Transou admits that he was in fact used as a stand-in for Ballard.

Additionally, during a recorded telephone conversation, Transou referred to Lowesco Ballard in the third person, even though it was supposed to be a call with Ballard.  (App. ¶ 45).  In the written transcript of that call, Lucas falsely changed the identity of the speaker from Ballard to Davis (Price) to mask the obvious inconsistency.  (App. ¶ 46).  In the new telephone transcript, Lucas also inserted ellipses to eliminate the reference to "Westco," altogether, even though the portion eliminated could be clearly heard.  (App. ¶ 47).  During Bray's cross-examination at Ballard's criminal trial, even though this phone call was to the same phone number Bray had used for the earlier purported Ballard calls, to a person who sounded just like the person who was supposedly Ballard in the earlier calls, but to a person who spoke of Ballard in the third person, Bray claimed that the call was actually to Ron Davis.  (App. ¶ 48).  Lucas backed Bray's lies with his own false testimony that the call where the recipient referred to "Westco" in the third person was actually to Davis.  (App. ¶ 48).  Obviously, if the call was with Davis, that call would have needed to be disclosed to Davis' defense, but it was not.  (App. ¶ 50).

*Joshawa Webb*

8

Lucas conducted a drug deal in the close quarters of a car with Jeremiah Conrad, the stand-in used to impersonate Joshawa Webb. (App. ¶ 51). Although Joshawa Webb was prosecuted for the purported crime committed by Conrad, Lucas did not tell anyone during the arrest or prosecution of Webb that the man Lucas purportedly bought drugs from in the car was not the same man as the one being prosecuted for the crime. (App. ¶ 51). DEA agent Cross has now admitted that the Webb deal did not abide by DEA procedures. (App. ¶ 52).

*Danny Lee Brown*

In an effort to frame Danny Brown, Bray made two recorded telephone calls to Brown, but Bray was unable to set up a drug deal during those two calls – in the first Bray left a message and in the second, Brown asked Bray to call him back in twenty minutes. (App. ¶ 53). Phone records show that Bray then tried to call Brown 28 times, but that Brown did not take Bray's calls. (App. ¶ 54). When Brown would not speak to Bray, Bray told the officers that Brown's telephone number was changed to a number that was actually registered to Robert Harris, another target of the investigation. (App. ¶ 55). This fact was not documented, and the two later calls that the DEA-6 report attributed to Brown were instead recognizable as being to Robert Harris. (App. ¶ 56).

During the resulting the drug deal, falsely attributed to Danny Brown, Frank Douglas was the courier who delivered the drugs. (App. ¶ 57). The deal took place close to the home of Chris Jordan, Bray's friend and fellow drug dealer whom Bray worked to keep free of allegations in the Mansfield roundup. (App. ¶ 57-58). Bray's body recording during the deal recorded Bray saying at the end of the buy, "That's cool, that's cool. Here, give that to Chris," which would alert a listener that the money was going to Chris, not Danny Brown. (App. ¶ 60). Because Bray's slip

9

undermined his contention that Danny Brown, not Chris Jordan, was the person behind the drug deal, the copy of the transcript of the body wire prepared by defendants for Danny Brown's trial omitted the statement, "give that to Chris." (App. ¶ 61).

Lucas also gave false testimony during the criminal trial against Brown to bolster Bray's testimony.  At his own criminal trial, Lucas testified that during the alleged Danny Brown deal, it was raining so hard that Lucas could not see the person who delivered the drugs. (App. ¶ 62). But at Danny Brown's criminal trial, Lucas testified that he identified the courier as Frank Douglas. (App. ¶ 62).

*Joe Ward*

In order to frame Joe Ward, Bray had his girlfriend bring drugs to him outside the house, so that Bray could go inside, pretend to make a purchase, and come back out with drugs that he could pretend to have purchased. (App. ¶ 62, 66).  The recording device that Bray wore recorded that a woman said "take it" to Bray before he went into the house. (App. ¶ 64).  Bray's girlfriend's delivery occurred in Lucas' plain view – at Ward's criminal trial, Lucas testified that he never let Bray out of his sight before the Ward deal and that he specifically watched for a drug hand-off. (App. ¶ 65).  Although Bray now admits that there was a hand-off, and the recording device actually captured the hand-off, Lucas falsely testified at Ward's criminal trial that it never happened. (App. ¶ 64-65).

*Noel Mott*

The Mott deal is further evidence Lucas' efforts to hide Bray's sloppy frame-ups from plaintiff and Lucas' other victims.  For instance, Lucas ignored that Bray did not turn on his recording device until after the alleged Noel Mott deal was completed. (App. ¶ 67).  Also, Lucas

10

was present when Bray used the same stand-in, Darren Transou, to impersonate both Mott and

Lowesco Ballard, but did not tell anyone about that fact. (App. ¶ 68).

