IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

HERMAN PRICE,                                )
                                             )
                    Plaintiff,               )        Case No. 1:09-CV-00118
                                             )
          v.                                 )
                                             )        JUDGE BOYKO
LEE LUCAS, *et al.*,                         )
                                             )
                    Defendants.              )        JURY TRIAL DEMANDED


**PLAINTIFF HERMAN PRICE'S CONSOLIDATED RESPONSE TO
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
<u>BASED UPON QUALIFIED IMMUNITY</u>**


Jon Loevy
Debra Loevy-Reyes
LOEVY & LOEVY
312 North May, Suite 100
Chicago, IL 60607
(312) 243-5900
Attorneys for Plaintiff

**Table of Contents**

Table of Authorities ........................................................................................... iv

Statement of the Issues...................................................................................... 1

Summary of the Argument.................................................................................. 2

Factual Background .......................................................................................... 3

        A.     The RCSO Drug Investigation in Mansfield (January – August 2005) Was Characterized By Improper Handling of Informant Bray and Compromised Evidence ................................................................. 4

        B.     The Joint DEA-RCSO Mansfield Investigation (August-November 2005) Covered Up Informant Bray's Obvious Lying, Stealing and Framing of Targets................................................................................. 7

        C.     Special Agent Lucas Joined The Mansfield Investigation With A History of Questionable Investigation Methods ................................... 11

        D.     The Investigation of Plaintiff Herman Price .............................. 14

Argument ....................................................................................................... 24

    I.     The Relevant Legal Standards for Adjudicating Summary Judgment on the Basis of Qualified Immunity ........................................................... 24

        A.     The Standard for Adjudicating Summary Judgment ................................ 24

        B.     The Standard For Assessing Qualified Immunity..................................... 25

    II.    Defendants Are Not Entitled to Summary Judgment on Plaintiff's Fourth Amendment Malicious Prosecution Claim .......................................... 25

        A.     The Legal Standard to Adjudicate Malicious Prosecution ...................... 26

        B.     The Available Evidence Creates a Dispute of Fact About Whether Defendants Are Liable For Malicious Prosecution.................................. 26

        C.     For All Of The Reasons Set Forth In Prior Sections, Defendants Are Not Entitled To Summary Judgment Based Upon A Qualified Immunity Defense ............................................................................... 41

    III.   Defendants Are Not Entitled to Summary Judgment Based on Plaintiff's Fourth Amendment Fabrication of Evidence Claim....................................... 42

        A.     The Legal Standard to Adjudicate Fabrication of Evidence .................... 42

ii

B.      Defendants Fabricated the Set-Up Calls of October 25, 2005 .................. 43

C.      Defendants Fabricated Evidence of a Controlled Drug Purchase From Plaintiff in the DEA-6 Report of October 25, 2005 .................................. 43

D.      Defendants Fabricated Evidence Leading to the Wrongful Search of Plaintiff's Residence Without Probable Cause .......................................... 45

E.      There Is a Reasonable Likelihood that the False Evidence Affected the Grand Jury and Magistrate's Finding of Probable Cause ......................... 45

IV.      Defendants Are Not Entitled to Summary Judgment Based on Plaintiff's Fourth Amendment False Arrest and False Imprisonment Claim .................................... 47

A.      The Legal Standard to Adjudicate False Arrest/ Imprisonment ............... 47

B.      The Available Evidence Creates a Dispute of Fact About Whether Defendants Are Liable For False Arrest/ False Imprisonment ................. 47

V.      Defendants Are Not Entitled to Summary Judgment on Plaintiff's Fifth Amendment *Brady* Claim ...................................................................................... 48

A.      The Legal Standard to Adjudicate a *Brady* Claim .................................... 48

B.      The *Ruiz* Ruling Does Not Bar Plaintiff's *Brady* Claim ........................... 49

C.      The Available Evidence Creates a Dispute of Fact About Whether Defendants Are Liable For *Brady* Violations ............................................ 52

VI.      Defendants Are Not Entitled to Summary Judgment on Plaintiff's Section 1983 Conspiracy Claim ................................................................................................. 54

A.      The Legal Standard to Adjudicate a Section 1983 Conspiracy Claim ...... 54

B.      The Available Evidence Creates a Dispute of Fact About Whether Defendants Are Liable For Conspiring To Violate His Constitutional Rights ................................................................................................................ 55

VII.      Should The Court Be Inclined Not to Find the Evidence Sufficient to Overcome Summary Judgment, Plaintiff Should Be Granted Further Discovery Before Any Dispositive Order Is Issued ................................................................................ 59

Conclusion ......................................................................................................................... 61

iii

## Table of Authorities

**Cases**                                                                                    **Page(s)**

*Ahlers v. Schebil*, 188 F.3d 365 (6th Cir. 1999) ...................................................................48

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)..........................................................25

*Barnes v. Wright*, 449 F.3d 709 (6th Cir. 2006) ............................................................27, 47

*Bazzy v. City of Dearborn*, 658 F.3d 598 (6th Cir. 2011).....................................................54

*BeVier v. Hucal*, 806 F.2d 123 (7th Cir. 1986).....................................................................48

*Brady v. Maryland*, 373 U.S. 83 (1963) ..................................................................... *passim*

*California v. Trombetta*, 467 U.S. 479 (1984)..................................................................46, 49

*Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc.,* 862 F.2d 597 (6th Cir. 1988)...........57

*Carroll v. United States*, 267 U.S. 132 (1925)......................................................................42

*Direct Sales Co. v. United States*, 319 U.S. 703 (1943) .......................................................56

*Dixon v. Donald*, 2008 WL 4148515 (6th Cir. Sept. 5, 2008)........................................25

*Fridley v. Horrighs,* 291 F.3d 867 (6th Cir. 2002) ..............................................................47

*Friedman v. Rehal*, 618 F.3d 142 (2d. Cir. 2010)................................................................52

*Garrett v. Adams*, 2010 WL 5296841 (E.D. Mich. November 5, 2010) ...............................55

*Ghandi v. Police Dept. of Detroit,* 747 F.2d 338 (6th Cir. 1984).................................57

*Gregory v. City of Louisville*, 444 F.3d 725 (6th Cir. 2006)..................................................42

*Hardesty v. Hamburg Twp*., 461 F.3d 646 (6th Cir. 2006)................................................25

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ........................................................................25

*Heck v. Humphrey*, 512 U.S. 477 (1994)..............................................................................50

*Higazy v. Templeton*, 505 F.3d 161 (2d Cir. 2007) ............................................................37

*Higgason v. Stephens*, 288 F.3d 868 (6th Cir. 2002).........................................................47

*Hill v. McIntyre*, 884 F.2d 271 (6th Cir. 1989)....................................................................28

*Hinchman v. Moore*, 312 F.3d 198 (6th Cir. 2002) ..........................................................47

*Hooks v. Hooks*, 771 F.2d 935 (6th Cir. 1985) ...............................................54, 55, 56

*In re Welding Fume Products Liability Litigation*, 2007 WL 1087605

(N.D. Ohio, April 7, 2007) .........................................................................................55

*Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988) ...................................................27

*Kuehl v. Burtis*, 173 F.3d 646 (8th Cir. 1999) ...............................................................48

*Kyles v. Whitley*, 514 U.S. 419 (1995).............................................................................48

*Lanman v. Hinson*, 529 F.3d 673 (6th Cir. 2008) ...........................................................25

*Malley v. Briggs*, 475 U.S. 335 (1986) ............................................................................27

*Manganiello v. City of New York*, 612 F.3d 149 (2d Cir. 2010).......................................36

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)......................25

*McCann v. Mangialardi*, 337 F.3d 782 (7th Cir. 2003).................................................52

*Mitchell v. Forsyth*, 472 U.S. 511 (1985) .....................................................................25

*Moldowan v. City of Warren*, 578 F.3d 351 (6th Cir. 2009) ..........................................49

*Moore v. Weber*, 2011 WL 3607037 (E.D. Mich. September 30, 2011).........................58

*Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539 (6th Cir. 2008) ....................24, 25

*Napue v. Illinois*, 360 U.S. 264 (1959) ..................................................................... 42, 46

*Newsome v. McCabe*, 260 F.3d 824 (7th Cir. 2001).......................................................42

*Painter v. Robertson*, 185 F.3d 557 (6th Cir. 1999) ................................................ *passim*

*Poliafico v. United States*, 237 F.2d 97 (6th Cir. 1956)..................................................59

*Revis v. Meldrum,* 489 F.3d 273 (6th Cir. 2007) ...........................................................54

*Ricciuti v. N.Y.C. Transit Authority*, 124 F.3d 123 (2d Cir. 1997) ................................36

*Sykes v. Anderson*, 625 F.3d 294 (6th Cir. 2010) ................................................... *passim*

*U.S. v. Higgins*, 557 F.3d 381 (6th Cir. 2009) ......................................................30, 34

*U.S. v. Murphy*, 937 F.2d 1032 (6th Cir. 1991) .....................................................56, 57

*United States v. Agurs*, 427 U.S. 97 (1976) ................................................................53

*United States v. Bagely*, 473 U.S. 667 (1985) ...........................................................42

*United States v. Braasch,* 505 F.2d 139 (7th Cir. 1974).............................................59

*United States v. Hamilton*, 684 F.2d 380 (6th Cir. 1982) ...........................................31

*United States v. Henderson*, 2010 WL 3075079 (N.D. Ohio August 4, 2010).......................12, 14

*United States v. Novaton*, 271 F.3d 968 (11th Cir. 2001)............................................12

*United States v. Ruiz*, 536 U.S. (2002) ............................................................... *passim*

*United States v. Taylor*, 2012 WL 2366243 (6th Cir. June 21, 2012). ...................13, 14

*Voyticky v. Village of Timberlake, Ohio*, 412 F.3d 669 (6th Cir. 2005)........................47

*Weberg v. Franks*, 229 F.3d 514 (6th Cir. 2000).......................................................56

*Wilson v. Russo*, 212 F.3d 781 (3d Cir. 2000) ............................................................47

*Yancey v. Carroll County*, 876 F.2d 1238 (6th Cir. 1989) ...........................................27

## Statutes and Rules

18 U.S.C. §§ 1001(a)(3)................................................................................................11

18 U.S.C. §§ 1503(a) ...................................................................................................11

18 U.S.C. §§ 1623(a) ...................................................................................................11

Fed. R. Civ. P. 56(d) ...............................................................................................24, 25

**Statement of the Issues**

Plaintiff, Herman Price, responds to Defendants' motions for summary judgment based on qualified immunity (Dkt. Nos. 121, 122, 123, 125, and 126). The following issues are raised in response to Defendants' motions for summary judgment:

(1)     Does the available evidence raise a genuine issue as to whether there was probable cause to prosecute Plaintiff?

(2)     Does the available evidence raise a genuine issue as to whether Defendants influenced or participated in the decision to prosecute Plaintiff?

(3)     Does the available evidence raise a genuine issue as to whether Defendants fabricated evidence falsely incriminating Plaintiff?

(4)     Does the available evidence raise a genuine issue as to whether Defendants violated their *Brady* obligations toward Plaintiff?

(5)     Does the available evidence raise a genuine issue as to whether Defendants conspired to violate Plaintiff's constitutional rights?

(6)     Is Plaintiff entitled to further discovery before the Court adjudicates Defendants' motions?

## Summary of the Argument

Plaintiff Herman Price was one of many targets of Operation Turnaround, a Mansfield drug investigation which resulted in dozens of wrongful convictions, all of which have now been vacated at the government's request. Defendants have each filed a motion for summary judgment asserting qualified immunity. Defendants do not deny that Price's allegations, when considered in the light most favorable to Plaintiff, are sufficient to show that they violated his clearly-established constitutional rights. Instead, Defendants simply deny that Plaintiff can demonstrate that his allegations are true and claim that they are entitled to summary judgment on the basis of his failure to meet this impermissibly heightened burden.

Defendants, however, ignore the significant evidence Plaintiff has been able to marshal – within the scope of the Court's ruling on the boundaries of qualified immunity discovery – that supports his allegations. That evidence is more than enough to show that there are significant disputes of material fact and to survive Defendants' motions for summary judgment.

Indeed, the available evidence creates an unmistakable dispute of fact about whether Defendants were aware that the investigation's confidential informant, Jerrell Bray, intentionally framed Plaintiff, whether Defendants played a material role in the constitutional violations by overlooking and burying Bray's history of obvious frame-ups, and whether Defendants in fact deliberately allowed Plaintiff's wrongful prosecution to happen by ignoring Bray's obvious subterfuge in this case and fabricating evidence to corroborate his false information.

There is powerful evidence showing that Defendants worked very hard to keep prosecutors and counsel for the accused unaware of the proof that Bray was using stand-ins to impersonate and falsely inculpate suspects and unaware that Bray was lying, stealing from the DEA, and dealing his own drugs while framing innocents. The evidence also establishes that the probable cause Defendants purport to have relied upon in this case was premised on their own

2

false testimony and doctored evidence. The evidence is so strong, in fact, that certain of the Defendants were prosecuted criminally for their misconduct in connection with Bray. Summary judgment is unavailable here.

## Factual Background

Plaintiff Herman Price was wrongfully arrested, indicted, and incarcerated for over two years on charges that have since proven to be pure fabrication. On October 25, 2005, confidential informant Jerrell Bray framed Price (then known as Davis) by selling his own drugs and falsely claiming that Price was the seller. Bray instructed Karmiya Moxley to sell the drugs he provided her to an undercover DEA agent, and then told police that she was Price's girlfriend and had delivered the drugs on Price's behalf. Bray falsely identified the girlfriend as Geneva France, a neighborhood woman who had no connection whatsoever to the drug trade. Moxley has since admitted under oath that she sold Bray's drugs during the deal.

Lucas conducted this deal in the close quarters of a car with Moxley, but when France was prosecuted for the crime, Lucas did not tell anyone during that case that the wrong woman had been arrested and prosecuted. Defendants were aware that during the same investigation, Bray stole from law enforcement, misidentified targets, and lied with abandon. With the apparent goal of securing convictions regardless of actual guilt or innocence, Defendants continued to work with Bray, covering up his deceptions and, in Plaintiff's case, fabricating evidence to corroborate Bray's unsupported version of events. Throughout his prosecution and incarceration, Price has never ceased to claim that he had no involvement in the staged buy of October 25, 2005.

