**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**


| | | |
|---|---|---|
| **HERMAN P. PRICE, AKA RONALD DAVIS, ET AL.,** | ) | **CASE NO.1:09CV118** |
| | ) | |
| Plaintiff, | ) | **JUDGE CHRISTOPHER A. BOYKO** |
| | ) | |
| Vs. | ) | |
| | ) | |
| **LEE LUCAS, ET AL.,** | ) | **OPINION AND ORDER** |
| | ) | |
| Defendant. | ) | |

**CHRISTOPHER A. BOYKO, J:**

This matter is before the Court on the Motions for Summary Judgment based on qualified

immunity of Defendants Lee Lucas (ECF # 121), Larry Faith and Matt Mayer (ECF # 122),

Robert Cross (ECF # 123), Thomas Verhiley (ECF # 125), and Charles Metcalf (ECF # 126).

For the following reasons, the Court grants Defendants' Motions.

**Background Facts**

In late August or early September of 2005, the DEA Task Force, at the request of the

Richland County Sheriff's Office, began to work collaboratively with the Richland County

Sheriff's Office to investigate cocaine and crack cocaine trafficking in and around Mansfield,

1

Ohio after the body of Timothy Harris was discovered in Richland County Ohio on December 31, 2004.  Harris' death was believed to be drug related.  Law enforcement officials comprised of both state officers and federal agents decided to pursue the investigation into Harris's death by means of conducting controlled drug buys from individuals believed to be involved in illegal drug sales in the hope that such buys may lead to information about Harris's death.  Jerrell Bray, a confidential informant used previously by the Richland County Sheriff's office, was enlisted to make the controlled buys under the direction and control of federal and state law enforcement agents.[1]

Jerrell Bray was an informant initially developed by the Richland County Sheriff's Office.  He became a paid DEA informant and was utilized by both the DEA Task Force and the Richland County Sheriff's Office in the Mansfield, Ohio investigation.

On October 25, 2005, Bray allegedly informed officers that he could purchase crack cocaine from an individual named Herman Price (aka Ronald Davis) in Mansfield, Ohio.  In 2003, Price fled Michigan after pleading to possession of illegal narcotics and unlawful possession of a firearm.  He used the assumed name of Ronald Davis during the time he resided in Mansfield.   Bray made police-monitored calls to Price, or someone who the officers allegedly thought was Price.  Through these phone calls, Bray, supported by numerous officials, set up a controlled buy.  On October 25, 2005, Bray met with a black male at 187 South Adams Street in Mansfield, Ohio whom he identified as Price.  Shortly thereafter, the buy was consummated on 121 Glessner Avenue in Mansfield, Ohio.  Based upon the alleged buy from Price, the officers sought and were granted a search warrant for Price's residence.

---

[1]        Bray died in prison on September 9, 2012.

2

As a result of the controlled buy, on November 9, 2005, Herman Price (aka Ronald Davis), was charged with violations of Federal criminal drug laws in a two count indictment returned in *United States v. Ronald Davis and Geneva France,* Case No. 1:05CR536 (N.D. Ohio 2005).  The Government subsequently dismissed the Indictment on February 7, 2006.  On February 7, 2006, Price pled guilty to a one count Information in Case No. 1:06CR045 (N.D. Ohio 2006).  Price was sentenced on May 1, 2006 to a term of 135 months imprisonment and 5 years of supervised release.  Subsequently, on December 27, 2007, the Government moved to dismiss Price's case due to Bray's confession to committing perjury in the trial of Price's co-defendant, Geneva France.  Bray's original statements had lead to the finding of probable cause for the search warrant executed at Price's residence.  Shortly thereafter, Price was released from federal custody and turned over to the custody of law enforcement officials from Michigan where he had an outstanding warrant.

## Plaintiff's Complaint

According to Plaintiff's Complaint, law enforcement created a target list of approximately fifty suspected drug dealers in the greater Richland area.  Confidential informant Jerrell Bray, in conjunction with law enforcement, staged and tape recorded actual and simulated drug buys using stand-in third parties who pretended to be, or were alleged to be, persons on the targeted list.  Such a staged drug buy using a stand-in was for the purpose of creating false evidence against Price.  Based upon the allegedly staged drug buy, officers sought and were granted a search warrant for Price's residence.  Furthermore, officers from the Drug Enforcement Agency ("DEA") and Sheriff's department fabricated or tampered with audio recordings of the staged drug buys so as to implicate innocent parties, including Price.

3

Price, in his Complaint, alleges the Defendants conspired against him to create false drug charges.  His Complaint alleges *Bivens* violations against the federal agents, 42 U.S.C. § 1983 claims against state actors for violating Price's constitutional rights, conspiracy, neglect to prevent the wrongful acts perpetrated against Price under 42 U.S.C. § 1986, false arrest and imprisonment, malicious prosecution andintentional and negligent infliction of emotional distress.