The Mott case also demonstrates how above the law Lucas believed himself to be.  He

admits that he ordered Ohio state troopers to steal money from Mott. (App. ¶ 69).  According to

Lucas, Mott and others were driving to Detroit to allegedly buy a large quantity of drugs.  (*Id.*).

Lucas came up with a plan to have Ohio troopers stop the car and essentially steal the money:

"Our game plan was to take the money that they were going to use to make the buy up in Detroit

before they got up to Detroit.  That way, no one would get arrested, if we just took the money and

we didn't arrest anyone, so the case could keep going. . . ." (*Id.*).  At Lucas' instruction, the

"ruse" was for the officers to find the money, "seize the money and identify who was in the

vehicles" without charging anyone with doing anything illegal.  (*Id.*).

### The deal purportedly involving Ronald Davis/Herman Price and Geneva France was a Farce

The drug deal at the heart of this case was a pure fiction, based on Bray's lies and Lucas

and the other defendants' efforts to bolster those lies.  On November 9, 2005, plaintiff Herman

Price (known then as Ronald Davis) was charged in a two count indictment with co-defendant

Geneva France. (App. ¶ 70).  The indictment alleged that on October 25, 2005, Price distributed

50 grams or more of a substance containing crack cocaine and that he did so in proximity to an

elementary school. (*Id.*).

As in the other sham deals, Bray was the confidential informant who purportedly

purchased the drugs from Price and France. (App. ¶ 71).  Bray admits under oath that neither

Price nor France was actually involved in the deal.  Instead, selling his own drugs, Bray "staged a

set-up deal" to frame the person that he thought was Ronald Davis. (App. ¶ 71-72). Bray sought to make it appear as if Davis was delivering drugs through Geneva France by staging the deal near Price's house and using Bray's friend "Shea Shea" (Karmiya Moxley) to pose as France. (App. ¶ 73). Karmiya Moxley has described how she, not France, delivered the drugs and how she did so for Bray, not Price. (App. ¶ 74). Price did not know Bray, did not authorize anyone to sell drugs to Bray on his behalf, and had no knowledge of this drug deal. (App. ¶ 88).

Lucas participated directly in this frame-up drug purchase. Moxley/"Shea Shea" got into the car with Lucas, had a conversation with him, and conducted a drug deal in the close confines of inside a car. (App. ¶ 75). Soon thereafter, Lucas arrested and prosecuted France but never identified that she was not the same person he spoke with earlier in the car, nor did Lucas ever alert plaintiff or any other conspiracy victim to this difference. (App. ¶ 75-76).

The conspirators' efforts to connect Ronald Davis (Herman Price) to the deal was pure fabrication. While defendants Lucas and Metcalf monitored Bray's recorded telephone call to set up the deal, Bray claimed that he was speaking with Davis, when the recording shows that he was actually speaking to a woman. (App. ¶ 79). In the recording, it sounds as if the woman was trying to deepen her voice to sound like a man, and she said that she would "send the girl." (App. ¶ 79). Immediately after the call, Bray told Lucas and Metcalf that the phone conversation was with Davis and said, "He [Davis] said he's sending his girl." (App. ¶ 80). Bray's false claim to the officers was recorded. (App. ¶ 81). The DEA-6 form generated, however, actually correctly identifies the phone call as one to a female recipient, but does not include that Bray lied and tried to pass the call off as one to Davis. (App. ¶ 80). In an effort to bolster Bray's false testimony at Price's criminal trial, Lucas testified that he overheard the telephone call between

12

Bray and Davis, though he now admits that this testimony was a lie.  (App. ¶ 82-83).

Given that the phone call connecting Davis to the deal was actually not a phone call with Davis, the prosecution needed some way to tie Davis to the deal.  Accordingly, immediately before the deal Bray stopped by to see the person he believed to be Davis.  (App. ¶ 84).  But in the recording of that meeting, that person never said anything about the deal, never alluded to Bray needing to meet with a person delivering drugs, and never directed Bray to a location. (App. ¶ 84).  Nevertheless, Bray falsely claimed (and later testified) that during this meeting Davis instructed Bray where to meet Davis' drug courier.  (App. ¶ 85).  Lucas had heard the recording of the meeting and knew this was false testimony, but did nothing to correct it or to alert the defense or any other victim of the conspiracy that the recordings contradicted Bray's testimony and impaired his credibility.  (App. ¶ 85-86).

To further bolster Bray's false testimony about this meeting, Lucas testified falsely at Davis' criminal trial that he saw Davis outside with a gun in his hand when he did not actually see Davis with a gun.  (App. ¶ 87).  Lucas also testified falsely about an incident during the deal in an effort to salvage Bray's credibility.  During the drug deal, there was a dispute about the weight of the drugs being delivered.  (App. ¶ 91).  Bray pretended to call Davis to resolve the matter, but in actuality did not dial anyone and merely pretended to have a conversation with Davis, in which Davis agreed to give $200 back because the drugs were short.  (*Id.*).  Bray's phone records support that no call was actually made.  (*Id.*).  Even though this was an entirely fictional conversation and there is evidence that no such call was made, Lucas testified falsely at both Geneva France's criminal trial and at his own that he was sitting close enough to Bray that he actually heard Davis say "take two back" on Bray's cell phone.  (*Id.*).