A.  **The RCSO Drug Investigation in Mansfield (January – August 2005) Was Characterized By Improper Handling of Informant Bray and Compromised Evidence**

In January 2005, following the murder of Timothy Harris, which was believed to be drug-related, the Richland County Sheriff's Office ("RCSO") began an investigation into drug trafficking in Mansfield, Ohio. Tr. 1654, 3193-94.[1] The investigation was named "Operation Turnaround." Tr. 1692-93. Almost from the beginning of the operation, county sheriffs used an undercover informant, Jerrell Bray, to assist in the investigation. Tr. 3193-94. Bray had been released in April 2004 from a 14-year term of imprisonment for involuntary manslaughter. Tr. 150-151. On January 21, 2005, Bray executed a Confidential Operative Agreement with the RCSO. Ex. 2, RCSO Confidential Operative Agreement.

Between February and August 2005, Bray assisted the RCSO in setting up and completing controlled drug buys with 9 individuals who were later indicted in the case *United States v. Nabors et al.*, 1:05-CR-537. Ex. 3, Superseding Indictment, March 15, 2006, *United States v. Nabors et al.*, 1:05-CR-537. On almost every controlled drug purchase, Bray was under the direct supervision of Defendant Chuck Metcalf, a Richland County sheriff. Tr. 1740-41. Bray also worked closely with two other Richland County sheriffs: Defendant Matt Mayer, who provided surveillance and security and was in many cases in charge of filming the controlled sales on video, Tr. 1153; and Defendant Captain Larry Faith, Metcalf and Mayer's supervisor, who often monitored the "cobble phone" which transmitted live from Bray's body wire during the deals and who provided surveillance during the October 25 deal. Tr. 2899-2900.

From its inception, Operation Turnaround was characterized by improper handling of informant Bray and whitewashing of the compromised evidence Bray provided. By February

---

[1] All transcript citations labeled "Tr." refer to testimony in *United States v. Lucas*, Case No. 1:09-CR-0222, attached hereto in numerical order as Exhibit 1.

2005, Dawn Brown, a 27-year veteran police officer with METRICH, the specialized drug-enforcement branch of the RCSO, was so concerned by the way buys with Bray were being conducted that she started keeping personal notes about the buys in which he was involved. Tr. 1515, 1533. After meeting with Bray and assessing him as a potential confidential informant, METRICH decided not to use him because they understood he would be too difficult to control. Tr. 2194.

As early as March 2005, Metcalf, Mayer and Faith obtained unequivocal proof that Bray had lied about the identity of investigation target Jason Westerfield. Bray made two controlled drug buys, purportedly from Westerfield, on March 12 and March 15. At that time, Westerfield wore an unremovable GPS device which demonstrated that he was not at the scene of either buy at the relevant times and dates. Ex. 4, ProTech Monitoring, Position History for Jason Westerfield. The RCSO Defendants (Metcalf, Mayer and Faith) were aware that Westerfield could be tracked by GPS, and, in fact, Mayer noted after the March 15 buy that he would "check with the Adult Parole Authority Jason Westerfield should have some sort of GPS on him, and we will maybe confirm of [sic] his whereabouts at the time of the sale of the drugs." Ex. 4, RCSO Report dated March 15, 2005.

The RCSO Defendants did nothing to ensure the false charges against Westerfield were dropped (he was ultimately acquitted at trial on the counts arising out of these two buys). Instead, they began their course of producing false official documents to corroborate Bray's false information. Metcalf knew what Westerfield looked like from prior encounters, Tr. 1735. According to Mayer's report, Metcalf stated on March 15 that he "could see a visual on [Bray] and Jason Westerfield." Ex. 4, RCSO Report dated March 15, 2005.  Given that Westerfield was

not on the scene, either Mayer lied in his report about Metcalf confirming Westerfield's identity or Metcalf lied about observing Westerfield at the buy.

Shortly afterwards, on March 31, 2005, the Richland County sheriffs also found out that Bray was dealing his own drugs when Bray was arrested for possession of crack cocaine, a mere two months after becoming a confidential informant for the RCSO. The crack was found in a secret compartment in his car and violated his informant agreement. Bray gave Metcalf two explanations about the drugs. First, he told him that "somebody dropped it off to me, and I put it in my steering wheel and I couldn't do nothing with it because I was at work." Tr. 373. Later, Bray and his girlfriend Alexis Younger told Metcalf that the drugs belonged to Younger. Despite these conflicting stories, Metcalf intervened and the charges against Bray were dismissed. Tr. 371-74, 1738-40. Younger was never charged either. Tr. 2401-02. Faith was aware of the incident, but allowed Metcalf and Mayer to continue using Bray to set up controlled drug sales, without even heightened surveillance. Tr. 2882-83.

In late August 2005, Drug Enforcement Administration agents joined Operation Turnaround, including Defendants Lee Lucas, Robert Cross and Thomas Verhiley. Lucas became the senior investigator and assumed responsibility for supervising Bray. The RCSO presented Bray to the DEA as a reliable informant with whom they had never had any problems and did not mention Bray's arrest from five or six months earlier. Tr. 3196-97. In fact, Metcalf and Mayer told Lucas that Bray was "the best informant we've ever had." Tr. 3196-97. In August 2005, Lucas registered Bray as a paid DEA informant under the joint supervision of himself and Cross. Tr. 563, 2952-53. Between September 6 and November 9, 2005, the joint investigation conducted numerous controlled buys and searches, resulting in the indictment of 17

individuals. Ex. 3, Superseding Indictment. The investigation of every one of these individuals relied upon information provided by Bray.

**B.**     **The Joint DEA-RCSO Mansfield Investigation (August-November 2005) Covered Up Informant Bray's Obvious Lying, Stealing and Framing of Targets**

Throughout the Mansfield investigation, Bray's conduct demonstrated a manifest pattern of lies and deceit which should have led law enforcement officers to document the lapses and stop working with him or at the very least severely limit their reliance on him by implementing more stringent requirements of supervision and corroboration. Instead, Defendants covered for Bray's lying, stealing from the police and continued drug dealing; relaxed their surveillance of him; and compensated for weaknesses in their investigation by fabricating evidence supporting Bray's false testimony.

At prosecutors' requests, federal judges have now freed all of those who were wrongfully convicted and incarcerated during this improper investigation, and Bray is in custody for his role.

The following examples demonstrate the glaring obviousness of Bray's duplicity and Defendants' efforts to cover up and collude in his lies. At the very least, these incidents show that by the time Price's investigation began, each Defendant was aware that Bray was feeding law enforcement false information and had stolen government funds. None of this crucial exculpatory evidence was ever documented in the investigation files or disclosed to defense counsel during the prosecution of Plaintiff.

Defendants knew that Bray used "stand-ins" for targets from his first transactions with the DEA. On September 6 and 9, 2005, at three days' interval, Bray used the same stand-in, Darren Transou, to impersonate two separate targets, Noel Mott and Lowestco Ballard. Tr. 170-171, 184. The obviousness of this ruse was augmented by the fact that Transou looked nothing like Ballard, whom Lucas would have seen during his prosecution. Tr. 186-87. Instead of

7

reporting the incident and dropping the informant, however, Defendants embarked upon a pattern of covering up for Bray and supporting his patently false testimony. Lucas, in particular, testified that he looked at a picture of Darren Transou to rule him out before (falsely) identifying Ballard. However, Defendant Cross did not actually order the identification picture of Transou for the DEA file until more than a year after Lucas' false identification, so Lucas' testimony was pure fiction. Tr. 688-92, 790, 3322. Lucas' testimony is laughable regardless because Bray admits that he in fact used Transou as a stand-in for Ballard. Tr. 187-93.

Very quickly, it also emerged that Bray had attempted to steal government funds from a staged deal. On September 15, 2005, Bray was given $2,400 for a controlled drug sale targeting Noel Mott. Bray actually paid $1,620 to Darren Transou, whom he had arranged to have stand in for Mott. Tr. 212-14, 387. Upon returning from the buy, Bray informed Defendants that the seller had wanted $2,500, and that Bray had given him $20 of his own money so that the deal would not "go sour" – in other words, according to Bray, the police now owed him $20.  Ex. 6, Audio Recording N05, Track #2 at 0:28-0:50. In support of this story, Bray says twice on the recording that he tried to get Mott to count the money out to 24. *Id.* at 0:34, 1:29.

Two DEA Agents, Defendant Verhiley and Jamaal Ansari, searched Bray's car following these statements, and found the extra $780 hidden behind his car radio. Tr. 210-14, 3062-68. Bray tried to act as if he had intended to return the money all along, and said, "That's the rest of ya'll money right there." Ex. 5, Audio Recording N05, Track #2 at 9:05. Lucas, Faith and Cross were present when Bray's vehicle was searched. Tr. 2939. Lucas' report did not disclose the theft, and instead reported: "The CS returned the remaining $780.00 OGF to S/A Lucas. The CS and his/her vehicle were again searched with negative results for any drugs or money." Tr. 3069; Ex. 7, DEA-6 Report dated September 15, 2005, para. 9.

8

Bray testified at Lucas's trial that when the Defendants found the money hidden in his car, he thought that "it was over." Tr. 215. When the Defendants instead continued working with him as before, he was "kind of amazed." *Id*. The Defendants' decision to cover up for him emboldened him to continue lying to the police. As he stated, the incident "[k]ind of made me feel like I could get away with just about anything." *Id*. Both Blas Serrano, the Assistant U.S. Attorney who prosecuted the Mansfield cases, and John Ferster, Lucas's supervisor at the DEA, testified that had they been informed of this incident, they would have stopped the Bray investigation. Tr. 2636-37, 1265-67. Ferster was informed of the incident almost two years later by Verhiley. When he confronted Lucas about the attempted theft, Lucas lied and attempted to cover for Bray. Later, Lucas asked Ferster not to report the incident. Tr. 1265-67.

The Defendants' acquiescence to Bray's obvious deceptions encouraged Bray to use stand-ins systematically on almost every subsequent controlled buy. On September 20, 2005, the Defendants and Bray set up a controlled drug sale targeting Dwayne Nabors. Bray used Albert Lee as a stand-in for Nabors. Tr. 220-21. When Bray was asked at Lucas's trial if he had any "concerns [that] if any of your surveillance people were to see you meeting Albert Lee instead of Dwayne Nabors, that you would get caught," Bray answered no, "because [he] had got away with it a few times." Tr. 242.

During the purported drug deal with Nabors, Bray again stole thousands of dollars from the DEA. Bray tried to hide the fact that he was paid for the drugs in part with an Oldsmobile Cutlass that he kept for himself (leading to the DEA's shortfall) by falsely testifying that the recorded discussion about a "Cutty" was actually a discussion about Nabors' "Caddy" (Cadillac). Tr. 236, 240-41. When a prosecutor confronted Bray about his obviously false explanation,

Lucas stepped up to cover Bray's false explanation by telling the prosecutor, falsely, that "Cutty" was just another word for "dope." Tr. 242-43.

Defendant Metcalf now admits that he blatantly lied during Nabors' criminal trial. Tr. 1721-29. His fictitious testimony included his false identification of Nabors as a participant in the deal. Tr. 1722. When questioned about why he testified falsely, Metcalf answered, "because I regurgitated what [came] off the DEA-6 report...Because I really thought this is what everybody else was going to testify to. This is what was on paper...it had to make sense." Tr. 1722, 1724, 1727.

Defendants' insistence on turning a blind eye to the obvious fact that Bray was unreliable became more marked as the investigation progressed. On October 5, 2005, Bray purportedly bought drugs from Roosevelt Williams. One of the surveillance officers, Detective Wheeler, was familiar with Williams from prior investigations, and knew him to be tall, thin and light skinned with freckles. Tr. 2086, 2112, 2091. The person Bray identified as Williams was short, dark skinned and stocky. Tr. 2091. Officer Wheeler immediately informed Lucas that the suspect had been misidentified by Bray. *Id*. Ignoring this informed opinion, Lucas insisted that the identification was correct, and Lucas' report of the buy omitted Wheeler's credible information that the suspect was not Williams. In fact, Lucas's report even omitted Wheeler's presence at the deal. Tr. 1838-39. Metcalf was aware of Wheeler's assertion that Bray had misidentified the target. Tr. 1686-87. Moreover, Defendants Lucas, Cross and Metcalf observed Williams' stand-in arrive at the deal in Bray's car and drive back to Bray's house after the alleged drug sale. Tr. 1832, 1835-36, 250-52. Lucas also omitted this information from his reports, and actively concealed it from prosecutors and Williams' criminal defense attorney.

10

On October 14, 2005, Lucas conducted a drug deal in the close quarters of a car with Jeremiah Conrad, a stand-in recruited by Bray to take the place of target Joshawa Webb despite a glaring height difference between the two men. Lucas did not tell anyone during the arrest or prosecution of Webb that the man being prosecuted was not the same man from whom he had bought drugs in the car. Tr. 268, 2220-28, 2232-33. Furthermore, Bray and his vehicle were not searched prior to the staged buy, in violation of DEA procedures, as Cross admitted. Tr. 2987. This allowed Bray, once again, to sell his own drugs to the DEA.

As a result of Lucas's actions in conjunction with using Jerrell Bray as a duplicitous informant, Lucas was indicted on May 12, 2009, in an eighteen count federal indictment for violating 18 U.S.C. §§ 1503(a) (obstruction of justice), 1001(a)(3) (knowing creation of a false government document), 1623(a) (false testimony and/or creation of a material false declaration), and 242 (deprivation of rights under color of law). The indictment's allegations all related to Lucas' actions in Operation Turnaround. Ex. 8, Indictment, May 12, 2009, *United States v. Lucas*, 1:09-CR-0222.

After Lucas was indicted, he drafted a memo that he distributed to others. Lucas admits that the memo contained false information, about Lucas' investigations regarding who saw what and how certain deals were verified, and that his intention in drafting the memo was to coordinate what the witnesses would say at his trial about the investigations. Tr. 3470-73.

**C.**     **Special Agent Lucas Joined The Mansfield Investigation With A History of Questionable Investigation Methods**

Lest there be any question about whether Agent Lucas was actually fooled by Bray's fabrications, it is noteworthy that Lucas is a controversial investigator with a history of using false informants to secure convictions. The Mansfield investigation was not the first time that he crossed the boundaries of proper law enforcement methods in order to secure convictions,

11

regardless of guilt or innocence. His career is marked by a trail of questionable investigations and arrests, which have been remarked upon by both courts and federal prosecutors.