### Procedural History

Plaintiff filed his Complaint on January 16, 2009.  Due to issues with service, all parties were not served until approximately one year after the Complaint was filed.  At a status conference held January 15, 2010, the Court stayed the proceedings until the completion of Defendant Lee Lucas's criminal case arising from the investigations at issue in this case.  Shortly thereafter, the Court dismissed Defendant Robert Fiatal due to Price's concession that Fiatal was not involved in Defendants alleged malfeasance.  In May of 2010, Defendant Lucas filed a Motion to Dismiss and Defendants Corso, Marotta, Faith, Sheldon, Verhiley, Metcalf, Cross, Ansari, Hefern, McGrath and the City of Cleveland moved for summary judgment based on qualified immunity.  In March of 2011, the Court granted Plaintiff's Motion for Limited Discovery to respond to Defendants' Motions.  The Court granted the Motions of Sheldon, Corso, Marotta, Ansari, Hefern, McGrath and the City of Cleveland's and denied Lucas, Metcalf, Cross, Ansari, Faith and Verhiley's Motions, subject to refiling after limited discovery.  Limited discovery was subsequently conducted and the remaining Defendants have again moved for summary judgment based on qualified immunity.  These motions are now before the Court.  Plaintiff has clarified and limited his constitutional claims to malicious prosecution, false

4

arrest/false imprisonment, fabrication of evidence in violation of Plaintiff's Fourth Amendment rights, *Brady* violations for failing to disclose exculpatory or impeaching evidence in violation of Plaintiff's Fifth Amendment rights and Section 1983 Conspiracy claims.

## STANDARD OF REVIEW

### Summary Judgment

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *accord Int'l Union v. Cummins, Inc.*, 434 F.3d 478, 483 (6th Cir. 2006); *Turner v. City of Taylor*, 412 F.3d 629, 637 (6th Cir. 2005). The initial burden to demonstrate the absence of a genuine issue of material fact rests with the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Once the movant makes a properly supported motion, the burden shifts to the non-moving party to demonstrate the existence of a genuine dispute. An opposing party may not simply rely on its pleadings; rather, it must "produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Ky. Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir.1995). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *accord Leadbetter v. Gilley*, 385 F.3d 683, 689-90 (6th Cir. 2004); *Weaver v. Shadoan*, 340 F.3d 398, 405 (6th Cir. 2003). A fact is material only if its resolution "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

When deciding a motion for summary judgment, the Court must view the evidence and

5

draw all reasonable inferences in favor of the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006); *Harbin-Bey v. Rutter*, 420 F.3d 571, 575 (6th Cir. 2005).  "Thus, any direct evidence offered by the plaintiff in response to a summary judgment motion must be accepted as true." *Muhammad v. Close*, 379 F.3d 413, 416 (6th Cir. 2004).  However, summary judgment should be granted if the party bearing the burden of proof at trial does not establish an essential element of its case.  *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. 317).  Furthermore, the Court is not required "to search the entire record to establish that it is bereft of a genuine issue of material fact."  *Betkerur v. Aultman Hosp. Ass'n.*, 78 F.3d 1079, 1087 (6th Cir. 1996).  Rather, the burden falls on the non-moving party to designate specific facts or evidence in dispute.  *Anderson*, 477 U.S. at 249-250.

**42 U.S.C. §1983, *Bivens* and Qualified Immunity**

In order to prevail on a claim under 42 U.S.C. § 1983, a plaintiff must prove two elements**.**  First, he must demonstrate that he was deprived of a right secured by the Constitution or the laws of the United States, and second, he must demonstrate that the deprivation was caused by a person acting under color of state law.  *Redding v. St. Edward*, 241 F.3d 530, 532 (6th Cir. 2001).

When the cause of action concerns violations of constitutional rights by federal agents sued in their individual capacities, the United States Supreme Court in *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 403 U.S. 388, 390-97 (1971), implied a right to damages for Fourth Amendment violations.  Since then, the Supreme Court has extended *Bivens* twice, " to provide an otherwise nonexistent cause of action against *individual officers* alleged to

have acted unconstitutionally, or to provide a cause of action for a plaintiff who lacked *any alternative remedy* for harms caused by an individual officer's unconstitutional conduct." *Correctional Services Corp. v. Malesko,* 534 U.S. 61, 70 (2001).  *Bivens* acts as a counterpart to 42 U.S.C. §1983 actions where the former is the proper vehicle for bringing constitutional violation suits against federal actors while the latter is used for suits against state actors.  *Id* at 66-67.  A *Bivens* action permits the defense of qualified immunity, the analysis of which is identical under either *Bivens* or §1983.  *Wilson v. Layne,* 526 U.S. 603, 609 (1999).

　　　"Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982) "Qualified immunity 'is an affirmative defense that must be pleaded by a defendant official.'"  *Harlow*, 457 U.S. 800, 815 (1982).  But qualified immunity "is an immunity from suit rather than a mere defense to liability."  *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).  "Immunity ordinarily should be decided by the court long before trial." *Hunter* at 228 (citing *Mitchell* at 527-29).  "Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery."  *Mitchell* at 526 (citing *Harlow* at 818).  The issue of qualified immunity must be addressed at the earliest possible point in the litigation. *Saucier v. Katz,* 533 U.S. 194, 200-201 (2001), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009). *Siegert v. Gilley,* 500 U.S. 226, 232 (1991).  The Supreme Court has stated that, "[u]ntil this threshold immunity question is resolved, discovery should not be allowed. " *Harlow*, 457 U.S. at 819.  A district court should resolve

the immunity question before permitting discovery. *Crawford-El v. Britton,* 523 U.S. 574, 598 (1998).  Indeed, one of the core purposes of the immunity is to shield officials from "the burdens of broad-reaching discovery." *Crawford-El,* 523 U.S. at 588 (quoting *Harlow,* 457 U.S. at 817-818).

The analysis of a qualified immunity claim is distinct from the merits of the underlying claim itself. *Saucier,* 533 U.S. at 204; *Dunigan v. Noble,* 390 F.3d 486, 491 n.5 (6th Cir. 2004). Qualified immunity is a purely legal question which must be determined early in the proceedings. *Saucier,* 533 U.S. at 200; *Siegert,* 500 U.S. at 232.