13

In a last ditch effort to tie Davis to this deal, when it was over, Bray purportedly called Davis to confirm that the deal went smoothly. (App. ¶ 93). The transcript of that telephone call, however, does not include any reference to the deal that had just happened, which supports that Davis was not involved in the deal. (*Id.*). Thus there was no evidence whatsoever tying Davis (Price) to the drug deal.

After the deal, Bray and Lucas identified France as the person who delivered the drugs, but a sham procedure was used. (App. ¶ 94). Each looked at a single picture (as opposed to a photo line-up) of an old, pre-pubescent photograph of France (who at the time of the fictitious drug deal was an adult woman) that likely had her name written across the photograph. (*Id.*). To identify France under such circumstances would be farcical if the consequences were not so dire.

After that fake drug deal, defendant Faith filed an affidavit in support of a search warrant of Price's residence. (App. ¶ 95). The affidavit's asserted basis for probable cause relied on the investigation of the fake October 25, 2005 drug deal. (*Id.*). The resulting search warrant was executed at Mr. Price's home, and that search resulted in further criminal charges against Price. (App. ¶ 96). As a result, Price pled guilty to a count of drug possession with intent to distribute. He was sentenced on May 1, 2006. (App. ¶ 97).

When the frame-up conspiracy came to light, the district court dismissed the original indictment returned against Price and France, upon the government's motion, based on the perjured testimony used to secure it. (App. ¶ 98). On January 18, 2008, the government, with leave of court, dismissed the second case against Price, based on the search that resulted from the patently false affidavit in support of search warrant. (App. ¶ 99).

In his own statement of facts, Lucas makes an extensive effort to malign Price. (Def.

14

Mem. at 8-11).  That smear campaign should be disregarded, as it is illegal to violate an individual's constitutional rights, no matter who the victim is.  Part of what made defendants' frame-up conspiracy so insidious is that many of the people they framed for false drug crimes happened to be drug dealers with criminal histories and  perceived propensities for dealing drugs.  Hand-selecting such disreputable victims gave the conspiracy better chances of succeeding because it is likely juries would credit law enforcement officers over the claims of known drug dealers.  But, importantly, the fact that Price may have admitted that he was dealing drugs does not refute that he was also framed for a drug deal he did not commit and subjected to an illegal search based on a patently false affidavit.  If Lucas wants to argue at trial that Price is entitled to recover less damages because he was a drug dealer, he certainly could do so.  Such argument, however, has no place in this 12(b)(6) motion, relating to the sufficiency of the pleadings.

Finally, Lucas' factual argument that Price's criminal background makes the frame up that occurred "exceedingly narrow" and "hyper-technical" ignores mounds of evidence.  (Def. Mem. at 10).  Price's testimony about the drug deal he was charged with was very clear – Price did not know Jerrell Bray, he did not authorize anyone to sell drugs to Bray on his behalf, and he had no knowledge of this drug deal.  (App. ¶ 88).  Bray's testimony supports Price: the person that Bray was trying to set up was not actually Price; and, more importantly, the drugs Bray bought with DEA funds were his own drugs delivered at his behest by his friend Karmiya Moxley.  (App. ¶ 71-73, 78).  This evidence presents a quintessential dispute of fact, precluding summary judgment.

15

**Argument**

I.      **Lucas is Not Entitled to Relief Under Rule 12(b)(6)**

      A.      **The Standard for 12(b)(6) Motions**

In ruling on Lucas' Rule 12(b)(6) motion, this Court "must accept all well-pleaded factual allegations of the complaint as true and construe the complaint in the light most favorable to the plaintiff." *Benzon v. Morgan Stanley Distrib., Inc.*, 420 F.3d 598, 605 (6th Cir. 2005) (internal quotation marks and citations omitted).  Dismissal of plaintiffs' complaint is proper "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Id.* (quotation marks and citations omitted).