In 2001, his misconduct caused him to be singled out for censure by the Court of Appeals for the 11th Circuit, which stated: "We find troubling Agent Lucas' apparent misrepresentations concerning the cooperation of the informants involved in this case. Although the government maintains that there was an absence of proof concerning the agent's deliberateness or recklessness in making the misrepresentations, it is unclear how Agent Lucas could have made such statements of an affirmative character for which there was no basis without having acted either deliberately or recklessly. Accordingly, we will assume that this was a deliberate or reckless misinterpretation." *United States v. Novaton*, 271 F.3d 968, 987 (11th Cir. 2001).  In 2003, in the *Gaviria-Pena* case, Judge Economus of the District Court for the Northern District of Ohio also found Lucas's investigatory evidence suspicious and circulated an opinion that included the following assessment: "These facts, coupled with SA Lucas' demeanor during the evidentiary hearing, raise significant questions regarding whether Pena made this statement, or whether SA Lucas recognized the patent deficiencies in the arrest and then remembered the statement."  Judge Economus later agreed to delete the language questioning Lucas' credibility at the government's request. *See United States v. Henderson*, 2010 WL 3075079, at *2 (N.D. Ohio August 4, 2010).

Prosecutors working for the United States Attorney's Office have also reported inappropriate conduct by Lucas. In a June 9, 2003, memorandum to Gregory White, then the U.S. Attorney for the Northern District of Ohio, Thomas Gruscinski described an incident where Lucas suggested conducting an illegal pretextual traffic stop of a family suspected of drug dealing. Gruscinski stated that, based on his experience with Lucas, he "would not use Special

Agent Lucas as a witness" because he did "not consider [Agent Lucas] credible." *See United States v. Taylor*, 2012 WL 2366243, at *32 (6th Cir. June 21, 2012).

In October /November 2004, Agent Dean Winslow of the FBI wrote a memorandum summarizing problems he had discovered with Lucas's methods while he was investigating another case of alleged DEA misconduct. Agent Winslow had found inconsistencies in reports drafted by Lucas, and Lucas's accounts of drug transactions were disputed by other witnesses. In Paragraph ZZ of the memorandum, Agent Winslow wrote that "the U.S. Attorney's Office had concerns about several investigations wherein Lucas may have lied." *Id.*

Another Assistant U.S. Attorney, Lori Hendrickson, who was prosecuting a case Lucas investigated in early 2005, determined that the search warrant for a search Agent Lucas had already executed lacked probable cause. Hendrickson later testified (at a hearing to consider the motion for retrial in *Henderson*, described *infra*) that she "did not believe that...Special Agent Lucas was being forthright with [her] regarding the evidence that had been seized at [the defendant's] residence." *Id*. at *33.

In the recent *Henderson* case, the District Court for the Northern District of Ohio and the Court of Appeals for the Sixth Circuit have had occasion to review Lucas's controversial record. In *Henderson*, three people convicted of PCP possession following an investigation led by Lucas petitioned for a retrial on the grounds that their *Brady* rights had been violated because impeachment evidence of Lucas had been withheld from them. Both the District Court and the Sixth Circuit denied the motion for lack of materiality. However, the Court of Appeals for the Sixth Circuit noted that it agreed with the District Court that "the lengths to which the government went to protect Agent Lucas —especially in light of the problems with Agent

13

Lucas's work revealed in the U.S. Attorney's Office's 2002 investigation—are troubling." *Id.* at *38; *Henderson*, 2010 WL 3075079, at *2.

**D.**     **The Investigation of Plaintiff Herman Price**

As detailed above, by the time Price's investigation began, all Defendants knew and had covered up for the fact that Bray had lied to and stolen from the police. Nevertheless, they not only ignored Bray's obvious subterfuge during the Price deal, which they could immediately detect via the transmission from Bray's body wire; they also fabricated evidence to corroborate Bray's false information, causing Price to be wrongfully indicted and incarcerated for over two years.

On November 9, 2005, Plaintiff Herman Price (a.k.a. Ronald Davis) was charged in a two count indictment with co-defendant Geneva France. The indictment alleged that on October 25, 2005, Price distributed over 50 grams of a substance containing crack cocaine in proximity to an elementary school. Ex. 9, Indictment, November 9, 2005, *United States v. Davis*, Case No. 1:05-CR-536.

Bray has now admitted under oath that Plaintiff was not actually involved in the deal of October 25, 2005. Tr. 270-71. Karmiya Moxley has also admitted that she, not France, sold drugs to the DEA at Bray's request. Tr. 2300-03.

**1.**     **The Set-Up Calls of October 25, 2005**

Bray and Plaintiff have never met. On October 25, 2005, Plaintiff had never even heard of Bray. Tr. 2505. A day or two before the staged buy, Bray met a man in a dance club in Mansfield and mistakenly thought that he was Ron Davis, as Plaintiff was then known. Tr. 269, 277-78, 448. It later emerged that the person Bray met at the club was Marcus English, a close friend and partner of Plaintiff. Bray had never conducted a drug deal with either Plaintiff or Marcus English. He never intended to go through with a real buy; he planned to make some calls

14

to the person he thought was Davis, to get him on the scene, and then to stage a buy to ensure it would involve a large amount of drugs. Tr. 270.

On October 25, 2005, between approximately 2:05 p.m. and 2:08 p.m., Bray placed three calls that purported to set up the controlled drug deal with Plaintiff. Ex. 10, Audio Recordings N19, Tracks # 1-3.[2] All three calls were recorded and monitored by Lucas, Metcalf, and Verhiley. Tr. 3356. Lucas testified that he "dialed the numbers or at least checked the number on this deal," and thus verified that the correct number was dialed. Tr. 1929-30, 3355.

Lucas falsified the content, recipients, and number of these calls in his DEA-6 Report dated October 25, 2005, in order to increase the appearance of probable cause against Plaintiff. The report states that at 2:05 and 2:08 p.m. respectively, two calls were placed to (419) 612-3269, the number provided by Bray as Davis's number. Ex. 12, Lucas DEA-6, Oct. 25, 2005. Lucas reported that in the first call, Bray and "Lil S" agreed to a sale of 2.5 ounces of crack cocaine at 121 Glessner Avenue; and that in the second call, Bray and Plaintiff agreed to a sale of some ounces of crack cocaine at a residence on Adams Street.

In reality, phone records demonstrate that, as Lucas, Metcalf and Verhiley knew, the 2:05 call went to another number, (419) 631-9518. This cell phone number is associated with Bray's girlfriend, Alexis Younger, and was being used that day by Karmiya Moxley, a friend of Alexis. Tr. 1897-98. Despite the recording clearly showing that Bray was speaking to a female, Bray sought to make it appear that he had spoken to Davis. Immediately after the call, Bray told the agents: "He [Davis] said he's sending his girl." Tr. 1883, 1888, 1924.  Lucas thought that it sounded like a woman trying to impersonate a man's voice. Tr. 3357. Though aware that Bray was not being forthright about this call, Lucas played along, responding: "OK. That's all right."

---

[2] For the Court's convenience, a transcript of all the audio recordings made during the investigation of October 2, 2005, is also attached as Exhibit 11. The author of the transcript is unknown, and Plaintiff's use of it does not amount to an acknowledgment of authenticity.

Ex. 10, Audio Recordings N19, Track 1 at 1:24; Ex. 11, Audio Transcript at 2.  Furthermore, he eliminated any reference to Bray's lie by stating in his DEA-6 report that the person Bray called was a woman, without recording Bray's attempt to pass the woman off as Ron Davis. Ex. 12, Lucas DEA-6.

Phone records confirm that the 2:08 call went to (419) 612-3269, the Plaintiff's alleged number and the number reported in the DEA-6. (This was not Plaintiff's telephone number, which Bray did not have, but Marcus English's number.)  Ex. 13, October 25, 2005 Calls for Ronald Davis/ Geneva France Buy (Charts created by Kim Thomas for Lucas's criminal trial). However, the recording shows that Bray and the alleged Davis did not mention drugs, but merely agreed to meet on Adams Street. The man on the other end of the line asks Bray to identify himself, and makes no reference to the deal and the meeting that were supposedly agreed upon 3 minutes earlier, making it obvious that he had no knowledge of the prior conversation. Ex. 10, Audio Recordings N19, Track #3; Ex. 11, Audio Transcript at 3-4.

Lucas was at counsel's table during France's trial when Bray testified falsely regarding the set-up calls. Tr. 1651. He said nothing to correct the false testimony.

## 2.  The Meeting At 187 South Adams Street

Following the purported set-up calls, Defendants left the RCSO office to conduct the controlled drug sale: Lucas and Bray in one car, Faith and Metcalf in a second car with a cobble phone which transmitted live from Bray's body wire, and Verhiley and DEA Agent Stross in a third car. The cobble phone recording includes the whole transaction as recorded by Bray's body wire, in addition to the comments made by Faith and Metcalf as they monitored the wire and conducted surveillance. Tr. 1744-45, 1878-79.

On the way to 121 Glessner Avenue, Faith and Metcalf saw a person whom they identified as Plaintiff sitting in a car at the intersection of South Main and Glessner. Tr. 2900-02.

16

Metcalf knew Davis from a single prior stop and a photograph and said as soon as he saw him: "I seen him [Davis] perfect." Tr. 1736, 1745, 1879, 2899; Ex. 14, Metcalf Responses to Plaintiff's Interrogatories, para. 10. Faith also testified that he recognized Davis from photographs he had seen. Tr. 2899-2902. However, Faith could not recall whether he had seen photographs of Ron Davis before or after the buy. Tr. 2926-28.

Faith identified the car as a silver Chevy Caprice, and Metcalf spelled out its license plate number as DOJ-6183. Tr. 1879, 2937. If the Defendants ran the license plate number to verify who it belonged to, they did not document the result in any report (the recordings provided do not indicate any effort to run the plate number). The license plate actually returned to Shakia Gordon, the girlfriend of Marcus English. Tr. 1877-78. When questioned later about a silver Caprice, Davis told Defendants that this car was used by English. Ex. 15, Proffer of Ronald Davis, DEA-6, November 17, 2005. Plaintiff's car was a silver Lincoln, registered in the name of Ronald Davis. Tr. 2515, 1876-77.

Lucas's description of this incident in his DEA-6 contains several lies. First, Lucas reported that Faith and Metcalf had seen Plaintiff in a silver Lincoln, the car that is registered to Plaintiff, rather than a Chevy Caprice. Secondly, Lucas stated that Faith and Metcalf had observed Plaintiff depart from 121 Glessner Avenue and had followed him to 187 South Adams Street, thus confirming Plaintiff's link to these two addresses. Ex. 12, Lucas DEA-6, para. 4. In reality, Faith and Metcalf could not tell where the car was coming from, and although they attempted to follow the vehicle in which they allegedly saw Plaintiff, they lost it immediately. They did not see the suspect again, and certainly did not see him meeting with Bray. Tr. 2924-26, 2936-38.

Faith also falsely stated in his search warrant affidavit that he and Metcalf followed the vehicle and saw it park on 187 South Adams Street. Ex. 16, Faith Affidavit, November 9, 2005, para. 3. Faith acknowledged at Lucas's trial that this was not true. Tr. 2929, 2937-38. What really happened is that Faith and Metcalf, knowing that there were already two police cars near the Adams Street location, parked about a quarter of a mile away. Tr. 2929-30. By falsifying their description of this incident, Lucas and Faith transformed a sighting of a few seconds to make it appear that three officers – Faith, Metcalf and Lucas – had positively identified the person Bray met at 187 South Adams Street. In reality, neither Faith nor Metcalf saw the person Bray met on South Adams.

Meanwhile, Lucas and Bray had driven to 187 South Adams and had parked outside. The person Bray thought was Plaintiff arrived shortly afterwards, got out of his car, and met Bray in front of the house. Lucas identified this person as Plaintiff based on a photograph he had seen. Tr. 3364. Lucas testified at France's trial and his own that he saw Plaintiff carrying a gun. Tr. 1929-30, 3393-94. However, after Bray exited the house and told Lucas: "this dude got a big ass gun on him." Lucas's ignorance is evident in his response: "Does he?" Ex. 10, Audio recording, Track 4 at 4:45; Ex. 11, Audio Transcript, at 8. At his trial, Lucas admitted that he only saw the alleged Davis with "something" in his hand, and he subsequently understood what it was after Bray explained that he had seen a gun. Lucas therefore claims, incredibly, to have been close enough to identity Plaintiff from a photograph, but too far away to recognize a gun, though he falsely testified twice that he actually saw a gun.

Bray and English, whom Bray thought was Plaintiff, walked into the house, and Bray remained inside for a minute. Faith and Metcalf contemporaneously heard the conversation which took place between Bray and English in the house, and Lucas and the other Defendants

18

listened to it after the fact. Bray asked English if he could sell him "an eighth" (of an ounce of drugs), to which English responded "I definitely can get it...I got your number, I'm gonna...I'll call you back with a price." Ex. 10, Audio Recordings N19, Track #4 at 2:30, 3:08; Ex. 11, Audio Transcript at 6-7. Faith and Metcalf therefore knew that Bray and the alleged target had not already agreed to a drug transaction, since they were still discussing a quantity and a price, and the supposed seller did not actually have the quantity of drugs, but would have to get it and call Bray. As Faith and Metcalf knew, the alleged target said nothing about a drug sale which was to take place in a few minutes, did not tell Bray to meet a woman delivering drugs, did not direct him to any location, and did not instruct him to return and meet with him after the sale – all things which Bray then told Lucas Plaintiff told him. Ex. 10, Audio Recordings N19, Track #4 at 4:43; Ex. 11, Audio Transcript at 8. Bray does mention twice that he is going to "pick the girl up," but these declarations are met with silence rather than instructions on where to meet her. Tr. 1891-92.

Bray falsely testified about this conversation at France's criminal trial, stating that during this meeting, Plaintiff instructed Bray where to meet his drug courier. Lucas had heard the recording of the meeting and knew this was false testimony. He sat at the prosecution table and did nothing to correct it or to alert the defense that the recordings contradicted Bray's testimony and impaired his credibility. Tr. 2651, 3407.

When Bray left the house at 187 South Adams, he made a call which was also transmitted via the cobble phone, in which he asked someone where she was, told her that she would have to "walk back," and finished with "I'm coming to get you now." Ex. 10, Audio Recordings N19, Track #4 at 4:21; Ex. 11, Audio Transcript at 8. Phone records show that this call went to Moxley. Tr. 1890-91, 1894-95. Lucas's DEA-6 report omits this call altogether, since it was

made to Bray's girlfriend's phone number and it makes it clear that it is Bray, not Plaintiff, who is organizing the meeting that is about to take place. Ex. 12, Lucas DEA-6.