Defendants bear the initial burden of coming forward with facts which suggest that they were acting within the scope of their discretionary authority at the time in question. *Rich v. City of Mayfield Heights,* 955 F.2d 1092, 1095 (6th Cir. 1992).  The burden then shifts to the plaintiff to show that the defendants are not entitled to qualified immunity. *Untalan v. City of Lorain,* 430 F.3d 312, 314 (6th Cir. 2005); *Cartwright v. City of Marine City,* 336 F.3d 487, 490-491 (6th Cir. 2003).

**Lucas's Motion**

Lucas contends that he is entitled to qualified immunity on all of Price's claims because Price plead guilty to drug charges and his plea waives all rights to challenge the probable cause basis for his prosecution and obtaining the search warrant.  Furthermore, it was Defendant Faith, not Lucas, who provided the affidavit in support of the search warrant.  Also, Lucas argues that because the grand jury decided probable cause existed to arrest Price, Price cannot attack its finding absent a showing that Defendants provided false information that formed the basis of the grand jury indictment.  While Lucas admits he provided testimony to the grand jury, his

8

testimony was limited to testifying that Bray placed phone calls to Price on October 25, 2005 to set up a drug deal and that he and other law enforcement officers observed Price meeting with Bray at or about the time of the drug deal.

Lucas further argues that Bray testified at Lucas's trial that Bray thought that the man he purchased drugs from was Price and only later learned it was Michael English.  It is also undisputed that the government dropped all charges arising from the controlled buy in February of 2006 and instead, Price plead to a one count Information that charged him with possession of drugs found during the search of his home.  Therefore, Lucas contends Price cannot show a *Brady* violation since he was never tried and he cannot show a false arrest or imprisonment since he plead to drug charges arising from the search and not from the controlled buy.

Lucas also contends he has absolute immunity from Section 1983 actions arising from his grand jury testimony and contends there is no legal duty to provide exculpatory evidence at a grand jury proceeding.  Lucas argues there was sufficient corroborating evidence to support probable cause regardless of Bray's past misdeeds since three officers corroborated Bray's identification of Price at the drug buy.

Finally, Lucas argues he is entitled to qualified immunity on Price's Conspiracy claim because Bray admitted he acted alone.  Price does not deny he was a major drug dealer and admitted his lieutenant, Michael English, sold drugs belonging to and on behalf of Price.

**Faith and Mayer**

Larry Faith and Matt Mayer are both officers with Richland County.  Faith contends his role in the Price controlled buy was surveillance and security.  He states he did not identify Price as being at the controlled buy.

Mayer contends he had no role in the Price controlled buy and neither Faith nor Mayer testified to the grand jury. Both contend there is no evidence that either fabricated evidence. Both Faith and Mayer contend all Plaintiff's constitutional claims are barred by his guilty plea and further contend there are no factual allegations plead against either of them that supports Plaintiff's Conspiracy claim.

**Cross**

Cross simply contends that Price fails to identify any falsified report prepared by Cross, fails to identify what was falsified or what evidence was exculpatory that was not produced. Cross contends he did not prepare the DEA -6 Report of the controlled buy but only prepared the DEA-6 Report of the November arrest and Price never states how that Report was false.

**Verhiley**

Verhiley contends there is no evidence of a law enforcement conspiracy to frame innocent civilians. A federal special prosecutor investigated thoroughly law enforcement involved in the Richland County investigations and found no conspiracy existed. Both Bray and Metcalf plead guilty to federal violations surrounding the drug investigations, yet they testified no conspiracy existed. Verhiley specifically denies falsely identifying a stand-in as the suspect in the case of *Williams v.Lee Lucas* 1:10CV 615 (N.D. Ohio) and the Judge presiding over the case granted Verhiley's Motion for Summary Judgment on that Plaintiff's constitutional claims.

**Metcalf**

Metcalf argues Price admits to selling drugs up until the time of his arrest in 2005. Price described that when a person called him to purchase drugs, he would inform his cousin Michael English, who would make the transaction and bring the money back to Price. (Price trial

10

testimony 2502-2504).  Price admitted he was living at 121 Glessner and English sold Price's drugs out of 187 South Adams.  (*Id* at 2504-2505).

Metcalf contends his only involvement was running the recording equipment and providing surveillance and security.   It is undisputed that Bray admitted that he alone used stand-ins without the participation or knowledge of law enforcement.  Metcalf contends Plaintiff's Complaint alleges generalized allegations of wrongdoing against all Defendants and fails to plead specific facts against Metcalf and fails to allege Metcalf's role in depriving Plaintiff of his constitutional rights.

Metcalf argues a grand jury found probable cause to indict Price.  Since Metcalf did not testify before the grand jury he cannot be liable for malicious prosecution or false arrest or imprisonment.  Furthermore, because Price pled guilty to drug charges stemming from the search of his house, the government dropped all charges arising from the controlled buy, therefore, no *Brady* claim exists.  Finally, although Metcalf did identify Price as being in the area at the time of the buy he did not identify Price at the buy, therefore, no conspiracy claim applies to Metcalf.

**Price's Opposition**

Price contends the controlled buy was entirely staged by Bray who sold his own drugs and passed them off as Price's.  Bray used Karmiya Moxley to sell his (Bray's) drugs to Lucas on October 25, 2005.  Bray then identified Moxley as Geneva France, a neighborhood woman who had no connection to the drug trade.  Lucas bought the drugs from Moxley, yet stood by silently while France was wrongfully indicted.  Defendants were aware that Bray had repeatedly used stand-ins, lied and even stole from law enforcement throughout the Richland County investigations, yet no one apprised prosecutors or the falsely accused of Bray's unreliability and

11

the Defendants even went so far as to fabricate evidence to support Bray's misdeeds.