      B.      **Accepting the Allegations in the Complaint as True and Construing Them in Plaintiffs' Favor, the Allegations Properly State a Claim for Relief**

Because for the purpose of a 12(b)(6) motion, the allegations in the complaint must be credited as true, there are abundant facts for the purposes of this motion supporting defendant Lucas' culpability for an egregious illegal frame-up of Herman Price.  Specifically, Jerrell Bray, worked with defendant Lucas and others, to "stage drug deals, fabricate evidence, and tamper with evidence for the purpose of conducting illegal searches, falsely arresting, falsely charging, maliciously prosecuting, wrongfully convicting, and falsely imprisoning innocent persons for crimes they did not commit." Complaint, Exhibit A, ¶¶ 4(g), 51.  While under Lucas' supervision, Bray "staged and taped-recorded actual and simulated drug buys using stand-in third persons who pretended or were alleged to be one or more of the designated targets for the purpose of fabricating evidence." *Id.* ¶¶ 12, 51.  This conduct was done "for the purpose of developing false evidence used to implicate" plaintiff in crimes he did not commit and was done

16

with Lucas' express consent or tacit approval. *Id.* at ¶¶ 12, 22. Defendants, including Lucas, "tampered with tape recordings made by Bray and others for the purpose of making innocent conversations regarding lawful matters appear as though they were related to narcotics." *Id.* at ¶¶ 16, 51. The defendants, including Lucas, also "made false statements in police reports and in affidavits in support of search warrants to provide corroboration for their tampered evidence." *Id.* at ¶¶ 17, 51. The defendants "destroyed, covered-up, and concealed the truth from prosecutors concerning false evidence" and failed to disclose exculpatory evidence to defense counsel, the prosecution or the court. *Id.* at ¶¶ 18, 19. Lucas suborned perjury, assisted Bray in committing perjury, and concealed the perjury from the prosecutors, defense attorneys and trial court in plaintiff's criminal proceedings. *Id.* at ¶ 28.

Lucas never actually argues that the complaint fails as a legal matter. The reason for that lapse is obvious – if Lucas did participate in a conspiracy and intentionally developed false evidence, tampered with evidence, assisted a witness in committing perjury, misled prosecutors, and buried exculpatory evidence, all in order to frame plaintiff for a crime that he did not commit, he would not be entitled to qualified immunity, and plaintiffs would have stated claims upon which relief may be granted. *See, e.g., Gregory v. City of Louisville*, 444 F.3d 725, 745 n.2 (6th Cir. 2006) (fabricating evidence violates clearly established law); *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (knowingly using false evidence violates clearly established rights); *United States v. Bagely*, 473 U.S. 667, 679 n.7 (1985) (use of perjured testimony and the deliberate suppression of favorable evidence violates established rights).

Instead, Lucas argues only that under his version of the facts, Lucas is entitled to qualified immunity because he had probable cause to search Price's residence and to support Price's arrest.

17

(Def. Mem. at 23-27).  That argument, of course, does not credit the allegations in the complaint and construe them in the light most favorable to plaintiffs, as required for a 12(b)(6) motion. Accordingly, Lucas' request for 12(b)(6) relief must be denied.  That argument also ignores all of the other allegations set forth in the complaint against Lucas – Price's false arrest and false imprisonment allegations comprise only two of the nine counts in his complaint, only a few of the eighty-two paragraphs set forth therein.  Thus, even if there were a basis for dismissal (a nonstarter given that when the allegations in the complaint are credited, the complaint states a clear basis for relief), Lucas' motion only pertains to a small fraction of the complaint.

Because it appears that Lucas is attempting to craft a summary judgment argument, claiming that under his version of the facts, he is entitled to qualified immunity, plaintiffs will respond to any attempt at summary judgment, which is equally unavailing.

## II.     The Applicable Legal Standards, Should this Motion Be Considered One for Summary Judgment

### A.     The Standard for Adjudicating Summary Judgment[2]

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 546 (6th Cir. 2008); Fed. R. Civ. P. 56(c).  The ultimate inquiry is "whether

---

[2] Of course, if this were a summary judgment motion, plaintiff would not be obligated to defend against it until after being afforded the opportunity to take discovery because the issue turns on a question of fact.  *See, e.g., Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985); *Harlow v. Fitzgerald*, 457 U.S. 800, 817-18 (1982); *Kinkus v. Village of Yorkville, Ohio*, 289 Fed. Appx. 86, 91 (6th Cir. 2008); *Kain v. Nesbitt*, 156 F.3d 669 (6th Cir. 1998); *Crawford-El v. Britton*, 523 U.S. 574, 598 (1998).  For the sake of argument, plaintiff argues against any summary judgment analysis, because even if adjudication was proper at this juncture, summary judgment should be denied.

18

the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Nance*, 527 F.3d at 547, *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). When deciding a motion for summary judgment, a court must view the evidence in favor of the non-moving party and draw all reasonable inferences in that party's favor. *Hardesty v. Hamburg Twp.*, 461 F.3d 646, 650 (6th Cir. 2006), *citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### B.  The Standard for Assessing Qualified Immunity

Government actors are shielded from liability by qualified immunity when their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In order to determine whether a defendant is entitled to qualified immunity, the Sixth Circuit usually uses a two-part test, asking: (1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated; and (2) whether that right was clearly established. *Lanman v. Hinson*, 529 F.3d 673, 683 (6th Cir. 2008) (citations omitted).