Bray joined Lucas in the car and told him that the suspect had told him "we got to deal with her" and "then he want me to come right back here." Anyone who listened to the recordings would know that these statements were patently false. Ex. 10, Audio recordings N19, Track #4 at 4:43, 4:55; Ex. 11, Audio Transcript at 8. Lucas then called Metcalf and asked him if the wire confirmed that the alleged target had told Bray to meet with a woman on Glessner. Metcalf responded, falsely, "I got all that recorded." Ex. 10, Audio Recordings N19, Track #8 at 5:12, 5:37; Ex. 11, Audio Transcript at 9.

### 3. The Deal Near 121 Glessner Avenue

Lucas and Bray drove to 121 Glessner Avenue and met Moxley outside the house. Moxley got into the car, and they drove to a nearby alleyway where the drug sale took place.

During the sale, Lucas weighed the drugs and found them light. He asked Bray to call Davis and ask him to reduce the sale price in consequence. Bray fake-dialed his phone and pretended to have a conversation with Davis, in which Davis agreed to give $200 back because the drugs were short. Tr. 287-88, 2301-02. However, according to Moxley, it was obvious that Bray did not really call anyone, because "he dialed maybe even two, three numbers and made it seem like he pressed "send," and no sooner did he press "send" he started talking." Tr. 2301. Phone records support that no call was actually made. Tr. 1893-94.

Even though this was an entirely fictional conversation, Lucas testified at both France's trial and his own that he was sitting close enough to Bray that he heard Davis say "take two back" on the other end of the line on Bray's cell phone. Tr. 1947-49, 2800-01, 2804-05, 3370. Lucas also included the fake call in his DEA-6 report. Ex. 12, Lucas DEA-6.

Following the deal, according to Lucas's DEA-6, Bray called Plaintiff and Plaintiff confirmed that "he had watched everything go down" and that the deal had gone smoothly. There is no recording for his call, though Lucas avers that it was "monitored." *Id*. The phone records show that this call, too, never took place. Tr. 1894; *see also* Ex. 13.

### 4.     The Identification of France, Search of 121 Glessner Avenue, and Prosecution of Plaintiff

After the deal, Bray and Lucas identified France as the person who delivered the drugs. The identification was made by each of them looking at a single photograph (as opposed to a photo line-up) of an old, pre-pubescent photograph of France that likely had her name written across it. Tr. 1190-1192, 1196-97, 1691, 1747.  Cross was present when Lucas made his identification of France based upon this single photograph. Tr. 2970-71.

Two weeks after the fake deal, Faith drafted and signed an affidavit in support of a search warrant of Plaintiff's residence at 121 Glessner Avenue.  The affidavit's asserted basis for probable cause relied on the investigation of the October 25, 2005, drug deal. Ex. 16, Faith Affidavit. The search warrant was executed on Plaintiff's residence on November 10, 2005, and resulted in further criminal charges against Price.

During the early stages of the Mansfield prosecutions, there were frequent interactions between the Defendants and the lead prosecutor, Blas Serrano, with regard to the charges arising out of the Mansfield investigation. The investigation team met with Serrano "on numerous occasions," and "most of the time" all the Defendants were there ("the Richland County guys...Bob Cross and other officers"), as well as Bray. Tr. 3345. All Defendants also participated in numerous proffer meetings which took place between the USAO and the Mansfield investigation targets, with Cross taking a lead role during this stage of the investigation. Tr.

3348. At none of these meetings did Defendants ever inform a prosecutor of Bray's history of obvious deceptions, nor of the misrepresentations and falsehoods in their written reports.

Lucas, Cross and prosecutor Blas Serrano met with Plaintiff for a proffer meeting on November 17, 2005. At this meeting, Plaintiff denied participating in the October 25, 2005 drug sale. Neither Lucas nor Cross informed the prosecutor that the evidence tying Plaintiff to the buy depended upon the word of an unreliable informant or that it was contradicted by the audio recordings made during the transaction. Ex. 15, Proffer; Tr. 2520-21.

Moreover, Serrano relied heavily upon the reports drafted by Lucas and other Defendants in preparing the cases against Plaintiff and other targets of the Mansfield investigation. As he stated, "since this was not one of those investigations where I'm really in control or overseeing, I relied mainly on the case agent to provide me information. I received from Agent Lucas a list of the buys with the participants, the amounts. I received a memo from him. We sat down, went over things." Tr. 2627-29. In particular, Serrano noted that because he did not have time to listen to all the audio recordings, he relied on Lucas's reports, Lucas's memo, and on his conversations with Lucas to prepare the indictments. Tr. 2628-29.

Plaintiff pled guilty to a count of drug possession with intent to distribute from a second set of charges, relating to the search of his residence. He was sentenced on May 1, 2006 to 135 months. Ex. 17, Judgment, *United States v. Davis*, Case No. 1:06-CR-45.

On January 4, 2008, the government, with leave of court, dismissed the original indictment returned against Price and France, upon the government's motion, based on the perjured testimony used to secure it. On January 18, 2008, the district court dismissed the second case against Price, stating that there was no probable cause for the search of Plaintiff's residence, which had been authorized on the basis of Faith's patently false affidavit. The government added

that Plaintiff was entitled to a new trial, but that there were "insufficient facts set forth in the affidavit to support probable cause for the search of Davis' residence." Ex. 18, Government's Motion for Leave of Court to Dismiss, at 2.

In his own statement of facts, Lucas makes an extensive effort to malign Price. Lucas Motion for Summary Judgment, Dkt. # 121 at 23-24. That smear campaign should be disregarded, as it is illegal to violate an individual's constitutional rights, no matter who the person is. Part of what made Defendants' conspiracy so insidious is that many of the people they framed for false drug crimes happened to be drug dealers with criminal histories and perceived propensities for dealing drugs. Hand-selecting such disreputable victims gave the conspiracy better chances of succeeding because it is likely juries would credit law enforcement officers over the claims of known drug dealers. But, importantly, the fact that Price may have admitted that he was dealing drugs does not refute that he was also framed for a drug deal he did not commit and subjected to an illegal search based on a patently false affidavit. If Lucas wants to argue at trial that Price is entitled to recover less damages because he was a drug dealer, he certainly could do so. Such an argument, however, has no place in his motion for summary judgment based upon qualified immunity.

Finally, Lucas's factual argument that Price's criminal background makes his claim "exceedingly narrow" and "hyper-technical" ignores mounds of evidence. Lucas Motion for Summary Judgment, Dkt. # 121 at 24. Price's testimony about the drug deal he was charged with was very clear – Price did not know Bray, he did not authorize anyone to sell drugs to Bray on his behalf, and he had no knowledge of the October 25 drug deal. Tr. 2505, 2508-09, 2514. Bray's testimony supports Price: the person that Bray was trying to set up was not actually Price; and more importantly, the drugs Bray had Lucas buy with DEA funds were his own drugs

23

delivered at his behest by his friend Karmiya Moxley. Tr. 270-72, 276-78. This evidence presents a quintessential dispute of fact, precluding summary judgment.

## Argument

There is ample evidence to show that Defendants knew of Bray's repeated deceptions during the investigation. Despite this knowledge, during the Price investigation Defendants not only relaxed their mandated control procedures over Bray, they also fabricated evidence in order to corroborate Bray's false information and build a bogus case against Plaintiff. Defendant's actions thus directly caused Price, who never ceased to claim his innocence, to be wrongfully prosecuted, indicted and imprisoned. Furthermore, throughout the investigation and ensuing criminal proceedings against Plaintiff, Defendants acted in bad faith by withholding information about Bray's unreliability and their own fabrication of evidence. In light of these facts, Plaintiff's claims for malicious prosecution, fabrication of evidence, unlawful detention and *Brady* violations, all in contravention of his federal constitutional rights, should prevail on summary judgment. At the very least, the available evidence demonstrates the existence of genuine factual disputes which should be resolved by a jury following full discovery.

## I. The Relevant Legal Standards for Adjudicating Summary Judgment on the Basis of Qualified Immunity

### A. The Standard for Adjudicating Summary Judgment

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 546 (6th Cir. 2008); Fed. R. Civ. P. 56(d). The ultimate inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Nance*, 527 F.3d at

547, citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  When deciding a motion for summary judgment, a court must view the evidence in favor of the non-moving party and draw all reasonable inferences in that party's favor.  *Hardesty v. Hamburg Twp.*, 461 F.3d 646, 650 (6th Cir. 2006), citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**B.      The Standard For Assessing Qualified Immunity**

Government actors are shielded from liability by qualified immunity when their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  In order to determine whether a defendant is entitled to qualified immunity, the Sixth Circuit usually uses a two-part test, asking:  (1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated; and (2) whether that right was clearly established.  *Lanman v. Hinson*, 529 F.3d 673, 683 (6th Cir. 2008) (citations omitted).  Qualified immunity is an immunity from suit, rather than a mere defense to liability, and, as such, it is an issue that should be resolved as early as possible in the litigation.  *Dixon v. Donald*, 2008 WL 4148515, at *2 (6th Cir. Sept. 5, 2008), citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

**II.      Defendants Are Not Entitled to Summary Judgment on Plaintiff's Fourth Amendment Malicious Prosecution Claim**

There is abundant evidence supporting the proposition that Defendants deliberately lied in order to support the indictment against Price.  If Plaintiff can establish a dispute of fact regarding that contention, then Defendants are not entitled to summary judgment on the issue of good faith qualified immunity.

Contrary to Defendants' assertions, Price has never wavered from his position that he was not in any way involved in the drug deal of October 25, 2012. Bray has also admitted that

Plaintiff, whom he mistook for another, had nothing to do with the drug sale. Both France and Plaintiff have given sworn testimony that they did not know each and never had a drug relationship. Moreover, Moxley, who delivered the drugs to Lucas, has testified that she did not know Plaintiff at the time. At this stage, Price is certainly entitled to the reasonable inference that he had no involvement in the drug deal that led to his wrongful indictment.

**A.**     **The Legal Standard to Adjudicate Malicious Prosecution**

In order to successfully claim malicious prosecution, a plaintiff must show that (1) a criminal prosecution was initiated against the plaintiff and that the defendant "ma[d]e, influence[d], or participate[d] in the decision to prosecute; (2) there was no probable cause for the criminal prosecution; (3) as a consequence of the legal proceeding, the plaintiff suffered a deprivation of liberty; and (4) the criminal proceeding was resolved in the plaintiff's favor." *Sykes v. Anderson*, 625 F.3d 294, 308-309 (6th Cir. 2010).

Defendants do not dispute that Price can meet the final requirement for malicious prosecution. It is undisputed that the criminal proceedings were resolved in Plaintiff's favor when the indictment and information against him were dismissed on the government's motion in January 2008. The dispute at bar centers on the first three elements: whether there was probable cause to arrest and prosecute Plaintiff; whether the Defendants influenced or participated in the decision to prosecute him; and whether Plaintiff's incarceration for over two years was a consequence of the wrongful criminal proceeding.

**B.**     **The Available Evidence Creates a Dispute of Fact About Whether Defendants Are Liable For Malicious Prosecution**

**1.**     **A Reasonable Jury Can Conclude That There Was No Probable Cause to Arrest Plaintiff**

Defendants argue that, whatever evidence may have subsequently come to light regarding Bray's misconduct, at the time of Price's investigation they were justified in concluding that they

26

had probable cause to proceed with Price's arrest. The evidence before us contradicts that contention and provides more than enough evidence to raise a genuine dispute of fact that at the time of the investigation, Defendants were well aware of Bray's deceits and their lack of probable cause. "In § 1983 cases, the existence of probable cause usually poses a jury question." *Painter v. Robertson*, 185 F.3d 557, 570 (6th Cir. 1999). Here, too, the issue must be left for a fact-finder to decide.

First, as a matter of law, because of their own deceptions, Defendants Metcalf, Mayer and Faith are mistaken in relying upon the grand jury indictment to conclusively dispose of the issue of the existence of probable cause. *Malley v. Briggs*, 475 U.S. 335 (1986) (rejecting argument that neutral magistrate's independent determination of probable cause broke the causal chain where officer misled the magistrate and improperly requested warrants). Metcalf, Motion for Summary Judgment, Dkt. # 126, at 16; Faith & Mayer Motion for Summary Judgment, Dkt. # 122, at 6.  The rule in *Barnes v. Wright*, 449 F.3d 709 (6th Cir. 2006), is inapplicable here, where the grand jury relied upon Defendants' deliberate concealment of key evidence impeaching Bray and Defendants' fabricated inculpatory evidence. As the Court of Appeals for the Sixth Circuit has stated, "[i]f police officers have been instrumental in the plaintiff's continued confinement or prosecution, they cannot escape liability by pointing to the decisions of prosecutors or grand jurors or magistrates to confine or prosecute him...They cannot hide behind the officials whom they have defrauded."  *Sykes*, 625 F.3d at 317, citing *Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir.1988). *See also Yancey v. Carroll County*, 876 F.2d 1238, 1243 (6th Cir. 1989) (an officer cannot rely on the fact that an indictment issued to establish his right to immunity when that judicial determination was based on his own deliberate subterfuge).

27

The question of whether the indictment would have been issued, even without a defendant's knowingly or recklessly false statement, is one that must be left for the jury.  *Hill v. McIntyre*, 884 F.2d 271, 276 (6th Cir. 1989). In this district, Judge Gaughan has ruled in a related matter, arising out of the same flawed criminal investigation, that there was no requirement that a defendant testify before the grand jury in order for a claim of malicious prosecution to succeed. Ex. 19, Memorandum of Opinion and Order, *Westerfield v. Lucas*, Case No. 1:07-CV-3518, at 6-7.  It is the Defendants' false information to the jury, rather than direct testimony, that breaks the causal chain.

Defendants, ignoring the record from Lucas's criminal trial and relying instead on the self-serving affidavits crafted in support of their motions, argue that they had probable cause because Bray was a reliable informant. However, there is ample evidence to create a dispute of fact about whether Defendants knew of Bray's unreliability almost from the beginning of Operation Turnaround. *Painter*, 185 F.3d at 571 (in assessing probable cause to effect an arrest, an officer may not ignore information known to him which undermines the probable cause).

Defendants' self-interested and unsupported assertions that they had no notice of issues with Bray's reliability cannot, by fiat, overcome Plaintiff's substantial evidence and entitle Defendants to summary judgment. All of the Defendants worked closely with Bray on the individual drug purchases. Plaintiff's factual overview of the investigation presents numerous instances in which Bray's lies about the identity of targets and his ability to set up drug purchases with those targets were obvious to Defendants. Plaintiff thus establishes a jury question as to whether Defendants were sufficiently aware that Bray had an incentive to lie because he was paid for every transaction, was stealing government funds, and was profiting from the sale of his own drugs as well.