In a companion case arising from the same Richland County drug investigation and involving largely the same Defendants Judge Gaughan summarized the Defendants' wrongdoings in other investigations involving Bray as follows:

With respect to the Mansfield defendants other than Westerfield, it is unrefuted that the following occurred:

> Dwayne Nabors:
> • Defendants Metcalf and Lucas testified that no video was taken of the drug deal involving Nabors, even though Metcalf later admitted that he videotaped the transaction;
>
> • Defendants Ansari, Lucas, and Metcalf identified Nabors as the individual involved in the drug deal. The real perpetrator looks nothing like Nabors. According to plaintiff, the videotape would have disclosed the discrepancy; and
> • Defendant Metcalf now admits that he signed an affidavit in support of a search warrant without reviewing or fully understanding its contents. The affidavit contains a number of untruthful statements. The DEA drafted the search warrant affidavit.
>
> Lowestco Ballard:
>
> • A stand-in, Darren Transou, impersonated Ballard during the drug deal. Ballard and Transou look nothing alike;
> • During a recorded telephone conversation, Transou referred to Ballard in the third person, even though he was supposed to be Ballard;
> • In the written transcript of that call, defendant Lucas deleted the third-party references to "Ballard" and inserted the name "Davis;"
> • In addition, the third party reference to Ballard was deleted in the written transcript and replaced with a series of ellipses, even though the recording was audible; and
> • Defendant Metcalf recorded all of the telephone calls and testified at the trial.
>
> Danny Lee Brown:
>
> • Bray made two recorded telephone calls to Brown. Thereafter, Bray told officers that Brown changed his phone number. The phone number Bray provided was actually the phone number for Robert Harris, who was also a target of the investigation;

12

• During an ensuing drug deal falsely attributed to Danny Brown, a courier was used. Bray's body recording showed that Bray said, "here, give that to Chris." This statement was omitted from the transcription.
In May of 2009, defendant Metcalf was charged with a criminal civil rights violation for his actions and testimony pertaining to Westerfield's co-defendant, Dwayne Nabors.

Metcalf pled guilty to presenting false evidence against Nabors at trial. Metcalf admits that he falsely identified Nabors as a participant in a drug deal. Metcalf indicated that he testified falsely because he believed that was "what everybody else was going to testify to." He indicated that his testimony at the Nabors trial consisted of a "regurgitation" of the DEA report.

In another Mansfield investigation of Noel Mott, Bray admitted using, Darren Transou, as a stand-in in the Ballard case, to impersonate Mott.

According to Price, Bray's misdeeds put all Defendants on notice that his information was unreliable and constitutes exculpatory and/or impeaching evidence that should have been disclosed to the U. S. Attorney and the falsely accused prior to indictments and up to and through their terms of incarceration.

According to Price, he and Bray had never met.  Price claims that in the initial pre-buy phone call at 2:05 PM on October 25, 2005, Bray simply called Karmiya Moxley at (419) 631-9518 and pretended she was Price.  The DEA-6 Report, a report prepared by DEA agents chronicling steps in an investigation, indicates the call was made to a woman but listed the number as (419) 612-3269, which Bray identified as Price's number, and does not reference Bray's attempts to pass it off as a call to Price.  Bray and the woman on the phone agreed to a sale of 2.5 ounces of crack at Glessner.

 A few minutes later, at 2:08 PM on October 25, 2005, Bray made a second call, this time to English, where they agreed to meet but drugs were never discussed.  It should be noted that Bray  first met English at a dance club and thought he was Price.  According to Bray, he thought

13

all along English was Price until sometime after the controlled buy.  At this second call, English told Bray to meet him on Adams.

At this time, Defendants proceeded to the controlled buy with Lucas and Bray in one car and Faith and Metcalf in another car with a cobble phone, which transmits live from Bray's wire. Verhiley and  fellow DEA Agent Stross traveled in a third car.  On the way to the controlled buy, Defendants Metcalf and Faith identified Price as sitting in a car, a silver Chevy Caprice,  at the intersection of Glessner and South Adams.  They listed the licence plate as DOJ-6183, which ultimately proved to be registered to English's girlfriend.  Price admitted English used the car. Price's own car was a silver Lincoln registered in his assumed name of Ronald Davis.

Price contends Lucas's DEA-6 report of the controlled buy contains numerous lies. These include misidentifying the car Faith and Metcalf reportedly witnessed Price sitting in as a silver Lincoln rather than a silver Caprice; reporting that Faith and Metcalf observed Price depart from 121 Glessner and followed him to 187 South Adams when, in fact, Metcalf and Faith never saw where the car came from and failed to follow it.  Faith admitted the DEA 6 Report was inaccurate where it states Faith and Metcalf followed the vehicle to South Adams.  Faith testified they didn't go to South Adams because they already passed by and identified Price at the intersection and two other police cars were on the scene for the controlled buy so they did not want to alert anyone.  The person Bray thought was Price met Bray and Lucas at the South Adams house where Lucas identified the person as Price.  Bray and the person went into the South Adams house.  Lucas testified the man had a gun but later stated he saw "something" in his hand.  When Bray left the house and returned to the car he told Lucas the man had a gun and Lucas responded "Does he?"  This indicates Lucas did not see the person with a gun until Bray

14

told him, which contradicts Lucas's prior trial testimony that he saw the person holding a gun.

In the house and as recorded by Bray's wire, Bray asked the suspect if he could get an "eighth" to which the suspect responded "I can definitely get it..I got your number, I'm, gonna... I'll call you back with a price." (Audio recording N19, Track #4, transcript 6-7).   When Bray says he'll "pick the girl up" it doesn't follow from the conversation and should have put the listening officers on notice that no one discussed delivery by a girl at another location.