### C.  Assessing Claims of Qualified Immunity in the Context of Probable Cause

A law enforcement officer is not entitled to immunity and is liable for violating an individual's constitutional rights when the officer "deliberately or recklessly submits false and material information in a warrant affidavit." *Johnson v. Hayden*, 67 Fed. Appx. 319, 323 (6th Cir. 2003). *See also Ahlers v. Schebil*, 188 F.3d 365, 373 (6th Cir.1996) (an officer can be held liable "for requesting a warrant which allegedly led to a false arrest if he 'stated a deliberate falsehood or acted with a reckless disregard for the truth'") (citation omitted); *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989) ("An action under § 1983 does lie against an officer who

19

obtains an invalid search warrant by making, in his affidavit, material false statements either knowingly or in reckless disregard for the truth.").

The officer cannot rely on the fact that a warrant or indictment issued to establish his right to immunity when that judicial determination was based on his own deliberate subterfuge. *See Yancey v. Carroll County*, 876 F.2d 1238, 1243 (6th Cir.1989).  The question of whether the warrant would have been issued even without the defendant's knowingly or recklessly false statement is one that should be left for the jury. *Hill*, 884 F.2d at 276, *citing Yancey*.

Defendant cites *Radvansky v. City of Olmsted Falls*, 395 F.3d 291 (6th Cir. 2005), *Higgason v. Stephens*, 288 F.3d 868 (6th Cir. 2002), *Ex Parte United States*, 287 U.S. 241 (1932), and *Malley v. Briggs*, 475 U.S. 335 (1986) (Def. Mem. at 16, 20), for the general proposition that when an officer acts pursuant to a judicially secured warrant or indictment, the issue of probable cause is conclusively determined.  None of those cases, however, address the situation here, when the judicial action relies on the officer's own deceptions.  In that situation, it is clear that the officer cannot use his falsely induced judicial determination to shroud him in immunity. *Yancey*, 876 F.2d at 1243.

In a nutshell, to overcome an officer's claim of qualified immunity, a plaintiff must establish: "(1) a substantial showing that the defendant stated a deliberate falsehood or showed reckless disregard for the truth and (2) that the allegedly false or omitted information was material to the finding of probable cause." *Hill*, 884 F.2d at 275 (applying the test set forth in *Franks v. Delaware*, 438 U.S. 154 (1978), to evaluate a § 1983 claim).  Treating Lucas' argument as one for summary judgment, plaintiffs would merely need to show that crediting their evidence and drawing all reasonable inferences in their favor, there is a dispute of fact about

20

these two issues. *Hardesty*, 461 F.3d at 650.

**D.      Assessing Qualified Immunity in Terms of Burying Exculpatory Evidence**

A police officer commits "a constitutional deprivation analogous to that recognized in *Brady* by withholding or suppressing exculpatory material." *Moldowan v. City of Warren*, 578 F.3d 351, 379 (6th Cir. 2009). In other words, officers inflict "constitutional injury when they hide, conceal, destroy, withhold, or even fail to disclose material exculpatory information." *See also Id.*, *quoting California v. Trombetta*, 467 U.S. 479, 488 (1984) (a constitutional violation occurs when an officer makes a "calculated effort to circumvent the disclosure requirements established by *Brady* [ ] and its progeny."). Where exculpatory evidence is withheld or destroyed by the police, the defendant is not required to prove that the officer acted in bad faith. *Moldowan*, 578 F.3d at 382-89.

An officer is not entitled to qualified immunity for the constitutional violation resulting from a *Brady* violation because "any reasonable police officer would know that suppressing exculpatory evidence was a violation of the accused's constitutional rights." *Moldowan*, 578 F.3d at 382. In *Moldowan*, the Sixth Circuit held that the due process guarantees recognized in *Brady* were "clearly established" as of the early 1990's, when the defendant police officer in that case failed to reveal exculpatory evidence to the plaintiff who then faced criminal charges. *Id.* at 381. *See also Spurlock v. Satterfield*, 167 F.3d 995, 1005-06 (6th Cir.1999) (relying on *Brady* to conclude that plaintiff had raised claims against a police officer that implicated clearly established constitutional rights).

21

III.  **Lucas is Not Entitled to Summary Judgment Because the Available Evidence Creates a Dispute of Fact About Whether Lucas Can Invoke Qualified Immunity**

    A.  **Summary Judgement Fails With Regards to Unlawful Arrest and/or Malicious Prosecution Claims**

There is abundant evidence supporting the propositions that Lucas deliberately lied in order to support the indictment and search warrant obtained against Price and that Lucas' false information was material to the resulting findings of probable cause. If plaintiffs can establish a dispute of fact regarding those contentions, then Lucas is not entitled to summary judgment on the issue of qualified immunity. (*See* Section II(A)-(C)).