28

Even assuming that Defendants were, at one time, reasonable in considering Bray reliable, that assessment could not be maintained in the face of the numerous and flagrant instances of deceit described above (all prior to the Price investigation). And as Judge Pearson noted in a related case arising from the same investigation, "the record shows Defendants resisted even the slightest efforts of corroboration despite unequivocal events casting doubt upon Bray's reliability...Plaintiff shows Defendants knowingly and repeatedly turned a blind eye to any suggestion their handling of Bray and the staged drug buys were worrisome...The point at which Bray stole buy money was a point where any lay version of common sense, let alone the judgment of reasonable and trained police officers and federal agents, should have dictated the informant was no longer, if he ever had been, reliable." Ex. 20, Memorandum of Opinion and Order, *Mott v. Lucas et al*., Case No. 1:10-CV-164, at 23.

Beyond a dogged insistence that Bray was reliable, Defendants do not justify their continued high opinion of him in the face of evidence that Bray was anything but reliable. Faith and Mayer state that prior to the beginning of Operation Turnaround, Bray had supplied "accurate and reliable information to the RCSO." Faith Affidavit, Dkt. # 71-1, para. 6; Mayer Affidavit, Dkt. # 69-1, para. 6. To date, no discovery has been permitted that would allow Plaintiff to test or rebut Defendants' assertions that Bray provided reliable information in other cases. However, Mayer's testimony at Lucas's trial reveals that Bray had been used only once before Operation Turnaround, in a non drug-related investigation (Bray was a suspect in a burglary and later assisted the police in identifying the recovered goods). Tr. 1151-52. Faith and Mayer add that they had information "from several other sources" regarding Bray's reliability, but fail to detail those other sources or explain how they outweighed their own observations of

Bray's misconduct over the course of the investigation. Faith Affidavit, Dkt. # 71-1, para. 8; Mayer Affidavit, Dkt. # 69-1, para. 8.

Given these obvious problems with Bray's credibility, a finding of probable cause could not be reached without substantial corroboration of the information provided by Bray. *U.S. v. Higgins*, 557 F.3d 381, 390 (6th Cir. 2009) (overturning district court's finding of probable cause where informant's reliability was not asserted and minimal police corroboration occurred).  The Defendants not only failed to corroborate Bray's information in Price's case, they went further and turned a blind eye to the double-dealings they caught on tape, preferring to report only the false evidence that strengthened the wrongful case against Plaintiff and to enhance the appearance of Plaintiff's involvement by deforming what they had seen and heard on the day of the staged buy.

Defendant Lucas lists seven facts which allegedly support his finding of probable cause at the time Plaintiff was arrested: (1) Bray, who knew Davis, told the agents that Davis was involved in the deal; (2) Lucas identified Davis as having met with Bray during the deal; (3) Chuck Metcalf, who was familiar with Davis, identified Davis as having met with Bray during his surveillance; (4) Captain Faith, who was familiar with Davis, identified Davis as having met with Bray during his surveillance; (5) Davis was known to be affiliated with both addresses, 121 Glessner and 187 South Adams, which were involved in the drug deal; (6) the "girl" sent by Ronald Davis delivered drugs to Lucas shortly after Bray set up the deal with Davis; and (7) after the deal, Davis' "girl" left the vehicle with Bray and Lucas and went onto the porch of 121 Glessner Avenue, Price's residence. Lucas Motion to Dismiss, Dkt. #67 at 23-24, incorporated into Lucas's Motion for Summary Judgment, Dkt. # 121 at 3. Lucas goes so far as to characterize Bray's identification of Price as "heavily corroborated" by these facts. Lucas Motion to Dismiss,

Dkt. #67 at 25. None of these purported supporting facts hold up to even a superficial scrutiny of the evidence, and none are undisputed so as to entitle Defendants to summary judgment.

Fact (1) relies entirely upon the credibility of Bray. As stated above, Defendants were on notice that Bray was (with their acquiescence) using stand-ins for drug buys, and furthermore they had recorded proof that Bray was lying to them during this deal – which, by definition, defeats their attested reliance on this fact.

With fact (2), Lucas relies upon his own identification of Plaintiff in front of 187 South Adams Street, based upon his viewing of a photograph after the deal. Lucas Declaration, Dkt. # 67-2, para. 27. This photographic comparison fails to conclusively establish probable cause. For starters, English and Price do not look sufficiently alike. Lucas explained at his trial that both men are "black and bald," Tr. 3364, but race and baldness hardly suffice to establish identity, and Lucas has not explained the resemblance in any more significant manner. At least one other person has asserted that the two do not look alike: Bray, on reviewing the investigation's arrest charts, realized immediately that he had framed the wrong person. Tr. 277-78. *See also* Ex. 21, Ronald Davis (Herman Price) / Brian Woods (Marcus English) Comparison.

Secondly, resemblance is a question of fact best left for a jury – the Court should not decide as a matter of law that Price and English look alike. *Painter*, 185 F.3d at 570 ("In § 1983 cases, the existence of probable cause usually poses a jury question."). Even assuming *arguendo* that there is at least a minimal resemblance between Price and English, the question of whether the viewing of a single photograph, outside of a photographic line-up, following the drug sale and in the context of an identification asserted by others, can rise to the level of probable cause in the absence of any other evidence is also best left to a jury. *United States v. Hamilton*, 684

31

F.2d 380, 382-83 (6th Cir. 1982) (holding in the suggestiveness context that the proper weight to put on comparisons between photographs is a jury question).

Furthermore, even had Bray indeed met with Plaintiff on the day of the controlled sale, that still would not furnish probable cause to arrest and prosecute him because a third party, Moxley, was involved in the actual drug transaction, and only Bray's word and contradictory audio evidence tie her to the person Bray met on South Adams Street.

Facts (3) and (4) are, quite simply, lies – lies that were first produced in Lucas's fabricated DEA-6 report of October 25 and Faith's Affidavit of November 9, 2005. As Lucas and the other Defendants involved in surveillance that day knew, neither Faith nor Metcalf observed Bray meeting with the person Bray identified as Plaintiff because they parked a quarter of a mile away from the location on South Adams Street. Moreover, contrary to what Lucas asserts, Faith and Metcalf were not "familiar" with Plaintiff's appearance in the sense that they had seen him on multiple prior occasions. Faith has in fact never seen Plaintiff in person. He has only seen one photograph of Price, possibly after rather than before the alleged sighting of October 25. As for Metcalf, he had seen Plaintiff just once in person prior to October 25 during a car stop by a deputy. He had also viewed a photograph of Plaintiff. Based on this photograph and this single encounter, Metcalf claimed at the time to instantly and "perfectly" recognize as Plaintiff a man whom the evidence has shown to be someone else. However, he has since declared that he "was not in a position to make a conclusive identification." Ex. 14, Metcalf Responses to Plaintiff's Interrogatories, para. 10. Consequently, Defendants cannot rely upon Plaintiff's identification by "at least three law enforcement officials who were conducting surveillance." Lucas Motion for Summary Judgment, Dkt. # 121 at 11. In this investigation, Lucas provided a single, problematic

32

identification of Plaintiff in Bray's company – an identification that has since been proved wrong. This is not "obviously more than sufficient to make out probable cause." *Id.*

Facts (5) and (7) are Plaintiff's "known affiliation" with the two residences involved in the October 25 buy, and Moxley's return to the "porch" of 121 Glessner following the drug sale. Apart from the fabricated observations of Faith and Metcalf and the disputed observation by Lucas, however, the only link between Plaintiff and the residence on Adams Street was provided by Bray, whose word cannot support probable cause. The Glessner residence was indeed Plaintiff's official address, but it is significant that no Defendant actually saw anyone enter or exit the house on the day of the buy – including Plaintiff's alleged courier and girlfriend, Moxley. Nor did any Defendant seek independent corroboration of Bray's assertion. Lucas and Faith asserted falsely, in their report and affidavit respectively, that Plaintiff had been observed leaving 121 Glessner Avenue and followed to Adams Street, but neither Plaintiff nor anyone else was observed leaving the residence on Glessner. Moreover, there is strong audio evidence of Bray's intention to frame Plaintiff, including Bray's phone call instructing Moxley to meet with him and then walk home afterwards so that the police would not find out that she lived at the same address as Bray. Merely picking up and dropping off a drug courier in front of an address cannot provide undisputed probable cause so as to justify summary judgment.

Lucas next argues that the search executed at 121 Glessner and Price's post-arrest statements confirm Bray's information that Plaintiff was running a drug business out of these two residences. Lucas Motion to Dismiss, Dkt. # 67 at 25. It should be obvious, however, that evidence obtained through Plaintiff's wrongful prosecution and the wrongful search of his residence cannot, after the fact, restore legality to the original warrants.

Finally, Lucas's claim of probable cause rests upon fact (6), that a woman appeared to deliver drugs shortly after Bray said that Plaintiff would send her. This fact does not support probable cause. The audio recording shows that the person Bray thought was Plaintiff never spoke of sending a drug courier, either on the phone or during their in-person meeting; that the person who said that she would send a woman was a woman at a different phone number whom Bray tried to pass off as Plaintiff; that Bray himself made an appointment to meet someone immediately after he had allegedly met with Plaintiff; that Bray tried to pass off the instruction to meet with a woman as Plaintiff's; and that Lucas then found a woman at the location described by Bray, not Plaintiff. This reasonable, non-incriminating alternative explanation for fact (6) suffices to defeat probable cause, but given the evidence, this explanation is the only possible one. At the very least, this fact, too, presents a genuine dispute and cannot entitle Defendants to summary judgment.

Without these "corroborating" facts, the only evidence which remains to support probable cause is the unsupported word of Bray. In view of Bray's record of obvious deceptions over the course of the investigation, Lucas is not entitled to summary judgment on the grounds that there was probable cause to arrest and prosecute Plaintiff at the time of his investigation. The remaining Defendants have as little reason to rely on Bray's statements as Lucas, and reliance on Lucas's statements alone, even were it justified, also fails to amount to probable cause without the informant's key evidence that he had set up the buy with Price. *Higgins*, 557 F.3d at 390.

Lucas also contends that he had good reason to believe it was Plaintiff who was implicated in the drug sale because Bray believed in good faith that Marcus English was Plaintiff. Lucas Motion for Summary Judgment, Dkt. # 121 at 5. But Bray's 'sincere' frame-up of the wrong person cannot justify Lucas's willful blindness to the abundant evidence that it was

34

a frame-up to begin with.  The real problem with the October 25 investigation is not that it was Price who was ultimately arrested, rather than English; the problem is that there was no drug deal at all, because Bray had his confederate Moxley sell Bray's own drugs to law enforcement. Bray's one good faith mistake, if it was that, amid a plethora of deliberate deceptions does not entitle Defendants to summary judgment.

Lucas further tries to suggest Price's guilt by arguing that Price could not explain at trial why he called English while the controlled buy was taking place. This fact is irrelevant to the probable cause analysis. To begin with, there is no evidence that the Defendants were in possession of English's phone records. Since Defendants did not know Price's real phone number, Defendants were unaware of the existence of this phone call at the time of Plaintiff's arrest. Secondly, Price provided a reasonable explanation for the phone call at trial: he testified that he spoke daily with English, who was a close friend and a partner. Tr. 2546. Finally, there is nothing incriminating about the timing of the call. Bray has testified that both English and Plaintiff were unaware that a drug sale took place between the DEA and Moxley that day, let alone when it took place.

In addition, a jury could consider Defendants' ready willingness to testify falsely, suborn perjury, and fail to correct patently false testimony in deciding this issue.  For example, it is now established that Metcalf perjured himself at Nabors' trial, while Lucas sat silently at the prosecutors' table. Lucas was aware that Metcalf's testimony was false, but did nothing to address the perjury.  Likewise, Lucas sat silently while Bray perjured himself at Nabors' and France's trials, and Lucas knew the testimony to be false and even backed up Bray's false testimony. All of these facts support the inference that in the Price case, Lucas knew that there was insufficient probable cause to indict Price when he told the grand jury that Price sold him

drugs, when in fact Bray did so.  "Like a prosecutor's knowing use of false evidence to obtain a tainted conviction, a police officer's fabrication and forwarding to prosecutors of known false evidence works an unacceptable corruption of the truth-seeking function of the trial process." *Manganiello v. City of New York*, 612 F.3d 149, 162 (2d Cir. 2010), citing *Ricciuti v. N.Y.C. Transit Authority,* 124 F.3d 123, 130 (2d Cir.1997) (citations omitted).

Finally, the Defendants' insistence that Plaintiff prove their individual knowledge of every fact relating to the Mansfield investigation is misplaced at this stage in the proceedings. There is, at the very least, a genuine issue of fact as to whether the Mansfield investigation team members worked so independently of each other that they would fail to share essential information about the reliability of their only informant. A jury could reasonably conclude that an investigating team of officers, some of whom had been colleagues for decades, who made several controlled purchases a week for a period of two months, worked closely enough together that they would share vital information about their informant's conduct and whether or not audio evidence contradicted his statements during an investigation.

Therefore, Defendants cannot prevail on summary judgment based on the argument that they had probable cause to arrest and cause the incarceration of Plaintiff.

### 2. A Reasonable Jury Can Conclude That Each Defendant Influenced or Participated in the Decision to Prosecute Plaintiff

The Defendants each argue that they took no part in the decision to prosecute Plaintiff and are thus shielded from liability for malicious prosecution. Contrary to their assertions, however, it is not necessary for them to have taken part in the final decision to prosecute Plaintiff in order for them to be liable for the tort of malicious prosecution. As discussed at length by the Court of Appeals for the Sixth Circuit in *Sykes v. Anderson*, influence over or participation in the decision to prosecute is sufficient to trigger liability. To be liable for "participating" in the

decision to prosecute, the officer must participate "in a way that aids in the decision, as opposed to passively or neutrally participating." *Sykes*, 625 F.3d at 309, n. 5. Where, as here, parties other than the Defendants took the final decision to commence criminal proceedings, the question is "whether [the officer's] falsehoods, misrepresentations, and omissions, which clearly led to the Plaintiffs' arrests, can survive a number of intervening decisions by others such that [the officer] can still be said to have influenced or participated in the decision to institute criminal proceedings." *Id*. at 314.