Bray then makes a phone call to an unidentified source later determined to be Moxley. Bray asks her where she's at and tells her he is coming to get her now.  He returns to the car and tells Lucas that " we got to deal with her," meaning a girl will deliver the drugs back at Glessner. This was not indicated in the recorded conversation between Bray and the man in the house. Bray testified at France's trial to these false statements and Lucas sat at the trial table knowing it was false but said nothing to correct Bray's false testimony.  Lucas did not include Bray's phone call to the woman in his DEA-6 Report.

Price states Bray and Lucas returned to Glessner where they met Moxley, who entered the car and handed Lucas the drugs.  Lucas weighed the drugs and found them light.  He asked Bray to call Price and tell him to reduce the price.  Bray fake dialed his phone and said take $200 back.  Even though no one was on the other line Lucas reported he heard Price say "take two back" at France's trial and his own.  Phone records failed to show any such call was made.

After the deal, Lucas and Bray identified France from photos as the woman in the deal. U.S. Assistant Attorney Blas Serrano testified he relied on Lucas's representations and reports to prepare the indictments of France and Price.  (Lucas trial transcript 2628-29).

15

## ANALYSIS

### Standing and Proximate Cause

As a preliminary issue the Court is compelled to address the issue of actual injury alleged by Price prior to examining qualified immunity.  Plaintiff must first demonstrate standing to assert his claims.  Article III of the United States Constitution confines the authority of the federal courts to the adjudication of actual cases and controversies. *National Rifle Assn. of America v*. Magaw, 132 F. 3d 272, 279 (6th Cir. 1997).  Further, "Article III standing requires a litigant to have suffered an injury-in-fact, fairly traceable to the defendant's allegedly unlawful conduct, and likely to be redressed by the requested relief." *Magaw, supra*.  Standing to sue or defend is an aspect of the case-or-controversy requirement."*Arizonans for Official English v. Arizona,* 520 U.S. 43, 64 (1997) citing *Northeastern Fla. Chapter, Associated Gen. Contractors of America v. Jacksonville,* 508 U.S. 656, 663-664, (1993).  As the Sixth Circuit and United States Supreme Court have repeatedly held, standing is a threshold issue that courts may address *sua sponte.  Community First Bank v. the National Credit Union Administration,* 41 F.3d 1050, *2 (6th Cir. 1995) " The federal courts are under an independent obligation to examine their own jurisdiction, and standing 'is perhaps the most important of [the jurisdictional] doctrines.'" *United States v. Hays*, 515 U.S. 737, 742 (1995) quoting *FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 230-231(1990).  "The standing Article III requires must be met by persons seeking appellate review, just as it must be met by persons appearing in courts of first instance." *Arizonans,* 520 U.S. at 64.  The Sixth Circuit has held, "a violation of a federally secured right is remediable in damages only upon proof that the violation proximately caused injury." *Horn by Parks v. Madison County Fiscal Court* 22 F.3d 653, 659 (6th Cir. 1994).

16

Price's alleged injuries are all derived from his arrest and incarceration.  However, Price has admitted under oath in the Lucas trial that he was arrested in 2002 in Michigan for drug and gun possession. (Lucas trial transcript pg 2499).  While out on bond, he entered into a plea agreement, agreeing to a term of incarceration of seven years. (*Id*).  He then admitted he jumped bond before sentencing and fled to Mansfield to sell drugs.  In Mansfield, Price admitted paying his ex-wife's brother a thousand dollars to use his birth certificate and Social Security card to get an ID under the name of Ronald Davis.  He did so expressly to avoid the warrant issued for his arrest out of Michigan for failure to appear at his sentencing. (*Id* at 2501).  A review of the docket of *People v. Herman P. Price* No. 2002-001678, shows the Michigan court issued a warrant for Price in 2003 for failure to appear at sentencing.

By his own admission Price knowingly, intelligently and voluntarily entered into a plea agreement, including a seven year term of incarceration.  If that term ran from the sentencing date of October 28, 2003 as indicated by the above docket, Price's term of incarceration would have run through 2010.  Price was incarcerated for his alleged drug dealing in the case at bar from November 2005 through 2007.

By pleading to drug and weapon possession charges in Michigan and voluntarily agreeing to a term of incarceration of seven years that would have fully encompassed the time he was incarcerated for the charges alleged herein, it cannot be disputed and there is no genuine issue of fact, that Price cannot show, as a matter of law, his injuries were proximately caused by a deprivation of his constitutional right to be free from unlawful search and seizure.  At the time of his arrest in this matter, Price had expressly forfeited any right to his liberty when he plead to the Michigan charges.  Therefore, he cannot now assert injuries due to a deprivation of a right he

17

no longer possessed.  It was only due to his further admitted crimes of a fugitive from justice and falsifying his identity by using the Social Security Number of another individual, that he was able to avoid his agreed to term of incarceration.

It is clear that Price's injuries, i.e. his arrest and incarceration, are not fairly traceable to Defendants for the simple reason he should have been incarcerated the whole time he was selling drugs in Richland County.  But for his continuing illegal acts he should have been in custody in the state of Michigan for the entire time he was arrested and held in this matter.  He cannot now allege that because he was unlawfully free at the time of his arrest and incarceration, he was deprived of his Fourth Amendment rights by these Defendants.  He had waived those rights when he entered into a plea agreement to serve seven years in prison and the Constitution does not demand he be compensated for rights he did not lawfully possess at the time of his subsequent arrest.  There was an independent basis for his arrest (i.e. the warrant), and for his incarceration (i.e. his plea agreement), that were not acted upon merely because Price unlawfully assumed the identity of another.  Therefore, on this basis alone, the Court finds Plaintiff's Complaint fails for lack of standing to pursue injuries he cannot allege were suffered due to Defendants unconstitutional acts.   He suffered no *injury in fact* arising from Defendants' alleged unconstitutional conduct.