As an initial matter, there is significant general information available showing that Lucas intentionally misled the grand jury and perpetrated a fraud on the court to obtain a warrant based on a patently false affidavit. For instance, a jury could reasonably conclude that Lucas lied to the grand jury based on the numerous other instances when Lucas appeared to lie with abandon, either directly or through pregnant omissions, during the Mansfield investigations: (1) the DEA-6 reports drafted by Lucas documenting his investigations were rife with inaccuracies and patently false statements and omitted significant exonerating information (App. ¶ 11, 12, 18-20, 26, 28, 30-31, 33, 38, 41, 56, 80, 89); (2) Lucas affirmatively changed a DEA-6 report to hide exonerating information (App. ¶ 30); (3) although it was contemporaneously reported to Lucas and he had first-hand knowledge, Lucas did not document or address Bray's theft(s) from the DEA (App. ¶ 12-13); (4) Lucas was aware that a highly credible police officer believed that a person criminally charged was not the same person as the one who participated in the buy, but this fact was not documented by Lucas, remedied by Lucas, or reported to the accused's defense, and it was expressly omitted from the DEA-6 report (App. ¶ 14, 24, 26-27); (5) Bray, routinely

22

dialed the identical telephone numbers for unrelated alleged suspects, called one suspect while claiming he called another, or had a different phone encounter from the one described by Bray and/or detailed in the DEA-6 form, and Lucas never documented the obvious blunders (App. ¶ 18); (6) Lucas overlooked obvious discrepancies between the drug weights allegedly transferred by Bray during the deals and the reality, which allowed Bray to deal his own drugs or steal money from the DEA without being caught  (App. ¶ 18, 20, 72); (7) when one defendant revealed that Bray was selling his own drugs on the side, in addition to the buying he was doing for the government, Lucas DEA-6 report of defendant's statements omitted that revelation (App. ¶ 20); (8) Lucas lied to the prosecutor on more than one occasion, including one lie to cover up the fact that Bray received a car as compensation for a deal in which the DEA was shorted payment. (App. ¶ 36, 39); (9) Lucas altered telephone transcripts to mask inconsistencies between the calls and Bray's claims (App. ¶ 45-47, 60-61).

Similarly, a jury could consider Lucas' ready willingness to testify falsely, suborn perjury, and fail to correct patently false testimony in deciding this issue.  For example, Lucas sat silently at the prosecutors' table while Metcalf perjured himself during Nabors trial (a fact Metcalf now openly admits), and Lucas was aware that Metcalf's testimony was false, but did nothing to address the perjury.  (App. ¶ 32-33, 37).  Likewise, Lucas sat silently while Bray perjured himself, and Lucas knew the testimony to be false and even backed up Bray's false testimony. (App. ¶ 39, 48-50, 81-82, 86).  Lucas also drafted a false search warrant affidavit for Metcalf to swear to.  (App. ¶ 40).  Lucas himself testified falsely and watched several individuals get prosecuted when it was readily apparent that they were wrongly accused. (App. ¶ 21, 23-25, 34-35, 42-44, 51, 56, 62, 63-66, 67-68, 75-76, 83, 87, 91-92).  Finally, Lucas enlisted Ohio troopers

23

to steal money from a drug dealer.  (App. ¶ 69).

All of these facts support the inference that in the Davis/Price case, Lucas deceived the grand jury and was a party to the false statements included in the search warrant affidavit used to authorize search of plaintiffs' house.  Furthermore, the available evidence supports the conclusion that virtually everything Lucas told the grand jury and purportedly relied on for probable cause is false.

1.    <strong>There is a Dispute of Fact About Whether Lucas Intentionally Lied to the Grand Jury</strong>

Almost every substantive statement Lucas made to the grand jury in this case was knowingly false.  First, Lucas testified, "On October 25, 2005 in Mansfield, Ohio an informant made tape recorded telephone calls to Ronald Davis, setting up a purchase of two-and-a-half ounces of crack cocaine."  (Lucas Grand Jury testimony, Exhibit B at 3).  This claim was false. There was only one call attributed to Davis and purporting to set up the drug deal, and Lucas listened to a recording of that call.  (App. ¶ 79, 83).  Immediately after the call, Bray claimed he spoke with Davis, but the recording actually shows that Bray spoke to a woman trying to lower her voice to sound like a man's.  (App. ¶ 79, 81).  At the end of the call, Bray told Lucas that Davis agreed to the deal and "said he's sending his girl," but the DEA-6 form generated was forced to acknowledge (since the call was recorded) that the call recipient was female.  (App. ¶ 80).  According to the testimony, this was the only call purporting to tie Davis to the deal, but it involved a woman impersonating Davis, not Davis.  (App. ¶ 79-80).  Thus Lucas' testimony to the grand jury that Bray spoke to Davis to set up the deal is so blatantly false and contradicted by the readily available evidence that a jury could certainly find it was intentionally so.