The Sixth Circuit held that officers participate in the decision to prosecute if there were "knowing misstatements made by the officers to the prosecutor." *Id*. at 315-16. Furthermore, "the chain of causation need not be considered broken in a malicious-prosecution claim against an officer if the officer deceived the subsequent decision maker or could reasonably foresee that his misconduct would contribute to an independent decision that results in a deprivation of liberty." *Id*. at 316, citing *Higazy v. Templeton*, 505 F.3d 161, 177 (2d Cir. 2007) (citations omitted).

In order to overcome summary judgment, "Plaintiffs needed to present some evidence that the impact of [the officer's] misstatements and falsehoods in his investigatory materials extended beyond the Plaintiffs' initial arrest and ultimately influenced the Plaintiffs' continued detention." *Id*. at 316. In *Sykes*, the defendant officer was found to have participated in the decision to prosecute because his investigatory materials were in the prosecution's possession, contained knowing misstatements, and the prosecution relied on the defendant's falsehoods. *Id*.

Similarly, here, the Defendants participated in the decision to prosecute because their investigatory materials and conclusions contained knowing misstatements regarding both the reliability of the informant, the corroboration of his information, and the content of the audio

37

recordings, and the prosecutor relied upon these falsehoods in deciding to institute criminal proceedings against Plaintiff. The United States Attorney's Office was in possession of Plaintiff's investigation file created by Defendants, including the DEA-6 in which Lucas inserted false incriminating evidence. Lead prosecutor Blas Serrano has testified that in preparing his indictments, he met "numerous times" with the Defendants and Bray, and relied particularly upon reports and memoranda drafted by the Defendants and upon his conversations with them. The prosecution's case was thus wholly based upon Defendants' deliberate misstatements and critical omissions. Because, moreover, the prosecutor testified that he had no time to listen to the audio recordings himself, the charges brought against Plaintiff flowed directly from the officers' representations of what occurred, which were at odds with the recordings. Absent the unreliable informant information and falsified corroboration, there would have been insufficient evidence to prosecute Plaintiff. Indeed this is why the government moved to dismiss the indictment against Price as soon as it became aware of Bray's deceptions.

Furthermore, Serrano testified that had he been made aware of a single example of Bray's misconduct – Bray's attempted theft of buy money during the Mott buy, or the disputed identification of target Roosevelt Williams, he would have immediately discontinued any investigations relying upon Bray's information. Had he been informed of the full scope of Bray's deceptions, there is no doubt that the government would have abandoned its case against Plaintiff.

Specifically, as to each Defendant, Plaintiff can present evidence that the prosecution relied upon the following knowing misstatements and omissions in deciding to prosecute Plaintiff:

- <u>Lucas</u>: a failure to include in his investigation notes or to inform the USAO of a pattern of incidents where Bray stole government funds, misidentified targets, and provided wholly incorrect drug-related information; the fabrication of evidence regarding the existence of a set-up call between Bray and Plaintiff; the fabrication of evidence that led to the appearance of probable cause (including the false information in the DEA-6); the false testimony corroborating the fake "take two back" conversation; the false identification of Plaintiff; and the false testimony regarding Plaintiff holding a gun.

- <u>Faith</u>: a failure to include in his investigation notes or to inform the USAO of a pattern of incidents where Bray stole government funds, misidentified targets, and provided wholly incorrect drug-related information; the fabrication of evidence in an affidavit that led to an unlawful search of Plaintiff's residence; and the false corroboration of evidence that was contradicted by the cobble phone recording of the alleged drug sale.

- <u>Metcalf</u>: a failure to include in his investigation notes or to inform the USAO of a pattern of incidents where Bray stole government funds, misidentified targets, and provided wholly incorrect drug-related information; the fabrication of evidence regarding the existence of a set-up call between Bray and Plaintiff; and the false corroboration of evidence that was contradicted by the cobble phone recording of the alleged drug sale, including his false assertion that he saw Bray meeting with Plaintiff while he was performing surveillance (an assertion which he continues to maintain before this Court – *see* Metcalf Motion for Summary Judgment, Dkt. # 126 at 5.)

- <u>Verhiley</u>: a failure to include in his investigation notes or to inform the USAO of a pattern of incidents where Bray stole government funds, misidentified targets, and

39

provided wholly incorrect drug-related information; and the fabrication of evidence regarding the existence of a set-up call between Bray and Plaintiff.

- Cross: a failure to include in his investigation notes or to inform the USAO of a pattern of incidents where Bray stole government funds, misidentified targets, and provided wholly incorrect drug-related information.

- Mayer: a failure to inform the USAO of a pattern of incidents of which he was aware, where Bray stole government funds, misidentified targets, and provided wholly incorrect drug-related information.

Finally, the Court should disregard Lucas's assertion that the government's decision not to charge him criminally with conspiring with Bray establishes that he committed no wrongdoing during the Mansfield investigation. Lucas Motion to Dismiss, Dkt. # 67 at 4-7. The indictment against Lucas and the government's concessions about what it could prove beyond a reasonable doubt during Lucas's criminal trial have no bearing on what evidence Plaintiff can use to prove his claims by a preponderance of the evidence or on whether, by construing the facts in the light most favorable to Plaintiff, he can establish a dispute of facts to defeat summary judgment. Moreover, Bray's denial of Lucas' involvement in the spate of wrongful prosecutions is just one piece of evidence, creating a dispute of fact in the face of the abundant evidence to the contrary presented herein, demonstrating Lucas' efforts to violate Price's clearly established constitutional rights.

### 3. As A Matter of Law, Plaintiff Suffered A Wrongful Deprivation of Liberty As A Consequence of the Legal Proceeding

While it is undisputed that Plaintiff was incarcerated for over two years as a result of the Mansfield investigation, Defendants contend that Plaintiff's deprivation of liberty is not a consequence of the wrongful October 25 investigation, because the government dismissed the

charges related to the drug sale when Plaintiff pleaded guilty to the second set of charges arising out of the drugs and weapons found in his residence on November 9, 2005. This argument, however, ignores that the search warrant permitting the search was based upon a patently false affidavit, which in turn was directly based upon the wrongful investigation of October 25, 2005. Faith, who authored the affidavit supporting the search warrant request, testified that he did not keep personal notes, and that it is likely that he based his affidavit in great part on other officers' notes, especially Lucas's falsified DEA-6. Indeed, the government's motion for leave to dismiss these charges against Plaintiff acknowledges as much. The motion states that, following Bray's revelations on the wrongful Mansfield prosecutions, "the government at this time, believes that there is now insufficient facts set forth in the affidavit to support probable cause for the search of Davis' residence." Ex. 18 at 2.

There is no doubt that, crediting Plaintiff's evidence, Defendants participated in his prosecution without probable cause, and that Plaintiff's incarceration for the charges arising out of the wrongful search of his residence was a direct consequence of the wrongful legal proceedings which arose out of the investigation of October 25. Summary judgment cannot be granted on this basis.

**C.**     **For All Of The Reasons Set Forth In Prior Sections, Defendants Are Not Entitled To Summary Judgment Based Upon A Qualified Immunity Defense**

This is not a qualified immunity case: if Plaintiff's evidence is credited, then Defendants engaged in violations of clearly-established constitutional rights.  All of the foregoing discussion sufficiently establishes that with all reasonable inferences drawn in Plaintiff's favor, the Defendants engaged in malicious prosecution without probable cause – or, at a minimum, that the issue of probable cause turns on credibility determinations that can only be properly made by a jury.  There can be no serious dispute that such misconduct violated clearly established rights.

41

*Newsome v. McCabe*, 260 F.3d 824 (7th Cir. 2001) (the prohibition against maliciously prosecuting someone "ha[s] been around for a very long time"). Moreover, "[t]he law has been clearly established since at least the Supreme Court's decision in *Carroll v. United States*, 267 U.S. 132, 162 (1925), that probable cause determinations involve an examination of all facts and circumstances within an officer's knowledge at the time of an arrest." *Painter*, 185 F.3d at 570-71 (denying qualified immunity).

### III.    Defendants Are Not Entitled to Summary Judgment Based on Plaintiff's Fourth Amendment Fabrication of Evidence Claim

### A.    The Legal Standard to Adjudicate Fabrication of Evidence

Officers are liable for violating a defendant's constitutional rights if they intentionally developed false evidence, tampered with evidence, assisted a witness in committing perjury, and/or misled prosecutors, in an effort to cause an accused to be wrongfully prosecuted for a crime that he did not commit. *See, e.g.*, *Gregory v. City of Louisville*, 444 F.3d 725, 745 n.2 (6th Cir. 2006) (fabricating evidence violates clearly established law); *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (knowingly using false evidence violates clearly established rights); *United States v. Bagely*, 473 U.S. 667, 679 n.7 (1985) (use of perjured testimony and the deliberate suppression of favorable evidence violates established rights). The Sixth Circuit has made plain that "a person's constitutional rights are violated when evidence is knowingly fabricated and a reasonable likelihood exists that the false evidence would have affected the decision of the jury." *Gregory*, 444 F.3d at 737.

The evidence here raises a genuine question of fact as to whether Defendants fabricated evidence falsely incriminating Price, and whether, without this evidence, there would have been any basis for a jury to issue an indictment.

42

**B.**     **Defendants Fabricated the Set-Up Calls of October 25, 2005**

The existence of "set-up calls" arranging for a drug sale between Bray and Plaintiff formed a key component of the case against Plaintiff. The calls created the impression that the subsequent staged purchased involved Plaintiff. Lucas, Metcalf and Verhiley monitored and recorded the purported calls. Contrary to what Lucas drafted in his DEA-6 report, only one call, not two, was made to Plaintiff's supposed number. As discussed above, the call setting up a drug sale was not placed to Plaintiff's alleged number, while the call placed to this number did not contain an agreement to sell drugs or reference the agreement that had been made in the previous call. Bray's attempts to make the calls appear genuine have also already been discussed. Defendants were thus aware that there was no call setting up a drug sale with Plaintiff – and this would have been the case even had the number Bray provided been Plaintiff's actual phone number.

Cross listened to the audio recordings of Plaintiff's investigation, read Lucas's DEA-6 report, Tr. 2976, and was present at Plaintiff's proffer. Ex. 15, Davis Proffer. He would also therefore be aware that the call was not a set-up call.

Based on this evidence, a jury could reasonably find that Lucas, Metcalf, Verhiley and Cross fabricated the existence of a set-up call to bolster the false case against Plaintiff.

**C.**     **Defendants Fabricated Evidence of a Controlled Drug Purchase From Plaintiff in the DEA-6 Report of October 25, 2005**

Plaintiff has proffered evidence to show that the DEA-6 of October 25, 2005, drafted by Lucas and reviewed by Cross and Faith, contains numerous deliberate misstatements. Given Metcalf, Verhiley and Mayer's close involvement with the preparation of the criminal proceedings, a jury could reasonably find that they, too, became aware of the falsified contents of the DEA-6 upon which prosecutor Serrano proceeded to bring the case against Plaintiff.

43

As discussed at greater length above, the DEA-6 drafted by Lucas contained the following deliberate falsehoods and omissions which served to bolster the appearance of probable cause against Plaintiff:

(1)     The set-up call of 2:05 p.m., during which Bray agreed to a drug sale, was not placed to the number listed in the report as Plaintiff's number.

(2)     The set-up call of 2:08 p.m. was placed to the number listed as Plaintiff's number, but did not contain any reference to a drug sale.

(3)     The report omits the contradictions between the audio recording of Bray's conversation with the person he claimed was Plaintiff, and the instructions which Bray attributed to Plaintiff regarding the logistics of the drug sale.

(4)     The report omits the audio recording showing that Bray, not Plaintiff, organized the meeting with the drug courier by phone after he left the residence at 187 South Adams.

(5)     The report falsely describes the incident where Faith and Metcalf claim to identify Plaintiff and their efforts to follow his movements, so as to create false corroboration of Lucas's identification.

(6)     The report documents the obviously faked "Take 200 back" call. Lucas's testimony at France's trial shows him attempting to further corroborate this fact by lying about hearing Plaintiff on the other end of Bray's phone.

Taken cumulatively, the fabricated facts brought into dispute by Plaintiff created the impression that Bray's version of events was corroborated by the audio recording of Bray's body wire and the officers' personal observations, that the informant received adequate supervision, and that the identity of the suspect was properly corroborated – none of which are true. Even if

44

Defendants had up to that point believed that Bray was a reliable informant, a genuine question of fact arises as to whether the staged buy as it truly happened produced enough incriminating evidence to meet the standard of probable cause.

**D.** **Defendants Fabricated Evidence Leading to the Wrongful Search of Plaintiff's Residence Without Probable Cause**

Plaintiff has also proffered evidence to show that the affidavit drafted by Faith to support the investigation's request for a search warrant on 121 Glessner Avenue contained deliberate misstatements. Given the close collaboration between prosecutor Serrano and Defendants during the preparation of the indictments, arrests and searches arising out of Operation Turnaround, a jury could reasonably find that they were each aware of the falsified contents of Faith's affidavit.

Faith admitted that he probably relied upon the DEA-6 in drafting his affidavit, since he did not take any personal notes during the investigation and drafted his statement two weeks later. Tr. 2935-36. His affidavit therefore contains many of the misrepresentations and lies of Lucas's report. There is a genuine dispute of fact over whether, as a member of the investigation team, Faith was aware of the misstatements in the DEA-6. In addition, the affidavit contains facts which Faith knew to be false on the basis of his personal observations, including the statement that Faith and Metcalf followed the vehicle in which they had identified Plaintiff and saw it park in front of 187 South Adams Street, and the assertion of Bray's reliability as an informant.

At the very least, Plaintiff's description of these events and the evidence which support it creates a dispute of fact which precludes summary judgment.

**E.** **There Is a Reasonable Likelihood that the False Evidence Affected the Grand Jury and Magistrate's Finding of Probable Cause**

The fabricated evidence, taken cumulatively, presents an investigation very different from the actual investigation which led to Plaintiff's indictment and incarceration. According to the fabricated investigation, the controlled purchase of October 25, 2005 was a solidly

corroborated controlled transaction involving a confidential informant who had a strong prior relationship with law enforcement. Without the fabricated evidence, there are enough holes in this investigation that it would be apparent to any reasonable law enforcement officer that there was insufficient evidence to go to a prosecutor, let alone a grand jury for an indictment or a judge for a search warrant. Quite the opposite, once the truth came to light, it was the law enforcement officers who were themselves prosecuted. Moreover, the evidence falsified by the Defendants must be added to the Defendants' knowledge of Bray's deceptions, which they concealed from all investigatory reports and from their discussions with the prosecution. There is every likelihood that had the grand jury and the judge been aware of Bray's lying and stealing, and of the shortcuts taken during Price's investigation, they would not have found that there was probable cause to indict Plaintiff or to issue a search warrant on his residence. Plaintiff therefore easily prevails on summary judgment here, where he only needs to demonstrate that he raises a genuine issue as to whether knowledge of the fabricated evidence would have changed the outcome of a jury proceeding.