However, assuming *arguendo* Price had standing to assert Fourth and Fifth Amendment violation claims, Defendants would be entitled to qualified immunity for the reasons described below.

**Malicious Prosecution in violation of the Fourth Amendment**

"The Sixth Circuit 'recognize[s] a separate constitutionally cognizable claim of

malicious prosecution under the Fourth Amendment,' which 'encompasses wrongful investigation, prosecution, conviction, and incarceration.'" *Sykes v. Anderson* 625 F.3d 294, 308 (6th Cir. 2010) *quoting Barnes v. Wright,* 449 F.3d 709, 715-16 (6th Cir.2006).  "The 'tort of malicious prosecution' is 'entirely distinct' from that of false arrest, as the malicious-prosecution tort 'remedies detention accompanied not by absence of legal process, but by *wrongful institution* of legal process.'" *Sykes at 308 quoting Wallace v. Kato,* 549 U.S. 384, 390, (2007).

In order to establish a Fourth Amendment violation for malicious prosecution a plaintiff must show: 1)" a criminal prosecution was initiated against the plaintiff and that the defendant "ma[d]e, influence[d], or participate[d] in the decision to prosecute; 2) the plaintiff must show that there was a lack of probable cause for the criminal prosecution; 3) as a consequence of a legal proceeding, the plaintiff suffered a deprivation of  liberty; and 4) the criminal proceeding must have been resolved in the plaintiff's favor." *Sykes* at 308-09.  Defendants' do not dispute that Price's right to be free from malicious prosecution under the Fourth Amendment was clearly established at the time of his arrest.

Here, Defendants contend there was sufficient probable cause to arrest and prosecute Price.  "Probable cause" denotes "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Painter v. Robertson,* 185 F.3d 557, 569 -570 (6th Cir. 1999) quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979).  "If the circumstances, viewed objectively, support a finding of probable cause, the arresting officer's actual motives are irrelevant.  In Section 1983 cases, the existence of probable cause usually poses a jury question." *Painter* at 570 (internal citation

omitted).

However, where, as here, a decision to indict is made by a grand jury, probable cause is conclusively determined.  "[I]t has been long settled that 'the finding of an indictment, fair upon its face, by a properly constituted grand jury, conclusively determines the existence of probable cause for the purpose of holding the accused to answer.' "*Barnes v. Wright* 449 F.3d 709, 716 (6th Cir. 2006) *Higgason v. Stephens,* 288 F.3d 868, 877 (6th Cir.2002).  Unless "police officers have been instrumental in the plaintiff's continued confinement or prosecution, they cannot escape liability by pointing to the decisions of prosecutors or grand jurors or magistrates to confine or prosecute him." *Jones v. City of Chicago,* 856 F.2d 985, 994 (7th Cir.1988).  "They cannot hide behind the officials whom they have defrauded."  *Sykes, at* 317.  The Sixth Circuit has held the "question whether the judicial officer issuing the warrant would have done so even without the knowingly or recklessly false statement is one for the jury." *Yancey v. Carroll County,* 876 F.2d 1238 (6th Cir.1989).

Price relies on a number of Bray's and Defendants' misdeeds in support of his argument that no probable cause existed for his arrest.  First, there is the litany of Bray's misdeeds in other investigations in Richland County which the Defendants knew, or should have known about, that establish Bray's unreliability.  Second, Price points to the inaccuracies and falsehoods admitted by the Defendants in the conflicting stories of the buy as described in Price's opposition. Finally, Price submits photos of himself and English showing little resemblance between the two.   No one saw Price at South Adams and no one saw anyone enter or leave Glessner.

Price argues all Defendants influenced and or participated in Price's prosecution.  Faith provided the affidavit supporting the search warrant, and provided false corroboration of

evidence that was contradicted by the wire recordings.  Lucas's testimony and representations were the main evidence for the decision to indict.  Price recounted numerous falsehoods in Lucas's  DEA-6 Report and Lucas falsely identified English as Price.  Cross attended the proffers and failed to inform anyone of Bray's misdeeds.  Metcalf falsely identified Price as having met with Bray and falsely corroborated information contained in the wire recordings.  Verhiley and Mayer failed to report Bray's misdeeds in other investigations.  All were aware of Bray's unreliability and failed to disclose it to the U.S. Attorney.  AUSA Serrano also testified that if he had known of Bray's misdeeds he would have discontinued any investigation relying on Bray.

Lucas argues sufficient probable cause existed to pursue an indictment against Price.  First, Bray knew Price.  Lucas then personally identified Price at the South Adams location meeting with Bray and heard them discuss a drug deal inside the home.  Metcalf and Faith identified Price as being in the vicinity of the South Adams house just prior to the deal.  Price had known affiliations with both the Glessner and South Adams houses.  A girl waited outside Price's house to deliver drugs to Lucas and after the deal went back and sat on Price's porch.

Lucas contends, and the Court agrees, he was able to sufficiently corroborate enough of Bray's information to support probable cause to prosecute Price.  While the issue of whether Bray knew Price is subject to dispute, it appears Bray genuinely thought he knew Price and testified to it at the time of Lucas's trial.  Price denied knowing Bray.  Bray, in fact, knew English, whom he thought was Price.  When Bray called English on October 25, 2005 to set up a buy, English clearly knew Bray.  When Bray called English, English asked "Who is this?" Bray responded "Jerrell."  English replied,  "Oh what up dog?." (October 25, 2005 transcript of

Conversation time 14:13).  Bray indicates he is coming over in ten minutes and English tells him to go to Adams, which location Bray clearly knew without further description.  No one points the Court to any competent evidence challenging the authenticity of the transcriptions.