24

Next, Lucas testified before the grand jury that Bray met with Davis, and Davis directed Bray to go to another location to meet his drug courier. (Exhibit B at 3-4). Bray now admits that the person he claimed was Davis was not actually Davis. (App. ¶ 78). Moreover, Lucas now admits that in the recording he listened to of Bray's meeting with the person purported to be Davis, the person did not acknowledge the deal at all, nor did he direct Bray to go anywhere to meet anyone. (App. ¶ 84-86). The body wire Bray wore during this exchange directly contradicts Lucas' testimony that "Ronald Davis directed us to go over to his residence, down a couple streets, 121 Glessner Avenue." (Exhibit B at 4). In the recording, Bray kept mentioning going to "meet the girl," but the person he was speaking to seems mystified by the references and just ignored them without comment or direction. (App. ¶ 85).

Next, Lucas testified before the grand jury that when he met with the person alleged to be Davis' drug courier, that woman was identified as Geneva France. (Exhibit B at 4). A jury could certainly find that Lucas was intentionally lying to the grand jury with that testimony. There is now evidence that Karmiya Moxley, not Geneva France, was in the car with Lucas delivering him drugs. (App. ¶¶ 73-74). The photograph identification procedure used to identify the drug courier as France was so contrary to proper procedures, that a jury could easily find that it was a set-up: Lucas and Bray looked at a single picture (as opposed to a photo line-up) of an long outdated, pre-pubescent photograph of France – a photograph that likely had her name written across it – in order to identify France. (App. ¶ 94). Between the falseness of the identification, the sham identification procedure, the evidence supporting that Lucas knew Bray frequently used stand-ins, and Lucas' own credibility problems, a jury could certainly find that Lucas' testimony about France was knowingly false.

Finally, Lucas testified that Bray spoke with Davis on the phone after the deal to confirm that it had gone smoothly. (Exhibit B at 4-5). Bray has now admitted that he sold his own drugs during this deal, using his friend Karmiya Moxley as the delivery person. (App. ¶ 72-74). In the transcript of that post-deal telephone call, there is no reference to the deal that Davis purportedly just conducted with Bray. (App. ¶ 93). The inculpatory substance of conversation that Lucas testified to was invented as well, and a jury could reasonably find that.

As the officer who participated directly in the drug deal, Lucas' testimony was essential to the indictment, and without it, no indictment would have issued. Because each piece of Lucas' testimony to the grand jury is susceptible to the conclusion that Lucas intentionally lied, he cannot rely on the resulting indictment to cloak himself with qualified immunity. To the contrary, his lies to the grand jury establishes plaintiff's case.

### 2. The "Evidence" Lucas Relies on in Support of Probable Cause for the Warrant is All Unsubstantiated and/or Belied by Plaintiffs' Evidence

Defendant Lucas spends pages upon pages outlining the facts he supposedly relied on in support of probable cause without any citation to evidence except for an occasional citation to his own declaration. (Def. Mem. at 23-27). All factual assertions that are not supported with a citation to evidence should be disregarded. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact.") (citation omitted); *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989) (a district court is not

required to speculate on which portion of the record an argument relies, "nor is it obligated to wade through and search the entire record for some specific facts that might support the" claim).

Moreover, the citation-less "facts" delineated in support of probable cause are all thoroughly discredited by the evidence. First, the fact that Bray identified Davis is ironic, since Bray now admits that the man arrested as Davis is not the person he thought was Davis. (App. ¶ 78). Regardless, as detailed above, the evidence supports the inference that Lucas was aware that Bray was lying, stealing, dealing his own drugs, and falsely accusing people, so Bray's identification of Davis must be considered in that context. Second, Lucas states in his own declaration that his identification of Davis was based on Bray telling him the suspect was Davis, so Lucas' identification does not independently support probable cause. (Lucas Declaration, ¶ 25). Third, detective Metcalf, captain Faith, and Lucas' identifications of Davis during surveillance merely indicate that they sighted Davis before the deal – they do not in any way actually tie Davis to the deal. Bray may well have talked to Davis before and after the deal, but because neither conversation mentioned the deal at all, those conversations support the inference that Davis was framed, not that he was a participant. (App. ¶ 84, 93).

Likewise, the fact that Davis was associated with the house where Bray allegedly met with him does nothing to establish probable cause because there was no evidence tying the person in the house to the deal. (App. ¶ 84-85, 93). Lucas argues that after the deal "Davis' 'girl'" went back to the porch of the house associated with Davis. But, Bray actually called her as she got out of the car, at the telephone number he claimed was Davis', and instructed her not to go home. (App. ¶ 90). This fact does not tie Davis to the deal.