Finally, it goes almost without saying that the constitutional violation alleged here is not one for which good faith qualified immunity is available.  No one could or would dispute that it was clearly established that law enforcement officers could not fabricate false evidence to secure false convictions.  *See California v. Trombetta*, 467 U.S. 479, 486 (1984) (referring to the "constitutional obligation to report to the defendant and to the trial court whenever government witnesses lie under oath"); *Napue*, 360 U.S. at 269 ("[I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State" must fail under the Fourteenth Amendment).

**IV.**     **Defendants Are Not Entitled to Summary Judgment Based on Plaintiff's Fourth Amendment False Arrest and False Imprisonment Claim**

**A.**     **The Legal Standard to Adjudicate False Arrest/ Imprisonment**

Law enforcement officers are also not entitled to qualified immunity where they violated Plaintiff's right to remain free of unreasonable searches and seizures. In order to succeed on a federal constitutional claim of false arrest/ false imprisonment, a plaintiff must show that he was detained without legal process. This requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff. *Voyticky v. Village of Timberlake, Ohio*, 412 F.3d 669, 677 (6th Cir. 2005), citing *Fridley v. Horrighs,* 291 F.3d 867, 872 (6th Cir.2002). An arrest made pursuant to a facially valid arrest warrant is a defense to a claim of false imprisonment. *Barnes*, 449 F.3d at 716, citing *Higgason v. Stephens*, 288 F.3d 868, 877 (6th Cir. 2002). If, however, the issuance of the warrant was tainted by an officer's perjury, fraud, suppression of evidence, or similar bad faith act, probable cause will not be found based upon the warrant. *See, e.g., Hinchman v. Moore*, 312 F.3d 198, 205-6 (6th Cir. 2002) ("falsifying facts to establish probable cause to arrest and prosecute an innocent person is of course patently unconstitutional and has been so."). *See also Sykes*, 625 F. 3d at 305, citing *Wilson v. Russo*, 212 F.3d 781, 786-87 (3d Cir.2000) (a warrant will not afford a defense to an officer who "knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that created a falsehood and such statements or omissions were material, or necessary, to the finding of probable cause.") (citations omitted).

**B.**     **The Available Evidence Creates a Dispute of Fact About Whether Defendants Are Liable For False Arrest/ False Imprisonment**

As Plaintiff has laid out above, Defendants lacked probable cause to arrest Plaintiff. By concealing key information about Bray's credibility, and falsifying facts to create the appearance of probable cause, the Defendants directly and personally caused the arrest, indictment and

imprisonment of an innocent person. Furthermore, they persisted in their deception, causing the Plaintiff's continued detention for over two years. Price was only released after Bray confessed to his role in Mansfield's wrongful prosecutions, not as a result of any action on the part of Defendants. The available evidence, canvassed in detail above, at the very least creates a genuine factual dispute about Defendants' liability for false arrest and false imprisonment.

This right, too, was clearly established at the time, and good faith immunity thus has no applicability here. *Ahlers v. Schebil,* 188 F.3d 365, 371 (6th Cir. 1999), *citing with approval both Kuehl v. Burtis*, 173 F.3d 646, 651 (8th Cir.1999) (rejecting officer's qualified immunity defense where the officer ignored exculpatory evidence which would have negated a finding of probable cause) and *BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir.1986) ("A police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest.").

## V. Defendants Are Not Entitled to Summary Judgment on Plaintiff's Fifth Amendment *Brady* Claim

### A. The Legal Standard to Adjudicate a *Brady* Claim

Law enforcement officers are not entitled to qualified immunity for committing *Brady* violations because such conduct violates a defendant's clearly established constitutional rights. In accordance with *Brady v. Maryland*, 373 U.S. 83, 87 (1963), "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is  material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  Even when the defense has not specifically requested information in discovery, the prosecution has a duty to volunteer exculpatory evidence if it is "material."  *Kyles v. Whitley*, 514 U.S. 419, 433 (1995), quoting *Brady*, 373 U.S. at 108.  Material evidence is evidence that, if disclosed, "undermines confidence in the outcome of the trial."  *United States v.*

48

*Bagley*, 473 U.S. 667, 682, 678 (1985). It was equally well-established that the disclosure

obligations under *Brady* apply to police officers.  *Kyles*, 514 U.S. at 438-40.

Moreover, a police officer commits "a constitutional deprivation analogous to that

recognized in *Brady* by withholding or suppressing exculpatory material."  *Moldowan v. City of*

*Warren*, 578 F.3d 351, 379 (6th Cir. 2009).  In other words, officers inflict "constitutional injury

when they hide, conceal, destroy, withhold, or even fail to disclose material exculpatory

information." *Moldowan*, 578 F.3d at 379; *see also id.*, quoting *Trombetta*, 467 U.S. at 488 (a

constitutional violation occurs when an officer  makes a "calculated effort to circumvent the

disclosure requirements established by *Brady* [...] and its progeny.").  Where exculpatory

evidence is withheld or destroyed by the police, the defendant is not required to prove that the

officer acted in bad faith.  *Moldowan*, 578 F.3d at 382-89.

In this case, Plaintiff's criminal defense counsel requested *Brady* materials. In response,

the government asserted that it had disclosed all relevant documents. Ex. 22, Government's

Notice of Response to Defendant's Request for Discovery, November 28, 2005, at 2.

**B.**     **The *Ruiz* Ruling Does Not Bar Plaintiff's *Brady* Claim**

Defendants move for summary judgment on Plaintiff's Fifth Amendment *Brady* claims

on the basis of the United States Supreme Court decision in *United States v. Ruiz*, 536 U.S. 622

(2002).

*Ruiz* held that federal prosecutors are not required to disclose impeachment material

relating to informants or other witnesses before entering into a binding plea agreement with a

criminal defendant. *Ruiz*, 536 U.S. at 628. *Ruiz* is inapplicable here because the case at bar is a

civil, not a criminal case, and it does not raise the policy concerns to which the *Ruiz* court was

responding. The *Ruiz* ruling was crafted, first, to respond to concerns specific to criminal

proceedings, and it is inapplicable in a civil context. Moreover, *Ruiz* struck a careful balance

49

between criminal defendants' rights and the efficiency of the judicial system by limiting its application to only one form of Brady material, impeachment evidence. *Ruiz* therefore has no application in a case such as this one, where the withheld evidence was also exculpatory in nature.

For these reasons, Defendants' argument is inconsistent with Judge Pearson's ruling on the same issue in a related case. In *Mott v. Lucas*, Judge Pearson observed that the  Brady trilogy governs the waiver of constitutional violations in a guilty plea, but "does not appear to apply to a *Bivens* or § 1983 action, when there is no harm of disrupting the trial court findings, as the public policy behind the *Brady* trilogy cases contemplates." Ex. 20, *Mott* Opinion, at 49, n. 32. Indeed, the rule in *Heck v. Humphrey* ensures that collateral claims do not interfere with the government's legitimate expectation of finality after a guilty plea. *Heck v. Humphrey*, 512 U.S. 477, 486-89 (1994) (holding that, to bring a § 1983 claim for harm caused by actions that would render a conviction invalid, the conviction must be "reversed, expunged, invalidated, or impugned.").  Moreover, as Judge Pearson noted, the Supreme Court's holding in *Ruiz* took place in the context not of a collateral claim, but of a criminal appeal. The government has a much reduced interest in the outcome of a collateral action which does not impugn valid criminal proceedings.

Even were the *Brady* trilogy applicable in full to collateral actions, the *Ruiz* bar is inapplicable to the present case because *Ruiz* only applies to impeachment evidence, not to exculpatory evidence. This is clear from the Supreme Court's two overriding concerns in *Ruiz*, neither of which bears on exculpatory evidence. First, the court noted that "[i]t is particularly difficult to characterize impeachment information as critical information of which the defendant must always be aware prior to pleading guilty given the random way in which such information

may, or may not, help a particular defendant. The degree of help that impeachment information can provide will depend upon the defendant's own independent knowledge of the prosecution's potential case." *Ruiz*, 536 U.S. at 623. Exculpatory evidence however has a clear and calculable effect in that it shows the strengths and weaknesses of the government's inculpatory evidence. Here, moreover, the withheld evidence disembowels the prosecution's case, as the government implicitly conceded by moving to dismiss the charges against Plaintiff once the withheld evidence came to light. Once we omit the information, facts and events that are tainted by Bray's criminal behavior during Operation Turnaround, there is nothing at all left of Plaintiff's investigation.

The court's second concern in *Ruiz* was that a disclosure obligation "could require the Government to devote substantially more resources to trial preparation prior to plea bargaining, thereby depriving the plea-bargaining process of its main resource-saving advantages." *Id.* at 632. This argument is also inapplicable here. Indeed it would be inconsistent with the very idea of holding the Defendants to their due process obligations in the conduct of criminal investigations. The greater expediency of the criminal justice system cannot be promoted by allowing the government to reduce the burden on its resources through its own unconstitutional misconduct in fabricating incriminating evidence, and the *Ruiz* exception to *Brady* obligations cannot contemplate such a result.

Moreover, the court in *Ruiz* also noted that guilty-plea safeguards "[diminish] the force of [defendant's] concern that, in the absence of the impeachment information, innocent individuals accused of crimes will plead guilty. *Id.* at 631. The guilty plea at issue in *Ruiz* "specifies the Government will provide any information establishing the factual innocence of the defendant." *Id.* Plaintiff benefitted from no such disclosure of the exculpatory evidence arising from his

investigation. *See McCann v. Mangialardi*, 337 F.3d 782, 788 (7th Cir. 2003) ("*Ruiz* indicates a significant distinction between impeachment information and exculpatory evidence of actual innocence. Given this distinction, it is highly likely that the Supreme Court would find a violation of the Due Process Clause if prosecutors or other relevant government actors have knowledge of a criminal defendant's factual innocence but fail to disclose such information to a defendant before he enters into a guilty plea.")

Thus, the *Ruiz* decision, properly understood, distinguishes between different forms of *Brady* evidence at the pre-plea phase, and relies on the mandatory disclosure of exculpatory evidence to appropriately balance the interests of criminal defendants and the government. *See* Ex. 20, *Mott* Opinion, at 49-50 (noting that should *Ruiz* be the governing authority, "the only possible window for a *Bivens* or § 1983 action alleging a constitutional tort based upon a *Brady* violation prior to a criminal defendant entering a guilty plea is to assert that the government withheld exculpatory evidence"); *see also Friedman v. Rehal*, 618 F.3d 142, 154, n. 4 (2d. Cir. 2010) ("[t]he same reasoning would not apply with equal force to disclosure of purely exculpatory information, since such information would presumably be of greater assistance to a defendant in deciding whether to plead guilty and would not necessarily create a danger to government witnesses.").

In sum, the evidence withheld in this case does not raise *Ruiz* concerns, and Plaintiff's Brady claims therefore should not be barred by the *Ruiz* ruling.

## C.    The Available Evidence Creates a Dispute of Fact About Whether Defendants Are Liable For *Brady* Violations

Plaintiff has already laid out myriad examples of Bray's flagrant deceptions, Defendants' knowledge of these lies, and their decision to continue pretending he was a reliable informant. It seems self-evident that instances of Bray stealing from the police, lying about the identity of

targets and providing wholly unreliable tips would be material to any investigation which relies even in part on information provided by Bray, let alone in an investigation like Plaintiff's, in which the Defendants lied in reporting corroboration for Bray's assertions.

Information about Bray's systematic misconduct during Operation Turnaround, coupled with the Price investigation's low standards of supervision, creates a jury question as to whether the result "undermines confidence in the outcome of the trial."  *Kyles*, 514 U.S. at 434, citing *Bagley*, 473 U.S. at 678; *United States v. Agurs*, 427 U.S. 97, 104 (1976) ("implicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial.").  This is especially so when one considers that the withheld evidence must be considered in the aggregate, rather than each piece in isolation, when assessing whether there is a reasonable probability of a different result if the withheld evidence had been disclosed. *Kyles*, 514 U.S. at 434-37.[3]

Were there any doubt, the government, too, thought this almost certain and consequently moved to dismiss the indictment and information against Plaintiff as soon as the true circumstances of the Mansfield investigation came to light. Given that concession, Defendants are on very thin ground in arguing otherwise now.

Moreover, Plaintiff has presented this Court with evidence that before Price's criminal trial, Lucas was aware that Bray was stealing money and drugs from the DEA, framing innocent people, falsely relating his encounters with suspects, targeting personal enemies, and lying with abandon.  Lucas drafted false case reports and failed to report any of the exculpatory evidence he unearthed, often altering reports or transcripts to hide the exonerating evidence.  The other

---

[3] The fundamental basis of the *Brady* right, therefore, is "avoidance of an unfair trial to the accused." *Brady*, 373 U.S. at 87-88. As the Supreme Court put it, "[s]ociety wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly." *Id.* at 87. The Supreme Court recognizes that a *Brady* violation offends due process precisely because it has the effect of misleadingly inducing the defense to believe that the requested or exculpatory information does not exist, causing him "to make pretrial and trial decisions on the basis of this assumption." *Bagley*, 473 U.S. at 682-83.

Defendants were wholly aware of these fabrications and did nothing to bring them to light. Plaintiffs are entitled to the inference that Defendants were aware of their own subterfuge in all of the Mansfield investigations, all of which occurred before Price's arrest and incarceration.

Additionally, Plaintiff asserts *Brady* violations with regard to his own investigation as well. Defendants had knowledge of the evidence they fabricated, described above, and their withholding of information about these falsifications also violates the *Brady* rule.

There is sufficient evidence here to raise a genuine issue of fact about Defendants committing *Brady* violations, violations for which good faith qualified immunity is unavailable given the well-settled line of Supreme Court case law prohibiting this type of misconduct. Consequently, Defendants are not entitled to summary judgment on this claim.