At 2:21 PM, Lucas relayed to the other officers that "we're gonna pick him up and probably drive him back to his house."  This appears to refer to English telling Bray to meet him at South Adams whereas the officers knew that Price lived on Glessner.  At this point, Metcalf tells Lucas "hey he just come out on Glessner.  He's coming your way."  Upon arriving at 187 South Adams, Bray was met by English and the two proceeded into the house.  Lucas saw English and independently identified him as Price.  Bray indicated as well that English was Price.  Bray and English proceeded inside the house where they discussed Bray purchasing crack from English.  English told Price "I got your number, I'm gonna...I'll call you back with a price."  Bray responds "oh let me buy that."  To which English replied, "Nah, you can't get this.  This is a P-90 baby, Ruger 45."  Bray then dialed another number and states in part "You gonna have to walk back, alright?  Yeah, I'm coming to get you now."  When Price left the house and returned to the vehicle Lucas asked "What's the story?"  Bray responded "he said we got to deal with her."

Lucas then contacted Metcalf and asked "hey, we're going over back to Glessner to buy from her.  He told us to go.  Did you get a good recording of that?  Metcalf responded, "yes, I did.  If he has it now, if he had some good dope on him, why didn't he cop from him?"  Bray interjected, "that was a gun!"  The deal then proceeded with a woman who told Lucas to call her "Lil S."  Bray told Lil S at the conclusion of the buy, "Tell him I'm going to call him." And she replied "OK."

22

Examining the corroborated, undisputed portions of evidence presented leads the Court to conclude there was sufficient probable to prosecute Price. Lucas, wholly apart from Bray, identified Price as the person at South Adams, who then went inside with Bray and discussed the purchase of drugs. Lucas then confirmed with Metcalf that he, presumably Price (English) told them to go and buy from a woman. Metcalf responded yes. Just as Bray said, a woman met them outside of Price's Glessner address, sold them drugs, and Bray, in Lucas's presence, placed a call to someone that the drugs were short and someone ordered the woman to return $200, which she did. Thus, Lucas reasonably believed the woman was selling the drugs on behalf of someone else, confirming Bray's information that Price was sending a woman to complete the transaction. After its completion, the undisputed testimony shows the woman returned to the porch of Price's Glessner Avenue house. All of the aforementioned supports probable cause that Price was selling through a proxy.

The Court is not precluded from finding that officers are entitled to qualified immunity if they are mistaken. See *Hunter v. Bryant,* 502 U.S. 224, 229 (1991). The inquiry focuses on whether they acted reasonably. Here, Bray knew English, who both Bray and Lucas thought was Price, was selling drugs and offered to sell to Bray. Lucas identified English as Price based on Lucas's own personal observation and Lucas complied with directions for meeting the woman as described by Bray and confirmed by Metcalf. All the above support a finding that Lucas acted with probable cause in pursuing charges against Price with the prosecutor.

In considering the DEA-6 Report that was part of the materials the prosecutor relied on in deciding to indict, the only falsified portion was para. 4, which describes Metcalf and Faith observing Price departing 121 Glessner and following him to 187 South Adams. Faith admitted

23

at trial they neither observed Price leave 121 Glessner nor followed him to 187 South Adams. Even so, this was based on representations which Lucas would have no reason to doubt the veracity of and had a legal basis to rely upon.  Furthermore, this falsity does not defeat probable cause since Lucas still had the 2:05 PM telephone conversation of Bray and a woman and Bray and English agreeing to a drug deal, Lucas's personal identification of Price at the 187 South Adams location and then the corroborating evidence surrounding the buy itself.  Thus the Court finds Lucas had probable cause to pursue charges against Price and is entitled to qualified immunity of Plaintiff's malicious prosecution claim.

Because it is undisputed that the U.S. Attorney indicated he relied almost exclusively on Lucas's testimony, Reports and conversations, Plaintiff cannot show Cross, Mayer, Faith, Verhiley or Metcalf played any significant role in the decision to prosecute Price.   Particularly, Verhiley and Cross played no noticeable role in gathering evidence, recording events and prepared no reports describing the events of October 25, 2005.  Nor is there any evidence Lucas relied on their input to corroborate events as they unfolded.

Mayer, Faith and Metcalf offered corroborating evidence however, even in the absence of such there exists probable cause to prosecute based on Lucas's own observations, which none of the above officers were in a position to dispute.  Regardless, it was Lucas the prosecution relied on, Lucas who testified at the grand jury and Lucas who observed the critical transaction that formed the basis for the probable cause finding.

Furthermore, Price was arrested on November 2005 and his house was searched and drugs were found.  Shortly thereafter, Price made an agreement with the Government to plead to a one count Information for possession of drugs found in his house during the search.  In

24

exchange, the Government dropped all charges relating to controlled buy of October 25, 2005.

Thus, his continued incarceration was not due to charges arising from the controlled buy, but

rather was due to his own plea to illegal drugs found in his house at the time of his arrest.

Therefore, for the foregoing reasons, the Court finds Defendants are entitled to qualified

immunity on Plaintiff's Malicious Prosecution claim.