Basically, all of the probable cause evidence Lucas lists comes down to Bray. A jury

might believe that Lucas was an innocent, duped by Bray's, but a jury could just as reasonably conclude that Lucas worked hard to cover Bray's tracks in his messy and corrupt efforts to frame innocent people or that Lucas himself was the mastermind behind the frame-up.

Lucas argues that Price was not really falsely arrested because he admits he was dealing drugs through Marcus English, and English was behind this deal, which supports a conspiracy. (Def. Mem. at 27). However, this evidence-free argument crumbles in light of Bray's testimony that the drugs sold during the deal were actually his own, not Price's or English's. (App. ¶ 72). The argument is also refuted by Price's testimony that he did not authorize any drug sale to Bray. (App. ¶ 88). Defendant's guilt-by-association ploy fails – at the end of the day, there is an unavoidable dispute of fact on the issue of probable cause precluding summary judgment.

**B.      Lucas is not Entitled to Summary Judgment on the Remaining Claims**

The complaint in this case includes a host of allegations against Lucas in addition to the two probable cause-based arguments addressed above, including very powerful claims relating to Lucas' suppression of exculpatory evidence. Lucas' only argument against all of those allegations is to contend that because the criminal indictment against him did not allege that he and the other defendants were aware of or participating in Bray's frame-up scheme, plaintiff cannot do so here. (Def. Mem. at 4-8). But the government's litigation decisions have no bearing on what the plaintiffs here can pursue, and Lucas presents no legal argument suggesting otherwise.[3] The government's concessions and theories are completely irrelevant here, where the

---

[3] Similarly, Lucas' arguments about admissions made by the government in his criminal case about what the government was not going to try to prove – beyond a reasonable doubt (which is more stringent than the preponderance of the evidence standard here) – or the government's theories about the role Marcus English played in this deal are irrelevant. (Def. Mem. at 6, 25-27).

28

plaintiffs are entitled to pursue any allegations they can support with evidence. Moreover, there are many independent claims against Lucas that are not reliant on Bray's misdeeds. Lucas presents no legal argument supporting dismissal of the additional claims against him.

The closest Lucas comes to a legal argument for the dismissal of the remaining claims is to emphasize Bray's most recent testimony that he acted alone in framing innocent people and that he lied when he said that Lucas participated in the frame-ups. (Def. Mem. at 7). Bray's testimony, however, does not eliminate the clear dispute of fact about whether Lucas gave his tacit approval to the frame-ups, lied, buried exculpatory evidence, testified falsely, suborned perjury, and manufactured evidence to conceal Bray's untruthfulness from the defense. There is abundant evidence demonstrating Lucas' involvement in furthering Bray's fabrications, and at this stage, that evidence must be credited and all reasonable inferences must be construed in plaintiffs' favor. *Hardesty*, 461 F.3d at 650. Accordingly, there is no basis for summary judgment on the remaining claims.

### Conclusion

Quite simply, Lucas' misguided motion has no factual or legal merit. On the merits, Lucas' 12(b)(6) motion must concede plaintiff's facts in his complaint. The allegations in the complaint are more than sufficient to preclude summary dismissal.

For the sake of argument and to put all of Lucas' claims to rest, plaintiffs have addressed Lucas' motion as if it were one for summary judgment, though, if the Court is inclined to consider it as one for summary judgment, it would be improper to require plaintiff to defend against it without affording him discovery. At this point, plaintiffs have not received even basic discovery disclosures and have not deposed a single witness. On June 3, 2010 (yesterday)

29

plaintiffs received approximately 20,000 pages of documents in discovery, but plaintiffs have

obviously not yet had an opportunity to sift through all those documents. Presumably, there are

even more due process violations to unearth, once the documents are reviewed and discovery is

permitted to begin. Nevertheless, based on the available evidence, plaintiffs have demonstrated a

clear dispute of fact supporting all of their allegations against Lucas. Plaintiffs ask that

defendant's motion be denied so that discovery may finally begin.

RESPECTFULLY SUBMITTED,


/s/ Mark Loevy-Reyes
Attorneys for Plaintiff

Jon Loevy
Mark Loevy-Reyes
Debra Loevy-Reyes
LOEVY & LOEVY
312 North May, Suite 100
Chicago, IL 60607
(312) 243-5900


## CERTIFICATE OF SERVICE

I hereby certify that on June 11, 2010, I filed electronically a copy of the foregoing
Plaintiffs' Response to Defendant Lee Lucas' 12(b)(6) Motion to Dismiss Complaint. Notice of
this filing will be sent by operation of the Court's electronic filing system to all parties indicated
on the electronic filing receipt. Any other parties will be served by regular U.S. mail. Parties
may access this filing through the Court's system.

s/ Mark Loevy-Reyes
Debra Loevy-Reyes
LOEVY & LOEVY
312 North May Street, Suite 100
Chicago, IL 60607
Ph. – 312-243-5900
Fx. – 312-243-5902
loevy@loevylaw.com

30