### VI.     Defendants Are Not Entitled to Summary Judgment on Plaintiff's Section 1983 Conspiracy Claim

### A.     The Legal Standard to Adjudicate a Section 1983 Conspiracy Claim

A conspiracy under Section 1983 is "an agreement between two or more persons to injure another by unlawful action." *Bazzy v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011), citing *Revis v. Meldrum*, 489 F.3d 273, 290 (6th Cir.2007). To succeed on a claim of conspiracy, a plaintiff must prove (1) that there was a "single plan"; (2) that the alleged coconspirator "shared in the general conspiratorial objective" to deprive Plaintiff of his constitutional rights; and (3) that "an overt act was committed in furtherance of the conspiracy that caused injury to the complainant." *Hooks v. Hooks*, 771 F.2d 935, 943-44 (6th Cir. 1985).

Defendants' contention that Plaintiff's conspiracy claim falls for failing to state a "class-based animus" is incorrect as a matter of law. Lucas Motion for Summary Judgment, Dkt. # 121, at 21-22. This argument assumes that conspiracy claims brought under 42 U .S.C. § 1983 are governed by 42 U.S.C. § 1985. While related, these are two separate statutory provisions

54

addressing different circumstances. *Garrett v. Adams*, 2010 WL 5296841, at *6-7 (E.D. Mich. November 5, 2010). The standard for proving a § 1983 conspiracy claim was set out in *Hooks v. Hooks*, cited above, and Sixth Circuit case law on the issue consistently relies upon this standard.

The heart of a conspiracy claim is an agreement between the parties against whom misconduct is alleged; however, the agreement need not be formally concluded either in writing or verbally. "A meeting of the minds occurs when the parties reach a unity of purpose or common design and understanding. . . . This meeting of the minds does not require a formal or an express agreement: [i]t is sufficient that the minds of the parties meet understandingly so as to bring about an intelligent and deliberate agreement to do the acts and to commit the offense charged, although such agreement is not manifested by any formal words, or by a written instrument." *In re Welding Fume Products Liability Litigation*, 2007 WL 1087605, at *10 (N.D. Ohio, April 7, 2007), citing 15A C.J.S. *Conspiracy* § 12 (Feb.2007) (internal citations omitted). Furthermore, by its nature a conspiracy "is rarely susceptible of direct proof." *Id*. It is enough that it can be "plausibly be inferred from words, actions, and interdependence of the activities and persons involved." *Id*.

**B.     The Available Evidence Creates a Dispute of Fact About Whether Defendants Are Liable For Conspiring To Violate His Constitutional Rights**

Plaintiff has proffered detailed evidence based on which a jury could reasonably find that Defendants conspired to violate his constitutional rights. Defendants rely on Bray's testimony that he decided alone to use stand-ins to frame the investigation's targets as a defense to Plaintiff's conspiracy claim. Lucas Motion for Summary Judgment, Dkt. # 121 at 23; Cross Motion for Summary Judgment, Dkt. # 123 at 4; Verhiley Motion for Summary Judgment, Dkt. # 125 at 4-5; Metcalf Motion for Summary Judgment, Dkt. # 126 at 6-7. Defendants Cross and Verhiley also cite an excerpt from Metcalf's testimony in which Metcalf asserts that he never

55

"discussed" his false testimony at the Nabors trial with Lucas, that Metcalf never "sat down with [Lucas] and said 'Hey, we're going to plan to do this.'" Cross Motion for Summary Judgment, Dkt. # 123 at 5-6; Verhiley Motion for Summary Judgment, Dkt. # 125 at 5-6. This argument not only impermissibly credits the Defendants' evidence over Plaintiff's, it also misunderstands the nature of a civil conspiracy.

As the Court of Appeals for the Sixth Circuit has explained, "[e]xpress agreement among all the conspirators is not necessary to find the existence of a civil conspiracy. Each conspirator need not have known all of the details of the illegal plan or all of the participants involved." *Hooks*, 771 F.2d at 943-44. Moreover, the Sixth Circuit has acknowledged that "[r]arely in a conspiracy case will there be direct evidence of an express agreement among all the conspirators to conspire[; thus,] circumstantial evidence may provide adequate proof of conspiracy." *Weberg v. Franks*, 229 F.3d 514, 528 (6th Cir.2000) (internal quotation marks omitted).

It is sufficient for Defendants to have agreed to a single plan and to have shared the same conspiratorial objective to obtain Plaintiff's arrest and indictment without following investigation procedures that would ensure that his constitutional rights were respected. "Tacit understanding, created and executed over time, is enough to constitute an agreement even absent personal communication." *U.S. v. Murphy*, 937 F.2d 1032, 1041 (6th Cir. 1991), citing *Direct Sales Co. v. United States,* 319 U.S. 703, 714 (1943).

Here, Plaintiff has marshaled sufficient evidence to reach a jury on Defendants' participation in a single, deliberate plan. The successive wrongful investigations composing Operation Turnaround follow a distinct *modus operandi*: allowing Bray's use of stand-ins by skipping basic procedures for establishing a target's identity; fabricating some pieces of evidence and ignoring others to corroborate Bray's compromised information; and the continued use of an

56

informant who proved time and again that he could not be trusted. All the Defendants directly witnessed instances of Bray's misconduct, and there is a genuine question as to whether they became aware of instances witnessed by their colleagues during the investigation. Over the course of Operation Turnaround, Defendants developed a well-honed routine to give the individual controlled drug sales the appearance of legality.

The second element of a conspiracy claim entails an examination of each Defendant's state of mind to determine whether they shared in the "general conspiratorial objective." Like all questions of intent, this issue is "ill suited to summary judgment" and is best left for a jury's assessment. *Murphy*, 937 F.2d at 1039, citing *Ghandi v. Police Dept. of Detroit,* 747 F.2d 338, 345 (6th Cir.1984). *See also Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc.,* 862 F.2d 597, 601 (6th Cir.1988) (questions of intent are "less prone to summary judgment."). This is particularly true in the context of a motion based upon qualified immunity, which is adjudicated on the basis of a limited evidentiary record.

Nevertheless, based on the limited evidence to which he has had access, Plaintiff can make the necessary showing that Defendants conspired to violate his constitutional rights. Defendants' tacit agreement is visible in their deliberate use and repetition of each other's false evidence in order to create the appearance of a corroborated record. Faith repeated in his affidavit the false statement from Lucas's DEA-6 report that Faith and Mayer had identified Plaintiff, followed him from one suspected drug location to the other, and seen him meet with Bray. Lucas asked Metcalf whether the suspect had told Bray to meet a female courier on Glessner Avenue, and Metcalf, who was listening to Bray's wire, falsely answered in the affirmative. Lucas, Metcalf and Verhiley together witnessed Bray dial a number different from the one he provided for Plaintiff and together allowed Bray to try to pass off the female recipient

of the call as Plaintiff. Lucas was aware that Bray fake-dialed a call to resolve the dispute on the

weight of the drugs, but he testified that he heard Davis on the other end of the phone. All the

Defendants, including Cross and Mayer, saw this pattern repeat itself in all the Mansfield

investigations, but collaborated with prosecutor Serrano to help him prepare the indictment

against Plaintiff, holding up Bray all the while as a problem-free informant.

Defendants' common intention to obtain Plaintiff's arrest and conviction based on

unreliable and fabricated evidence may reasonably be inferred from the incidents listed above

and at length throughout this brief. In addition to this evidence, Metcalf made a series of

unambiguous statements pointing to the existence of conspiratorial intent at Lucas's trial. When

he was asked why he falsely testified under oath that he had identified Nabors, he answered:

"Probably because I regurgitated what come off the DEA-6 report...Because I really thought this

is what everybody else was going to testify to. This is what was on paper...Because I wanted to

support the case...Because it had to make sense." Tr. 1722-27 (emphasis added). Metcalf's

statement of intent goes beyond mere awareness, knowledge or passive acquiescence of illegal

conduct, which have been ruled insufficient to prove that there was a conspiracy. *Moore v.*

*Weber*, 2011 WL 3607037, at *4 (E.D. Mich. September 30, 2011). Metcalf's intent and his

understanding of his colleagues' intent was to conspire to corroborate each other's false

evidence, so that the false case against Plaintiff would appear to make sense.

Finally, there can be no serious dispute over Plaintiff showing the third element of

conspiracy. Plaintiff has provided ample evidence, discussed above, that Defendants committed

overt acts violating Plaintiff's constitutional rights with the purpose of obtaining his indictment

and conviction regardless of the accuracy of the evidence used to charge him. Moreover, "each

conspirator is liable for the overt acts committed by any member of the conspiracy, even if the

defendant did not personally commit the acts." *Id*., citing *Poliafico v. United States,* 237 F.2d 97, 104 (6th Cir.1956). Once the existence of a conspiracy has been established, "slight evidence is needed to connect a particular participant to the conspiracy." *Id*., citing *United States v. Braasch,* 505 F.2d 139, 148 (7th Cir. 1974)). Similarly, there can be no dispute that Plaintiff suffered an injury: violations of multiple constitutional rights resulting in over two years of wrongful incarceration.

Plaintiff has brought enough evidence to raise a genuine issue of fact. Summary judgment is not available to Defendants on Plaintiff's Section 1983 conspiracy claim.

**VII.  Should The Court Be Inclined Not to Find the Evidence Sufficient to Overcome Summary Judgment, Plaintiff Should Be Granted Further Discovery Before Any Dispositive Order Is Issued**

It is clear from Defendants' motions that they unfairly request that the Court grant summary judgment based on their purported lack of liability, rather than on their defense of qualified immunity, and this, before Plaintiff has had a chance to conduct full discovery. Defendants do not argue that, considering the evidence in the most favorable light for the Plaintiff, that they did not violate Price's clearly established constitutional rights. Rather, they each assert that, on the facts, which they present as undisputed, their conduct was fully lawful. Remarkably, they all insist that they had no reason to doubt Bray's credibility throughout Operation Turnaround, up to and including the time when Plaintiff was being investigated. *See, e.g.,* Lucas Motion to Dismiss, Dkt. # 67 at 24; Metcalf Motion for Summary Judgment, Dkt. # 126 at 7; Faith & Mayer Motion for Summary Judgment, Dkt. # 122 at 3.  In light of Plaintiff's exposure of the long history of obvious deceptions practiced by Bray, which at this stage must be given credence, this position is untenable.

Nor is reliance on the criminal record and transcripts a sufficient substitute for discovery. First, the exhibits relevant to Defendant Lucas's criminal trial do not encompass the whole

universe of documents which are relevant in the present suit. The scope of criminal trial exhibits and the purpose for which they were assembled are much narrower than the breadth of evidentiary material which is open to discovery requests in a civil suit, even on the limited issue of qualified immunity.

Secondly, despite Plaintiff's repeated requests, Defendants have never certified the exact scope of the documents produced. *See* Ex. 23, Correspondence between counsel Aaron Mandel and Larry Eiser, January 2012. In prior pleadings, Defendants have emphasized the number of pages included in the disclosures, but they neglect to mention that only a small portion of the record is directly relevant to Plaintiff. Of the 23,000 pages counted by Defendants, only a small proportion is directly relevant to the investigation of Price.

In related cases arising out of the same drug investigation, Defendants have also asserted that the disclosures include: (1) all the investigative reports of all the Mansfield drug transactions; (2) all of the proffers of the Mansfield drug defendants; (3) the statements of Jerrell Bray relating to the Mansfield drug transactions; and (4) all audio and video recordings of the Mansfield drug transactions and transcripts thereof. *See* Defendant Lucas' Response to the List of Discovery Sought by Plaintiff Webb Regarding Qualified Immunity, *United States v. Webb*, Case No. 1:07-CV-3290, Dkt. # 158 at 3. Dkt; Objections of Defendant Metcalf to Plaintiff's Request for Discovery, *United States v. Webb*, Case No. 1:07-CV-3290, Dkt. # 160 at 2. On the face of the record, without even the benefit of further discovery, Plaintiff can identify omissions and deficiencies which show that Defendants' characterization of the record is, to say the least, hyperbolic.

The following documents which are directly related to the investigation of Plaintiff were not to be found in the record:

(1) The personal notes of Lucas and other DEA agents made during the course of their investigation, and which they had an obligation to conserve. *See*, *e.g*., Tr. 3399-33400.

(2) Any notes made by prosecutor Serrano in preparation for Plaintiff's prosecution.

(3) Any reports documenting the dates and amounts Bray was paid for his participation in the Price investigation.

Pursuant to Rule 56(d) of the Federal Rules of Civil Procedure, Plaintiff should not be required to defeat summary judgment without access to this discovery.

The transcript of Lucas's criminal trial fails to provide any kind of substitute for discovery, especially with regard to the remaining Defendants. The proceedings focused on wrongdoing alleged in the indictment against Lucas, and few questions were asked regarding the misconduct of other Defendants.

In order to respond to Defendants' motions for summary judgment, Plaintiff has therefore had to mainly rely on an incomplete set of written files from his investigation and the transcript of Lucas's criminal trial. Further discovery, including depositions of all the Defendants, is the only way to determine what really happened during Plaintiff's investigation. Deciding Defendants' present motions for summary judgment would be premature without expanded discovery. [4]

## Conclusion

---

[4] For purpose of compliance with Rule 56, Plaintiff's counsel respectfully submits this Section of this memorandum as the requisite affidavit, attested to by her signature below.

Even though Plaintiff has not yet been allowed the benefit of full discovery, Defendants argue their motions for summary judgment with respect to their liability, rather than on their defense of qualified immunity. On the standard that is proper at this stage of the proceedings, Plaintiff has fully met his burden and should prevail on summary judgment. Based on the available evidence, Plaintiff has demonstrated a clear dispute of fact with respect to each of his allegations against Defendants.

Defendants' motions for summary judgment on qualified immunity have no merit. Plaintiff asks that summary judgment be denied so that discovery can finally begin.

RESPECTFULLY SUBMITTED,


/s/ Debra Loevy-Reyes
Attorney for Plaintiff

Jon Loevy
Debra Loevy-Reyes
LOEVY & LOEVY
312 North May, Suite 100
Chicago, IL 60607
(312) 243-5900

## <u>CERTIFICATE OF SERVICE</u>

      I, Debra Loevy-Reyes, an attorney, certify that on August 16, 2012, I delivered a copy of the attached PLAINTIFF HERMAN PRICE'S CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT BASED UPON QUALIFIED IMMUNITY to counsel of record in this matter via the ECF system.


              /s/ Debra Loevy-Reyes         
              Attorney for Plaintiff


Jon Loevy
Debra Loevy-Reyes
LOEVY & LOEVY
312 North May Street, Suite 100
Chicago, IL 60607
(312) 243-5900