**False Arrest/False Imprisonment**

"A false arrest claim under federal law requires a plaintiff to prove that the arresting

officer lacked probable cause to arrest the plaintiff." *Voyticky v. Village of Timberlake, Ohio,*

412 F.3d 669, 677 (6th Cir.2005).  "Generally, the claims of false arrest and false imprisonment

by police officers acting while on duty are essentially the same since the alleged false

imprisonment arises out of and logically follows the arrest of plaintiffs." *Walker v. Schaeffer,*

854 F.2d 138, 142 (6th Cir.1988).  Probable cause is a defense to false imprisonment. *Id.*

Because this Court has already determined there was probable cause to arrest Price,

Defendants are entitled to qualified immunity on Plaintiff's claim for false arrest/ false

imprisonment.

**_Brady_ Violation**

Plaintiff contends the suppression, fabrication and distortion of evidence by Defendants

resulted in his being falsely arrested and violates his Fifth Amendment rights under *Brady v.*

*Maryland,* 373 U.S. 83, 87 (1963).  However, it is undisputed that Price was never tried but had

his controlled buy charges dropped before he went to trial and instead, pled to a one count

Information for drugs found in his house pursuant to a search.  Therefore, under binding Sixth

Circuit precedent, Plaintiff cannot maintain a *Brady* violation.  "Because the underlying criminal

proceeding terminated in appellant's favor, he has not been injured by the act of wrongful

suppression of exculpatory evidence." *McCune v. City of Grand Rapids* 842 F.2d 903, 907 (6th

Cir.,1988).  See also *Flores v. Satz*, 137 F.3d 1275, 1278-1279 (11th Cir. 1998) which held;

> Brady protects an accused's due process right to a fair trial. And, due process is
> violated when a defendant is convicted in a trial in which the prosecution failed to
> disclose to the defense exculpatory or impeachment evidence that undermines
> confidence in the outcome of the trial. Plaintiff, however, was never convicted
> and, therefore, did not suffer the effects of an unfair trial. As such, the facts of this
> case do not implicate the protections of *Brady*. (So long as the evidence is
> disclosed at trial in time for it to be put to effective use, a new trial will not be
> granted 'simply because [the *Brady* evidence] was not disclosed as early as it
> might have and, indeed, should have been. (Internal citations omitted).

> The same holds true if a Defendant pleads.  In *United States  v. Ruiz,* 536 US 622 (2002),

the Supreme Court held the government is not required to disclose impeaching material prior to a

plea.

> Therefore, Defendants are entitled to qualified immunity on Plaintiff's *Brady* violations

claim because it is undisputed that the Government dropped the charges prior to trial and Price

plead to a one count Information.

## **Fabricating Evidence**

The Sixth Circuit has held that, "a person's constitutional rights are violated when

evidence is knowingly fabricated and a reasonable likelihood exists that the false evidence would

have affected the decision of the jury." *Gregory v. City of Louisville,* 444 F.3d 725, 737 (6th

Cir.2006).   Plaintiff makes clear in his Brief in Opposition that his fabrication of evidence claim

is brought under the Fourth Amendment.  (Plaintiff's brief in opposition ii, 42).  There is no

dispute that a law enforcement officer violates a person's constitutional right when he

manufactures probable cause, and such a right was clearly established at the time of Price's

26

arrest and detention. "[A] reasonable police officer would know that fabricating probable cause, thereby effectuating a seizure, would violate a suspect's clearly established Fourth Amendment right to be free from unreasonable seizures." *Spurlock v. Satterfield* 167 F.3d 995, 1006 (6th Cir. 1999).

The Court has already determined there was sufficient, corroborative evidence relied on by Lucas, wholly apart from Bray's, that supported a probable cause determination, thus Plaintiff's claim of a Fourth Amendment violation for fabricating evidence must fail. Furthermore, Lucas has absolute immunity from liability under Section 1983 for his testimony before the grand jury even if he committed perjury. See *Macko v. Bryan* 760 F.2d 95 (1985).

**§1983 Conspiracy**

"A civil conspiracy under § 1983 is an agreement between two or more persons to injure another by unlawful action. To prevail on a civil conspiracy claim, [a plaintiff] must show that (1) a single plan existed, (2) [defendants shared in the general conspiratorial objective to deprive [plaintiff] of his constitutional (or federal statutory) rights, and (3) an overt act was committed in furtherance of the conspiracy that caused injury." *Bazzi v. City of Dearborn* 658 F.3d 598, 602 (6th Cir. 2011).

There is no evidence pointing to a single plan amongst the Defendants to deprive Price of his constitutional rights. It is undisputed Bray testified at Lucas's criminal trial that he (Bray) acted alone. Furthermore, conspiracy claims must be plead with specificity. Plaintiff's Complaint alleges a conspiracy claim in general terms, accusing all Defendants of tampering with evidence, staging drug deals and fabricating evidence. Plaintiff does not identify overt acts attributable to particular individuals. Thus, Plaintiff Conspiracy allegations fail to state a

27

cognizable claim and fails to support his conclusory claims with any evidence showing a single plan existed.

Therefore, Defendants are entitled to qualified immunity on Plaintiff's conspiracy claim.

For the foregoing reasons, the Court grants the Motions of Defendants Lee Lucas (ECF # 121), Larry Faith and Matt Mayer (ECF # 122), Robert Cross (ECF # 123), Thomas Verhiley (ECF # 125), and Charles Metcalf (ECF # 126) finding they are entitled to qualified immunity on all of Plaintiff's constitutional claims.

Plaintiff shall show cause why his remaining state law claims and childrens' claims should not be dismissed in light of the Court's ruling above.  Plaintiff shall file his brief no later than April 8, 2013.

IT IS SO ORDERED.


s/ Christopher A. Boyko
CHRISTOPHER A. BOYKO
United States District Judge

Dated:  March 28, 2013